# EXHIBIT A

1

2

3

4        IN THE CIRCUIT COURT OF THE STATE OF OREGON
              FOR THE COUNTY OF MULTNOMAH
5

6

| | |
|---|---|
| STATE OF OREGON ex rel. DAN RAYFIELD, Attorney General for the State of Oregon, | Case No. |
| | **COMPLAINT** |
| Plaintiff, | CLAIMS NOT SUBJECT TO MANDATORY ARBITRATION |
| V. | **ORS 20.140 - State fees deferred at filing** |
| ELI LILLY AND COMPANY; NOVO NORDISK INC.; SANOFI-AVENTIS U.S. LLC; EVERNORTH HEALTH, INC. (FORMERLY EXPRESS SCRIPTS HOLDING COMPANY); EXPRESS SCRIPTS, INC.; EXPRESS SCRIPTS ADMINISTRATORS, LLC; ESI MAIL PHARMACY SERVICE, INC.; EXPRESS SCRIPTS PHARMACY, INC.; ASCENT HEALTH SERVICES LLC; MEDCO HEALTH SOLUTIONS, INC.; CVS HEALTH CORPORATION; CVS PHARMACY, INC.; CAREMARK RX, LLC; CAREMARKPCS HEALTH, LLC; CAREMARK, LLC; ZINC HEALTH VENTURES, LLC; ZINC HEALTH SERVICES, LLC; UNITEDHEALTH GROUP, INC.; OPTUM, INC.; OPTUMRX, INC.; EMISAR PHARMA SERVICES LLC; OPTUMINSIGHT, INC.; AND OPTUMINSIGHT LIFE SCIENCES, INC., | DEMAND FOR JURY TRIAL |
| Defendants. | |

Page 1 – COMPLAINT
1010077716

1

## TABLE OF CONTENTS

2  **INTRODUCTION** ................................................................. **5**

3  **PARTIES**............................................................................ **14**

4      A.    Plaintiff ............................................................... 14

5      B.    Manufacturer Defendants ...................................... 15

6      C.    PBM Defendants .................................................. 20

7  **JURISDICTION AND VENUE**........................................... **57**

8  **FACTUAL ALLEGATIONS** ............................................... **58**

9      D.    Diabetes and Insulin Therapy ................................ 58

10         (1)    Diabetes: A growing epidemic ........................ 58

11         (2)    Insulin: A century old drug ........................... 60

12         (3)    Current diabetes medication landscape ........... 62

13         (4)    Insulin adjuncts: Type 2 medications ............. 64

14     E.    The Dramatic Rise in the Price of Diabetes Medications ........ 68

15         (1)    Diabetes medication price increases ............... 68

16     F.    Pharmaceutical Payment and Supply Chain ............ 78

17         (1)    Drug Costs for Diabetics .............................. 81

18         (2)    PBMs' role in the pharmaceutical payment chain ...... 82

19         (3)    The rise of the PBMs in the pharmaceutical supply chain ........ 86

20         (4)    Insular nature of the pharmaceutical industry........... 88

21     G.    The Insulin Pricing Scheme................................... 92

22     H.    Defendants' Congressional Testimony ................... 101

23     I.    Defendants Profit Off the Insulin Pricing Scheme ........... 109

24         (1)    Manufacturers Profit Off Insulin Pricing Scheme ......... 109

25         (2)    PBMs Profit Off Insulin Pricing Scheme........... 109
                  a)    PBMs profit off Manufacturer Payments........ 110
26                b)    PBMs profit off pharmacies........................ 118

Page 2 – COMPLAINT
1010077716

**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1              c)  PBM Defendants' captive mail order and retail
                         pharmacies are integral to the Insulin Pricing
2                           Scheme ................................................................. 119

3      J.  Defendants Deceived Oregon Diabetics and Payors .......................... 123

4          (1)  Manufacturer Defendants deceived Oregon diabetics and

5                   payors ................................................................. 123

6          (2)  PBM Defendants deceived Oregon diabetics and payors ......... 127

7      K.  The Insulin Pricing Scheme Has Damaged Diabetics and Payors ..... 145

8          (1)  Defendants' misconduct has caused increased healthcare

9                   costs ................................................................. 145

10         (2)  The Insulin Pricing Scheme has damaged Oregon

11                  diabetics and payors ................................................. 146

12      L.  Defendants' Recent Efforts in Response to Rising Insulin Prices ...... 149

13  **CLAIMS FOR RELIEF** ................................................................. **154**

14     (1)  Oregon Unlawful Trade Practices Act ..................................... 154

15         •  Count One: ORS 646.608(1)(e) – Against Each Defendant ...... 154

16         •  Count Two: ORS 646.608(1)(s) - Against Each Defendant ...... 162

17         •  Count Three: ORS 646.607(1) – Against Each Defendant ....... 167

18     (2)  Unjust Enrichment – Against Each Defendant ................................. 169

19  **JURY DEMAND** ................................................................. **171**

20  **PRAYER FOR RELIEF** ................................................................. **171**

21

22

23

24

25

26

**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1        **TABLE OF FIGURES**

2    Table 1: Diabetes medications at issue in this case ................................................. 67

3    Figure 1: Rising list prices of Humulin R (500U/mL) Vial 1997 –2023.................... 69

4    Figure 2: Rising list price increases for human insulins ........................................... 70

5    Figure 3: Rising list prices of Humalog vials and pens 1996 –2023......................... 71

6    Figure 4: Rising list prices of Levemir 2006 –2023.................................................. 72

7    Figure 5: Rising list prices of Novolog vials and pens 2001 –2023.......................... 73

8    Figure 6: Rising list prices of Lantus vials and pens 2001 –2023 ........................... 74

9    Figure 7: Rising list prices of long-acting insulins from 2006-2021 ........................ 76

10   Figure 8: Rising list prices of rapid-acting insulins from 2000-2021 ...................... 77

11   Figure 9: Rising list prices of Type 2 drugs ............................................................. 78

12   Figure 10: Diabetes drug distribution and payment chain........................................ 83

13   Figure 11: PBM consolidation .................................................................................. 87

14   Figure 12: Average Markups for Medicines Dispensed through Mail Order

15          versus other channels................................................................................. 122

16   Figure 13: Novolog VA Prices (Pink Dotted Line) vs. Novolog WAC Prices

17          (Blue Line) ................................................................................................ 140

18   Figure 14: Novolin VA Prices (Pink Dotted Line) vs. Novolin WAC Prices

19          (Blue Line) ................................................................................................ 141

20

21

22

23

24

25

26

Page 4 – COMPLAINT

1010077716

**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

## INTRODUCTION

1.

Diabetes is a serious public health concern in Oregon as approximately 350,000 Oregon residents are living with diabetes. An additional 1.1 million Oregon residents have prediabetes, which is when a person's blood sugar level is higher than it should be and signifies that the person is at greater risk for developing diabetes.

2.

Diabetes is one of the leading causes of blindness, kidney failure, and lower limb amputations despite the availability of effective treatment.

3.

The economic impact of diabetes is staggering. The total estimated cost of diagnosed diabetes in Oregon is $4.3 billion per year.

4.

Nearly all diabetics in Oregon rely on daily insulin treatments to survive, Type 2 diabetic treatments such as glucagon-like peptide-1 (GLP-1) drugs, or use a combination of both to treat and control diabetes.

5.

Defendants Eli Lilly, Novo Nordisk and Sanofi (collectively, "Manufacturer Defendants" or "Manufacturers") manufacture the vast majority of insulins and other diabetic medications available in Oregon.

6.

Defendants CVS Caremark, Express Scripts, and OptumRx ("PBM Defendants" or "PBMs") act as the gatekeepers to the pharmaceutical market, as these three corporate actors are at once: (1) the largest pharmacy benefit managers in the United States and in Oregon (controlling approximately 80% of the PBM market); (2) the largest pharmacies in the United States and in Oregon (making up 3

Page 5 – COMPLAINT
1010077716

1   of the top 5 dispensing pharmacies in the U.S.); and (3) owned by three of the largest

2   health insurers in the country (Express Scripts-Cigna, CVS Caremark-Aetna, and

3   OptumRx-UnitedHealth Group). These PBM conglomerates sit at 4th (UHG/Optum),

4   6th (CVS Health/Aetna), and 16th (Express Scripts/Cigna) on the Fortune 500 list of

5   the largest corporations by revenue.

6                                    7.

7        Because of their size and the roles their affiliated entities play in the

8   pharmaceutical system, CVS Caremark, OptumRx, and Express Scripts have near

9   complete and ubiquitous control of the pricing, dispensing, and reimbursement

10  systems for the at-issue diabetes medications for their covered lives.[1] The PBM

11  Defendants affect nearly every diabetic drug transaction in Oregon.

12                                   8.

13       While the PBM Defendants represent that they perform their services on

14  behalf of their clients (including Oregon payors)[2] and diabetics to lower drug prices,

15  increase access to affordable drugs, and promote diabetic health, these

16  representations are false.

17                                   9.

18       Rather, the PBM Defendants have worked in coordination with the

19  Manufacturer Defendants to distort the market for diabetic treatments to their

20  benefit at the expense of Oregon diabetics.

21

22

23  ─────────────────

[1] "Covered lives" refer to patients that are enrolled in health plans covered by a
24  PBM.

25  [2] The PBM Defendants' clients in Oregon, referred to herein "payors," include health
    insurers, employers, state and local governments, and unions who provide
26  prescription benefits for their employees and/or members.

DEPARTMENT OF JUSTICE
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1      10.

2      As part of their work, PBM Defendants design and implement drug

3   formularies (i.e., approved drug lists).

4      11.

5      Drug formularies are tiered lists which determine which drugs are available,

6   at what out-of-pocket costs, and with what restrictions for insured consumers.

7      12.

8      The PBM Defendants' formularies play a crucial role in their ability to control

9   drug availability and price.

10      13.

11      If a drug is not included on a formulary, then it is not covered by health

12   insurance.

13      14.

14      PBM Defendants understand that their standard formulary offerings drive

15   drug utilization and control access.

16      15.

17      Because the three PBM Defendants control 80% of the pharmacy benefit

18   market, unless they include a drug on one of their standard formulary offerings, it

19   functionally is not available to an estimated 80% of Oregon's insured citizens.

20      16.

21      The Manufacturers likewise understand that PBMs' standard formularies

22   drive drug utilization—if Manufacturers want their drugs to be prescribed and paid

23   for, they must obtain preferable formulary positions on the PBM Defendants'

24   formularies.

25      17.

26      Given the PBMs' market power and the crucial role their standard

DEPARTMENT OF JUSTICE
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1  formularies play in the pharmaceutical drug market, both Defendant groups

2  understand that the PBM Defendants wield enormous control over access, drug

3  prices, and drug purchasing behavior.

4                                    18.

5        The unconscionable and deceptive scheme described herein—referred to as the

6  Insulin Pricing Scheme—was born from this mutual understanding.

7                                    19.

8        Over the course of the last fifteen years, and pursuant to the Insulin Pricing

9  Scheme, Manufacturer Defendants have dramatically raised the list prices of their

10  respective diabetes drugs despite the fact that the cost to produce these drugs has

11  decreased during that same time period.

12                                    20.

13        The price for diabetes medications, which cost Manufacturer Defendants less

14  than $2 to produce and which were originally priced at $20 when released in the late

15  1990s, skyrocketed during the relevant time period to prices between $300 and $700,

16  and sometimes even more.

17                                    21.

18        Remarkably, nothing about these medications has changed; Defendants' $350

19  insulin is the exact drug Defendants originally sold for $20.

20                                    22.

21        The current unlawfully inflated price stands in stark contrast to insulin's

22  origins: the discoverers sold the original patent for $1 to ensure that the medication

23  would remain affordable. Today, insulin has become the poster child for skyrocketing

24  and inflated drug prices.

25                                    23.

26        Both Manufacturer and PBM Defendants play vital roles in and profit

Page 8 – COMPLAINT

**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1   immensely from the Insulin Pricing Scheme and the artificially-inflated prices

2   produced by it.

3                                         24.

4          Specifically, the Insulin Pricing Scheme works as follows: first, to gain

5   formulary access from the PBM Defendants for their diabetic treatments,

6   Manufacturer Defendants artificially and willingly raise their list prices, and then

7   pay a significant, yet undisclosed, portion of that price back to the PBMs. These

8   Manufacturer Payments[3] are provided under a variety of labels, yet, however they

9   are described, these Manufacturer Payments, along with the inflated list prices, are

10  quid pro quo for formulary inclusion on the PBMs' standard offerings.

11                                        25.

12         The PBM Defendants then grant preferred status[4] on their standard

13  formularies to the drugs with the largest Manufacturer Payments and the highest

14  list price, while at the same time excluding lower priced diabetic treatments.

---

[3] In the context of this Complaint, the term "Manufacturer Payments" is defined as all payments or financial benefits of any kind conferred by the Manufacturer Defendants to PBM Defendants (or a subsidiary, affiliated entity, or group purchasing organization or rebate aggregator acting on the PBM's behalf), either directly via contract or indirectly via Manufacturer-controlled intermediaries. Manufacturer Payments include rebates, administrative fees, inflation fees, pharmacy supplemental discounts, volume discounts, price or margin guarantees, price concessions, indirect purchase fees and rebates, and any other form of consideration exchanged. This broad definition is necessary because PBMs historically have continued to change and evolve the nature of their payment streams to avoid disclosure to clients and disclosure pursuant to state transparency laws. While the route by which the payment streams reach the PBMs has evolved, the fact that the payments do, in fact, reach the PBMs has remained the same.

[4] "Preferred status" on a formulary refers to a lower tier. The lower the tier a drug is on, the less the out of pocket costs the patient has to pay. Achieving lower tiered status for manufacturers often increases sales because prescribers are more likely to prescribe the drug with a lower out of pocket payment and the patient is more likely choose that drug.

Page 9 – COMPLAINT
1010077716

1      26.

2      To make matters worse, rather than fully pass through these Manufacturer

3  Payments to diabetics or their clients to lower the prices, the PBM Defendants

4  instead obfuscate and retain significant amounts of these Manufacturer Payments

5  as profit.

6      27.

7      Moreover, around 2012, PBM Defendants began to implement a bold new

8  formulary strategy by creating so-called "exclusionary" formularies which entirely

9  exclude (i.e., do not cover or list) one or more drugs used to treat the same condition.

10  The PBM Defendants created exclusionary formularies to further drive up their own

11  profits. As a result of exclusionary formularies, the PBM Defendants were able to

12  significantly increase the amount of Manufacturer Payments that they were

13  receiving from the Manufacturer Defendants.

14      28.

15      In order to maintain their profit margins, the Manufacturer Defendants

16  further raised their list prices in order to make larger and larger Manufacturer

17  Payments to the PBM Defendants.

18      29.

19      The list prices for the at-issue drugs have become so untethered from the net

20  prices realized by the Manufacturers as to constitute an unlawful price.[5]

21      30.

22      The Insulin Pricing Scheme creates a "best of both worlds" scenario for

23  Defendants. Manufacturer Defendants are able to make these undisclosed

24  Manufacturer Payments to buy preferred formulary position—which significantly

25  _____

26  [5] "Net price" refers to the Manufacturer Defendants' list price minus all the
    Manufacturer Payments made to the PBM Defendants.

Page 10 – COMPLAINT
1010077716

1 increases their revenue and protects their market share—without sacrificing their

2 profits.

3                                     31.

4       For the PBM Defendants—contrary to their representations—they make more

5 money from diabetic drugs with higher list prices and higher Manufacturer Payment

6 amounts.

7                                     32.

8       In particular, the PBM Defendants profit off the inflated list prices that result

9 from the Scheme in numerous ways, including: (1) retaining a significant—yet

10 undisclosed—percentage of the Manufacturer Payments, either directly or through

11 their affiliated rebate aggregators; (2) using the inflated list prices produced by the

12 Insulin Pricing Scheme to generate profits from pharmacies in their networks; and

13 (3) relying on those same inflated list prices to drive up the PBMs' profits through

14 their own retail, specialty, and mail order pharmacies.

15                                     33.

16       With respect to their affiliated pharmacies, the PBM Defendants steer their

17 clients' prescription-drug plans to those pharmacies, including Defendant CVS

18 Pharmacy and the PBM Defendants' affiliated mail order pharmacies, and then

19 overcharge for the at-issue drugs dispensed at those pharmacies to further profit

20 from the Insulin Pricing Scheme. PBM Defendants also collect additional

21 Manufacturer Payments (again tied to list price) from the Manufacturer Defendants

22 for the at-issue drugs sold through their captive pharmacies.

23                                     34.

24       Thus, while the PBM Defendants represent both publicly and to their clients

25 that they use their market power to drive down prices for diabetes medications and

26

Page 11 – COMPLAINT
1010077716

1   increase access to affordable drugs, these representations are misleading and

2   deceptive.

3                                   35.

4          Rather, the PBM and Manufacturer Defendants are working together to drive

5   up drug prices for Oregon diabetics and to foreclose access to lower-priced diabetic

6   treatments in order to increase their profits.

7                                   36.

8          Because the PBM Defendants control which drugs are available for the vast

9   majority of Oregon diabetics and because the price paid by nearly every diabetic and

10  payor is based upon the artificially-inflated list prices generated by Defendants'

11  scheme, the Insulin Pricing Scheme directly harms every diabetic and payor in

12  Oregon who purchase these life-sustaining drugs.

13                                  37.

14         The consequences to Oregon' public health caused by the Insulin Pricing

15  Scheme cannot be overstated.

16                                  38.

17         Oregon diabetics and payors have been overcharged millions of dollars a year

18  as a result of the Insulin Pricing Scheme.

19                                  39.

20         Further, the Insulin Pricing Scheme and the PBM Defendants' formulary

21  exclusions have cut off access for Oregon diabetics to lower-priced, affordable

22  diabetic treatments.

23                                  40.

24         For Oregon diabetics, the physical, emotional, and financial tolls caused by

25  the Insulin Pricing Scheme have been devastating. Unable to afford the drugs they

26  need to stay alive, many diabetics across the country ration or under-dose their

Page 12 – COMPLAINT

1010077716

1    diabetes medications, inject expired insulin, reuse needles, and starve themselves to

2    control their blood sugars. This behavior is extremely dangerous and has led to

3    serious complications or even death.

4                                            41.

5          In addition to the immeasurable human costs, the Insulin Pricing Scheme also

6    substantially increases healthcare costs for Oregon diabetics by increasing

7    preventable complications. For example, one national model found that all people

8    with diabetes adhering to their diabetes medications would save $8.3 billion in direct

9    medical costs per year by averting one million emergency department visits and

10   618,000 hospitalizations.

11                                           42.

12         Notably, on January 14, 2021, the US Senate Finance Committee released a

13   Staff Report titled "Insulin: Examining the Factors Driving the Rising Cost of a

14   Century Old Drug" ("January 2021 Senate Insulin Report"). This report was the

15   culmination of a two-year investigation based on hundreds of thousands of pages of

16   confidential Manufacturer and PBM documents. For the first time, these

17   confidential documents revealed key information demonstrating that it was the

18   Defendants' misconduct in furtherance of the Insulin Pricing Scheme that was the

19   driving force behind the precipitous price increases for diabetes medications.

20                                           43.

21         A year after the release of the January 2021 Senate Insulin Report, the

22   Federal Trade Commission ("FTC") began an investigation into PBM Defendant

23   practices ("FTC PBM Inquiry"). In its policy statement announcing this

24   investigation, the FTC cited specifically to the effect that Manufacturer Payments

25   have in the context of the exorbitant insulin prices and the devastating impact such

26   practices have on the lives of diabetics.

Page 13 – COMPLAINT
1010077716

1            44.

2        Following this investigation, on September 20, 2024, the FTC brought an

3    action against the PBM Defendants and their affiliated rebate aggregators (Ascent,

4    Emisar, Zinc) for engaging in the Insulin Pricing Scheme.

5            45.

6        The State of Oregon ("State"), through its Attorney General, now brings this

7    action pursuant to the Oregon Unlawful Trade Practices Act, ORS 646.605 et seq

8    (hereafter referred to as the "UTPA") and the Oregon common law on behalf of

9    Oregon consumers, including Oregon diabetics and payors, to protect the health and

10   economic well-being of Oregon residents.

11           46.

12       This action asserts causes for Defendants' violations of the UTPA and unjust

13   enrichment.

14           47.

15       This action seeks all available relief, including without limitation injunctive

16   relief, restitution, disgorgement, actual damages, civil penalties, and attorneys' fees

17   to address and abate the harm caused by the Insulin Pricing Scheme.

18                              **PARTIES**

19   **A.    Plaintiff**

20           48.

21   **Plaintiff, State of Oregon**. Attorney General Dan Rayfield bring this action

22   in the name of the State of Oregon ("State") under the authority granted by Oregon

23   law, including but not limited to the UTPA, the common law, and pursuant to *parens*

24   *patriae* authority.

25

26

Page 14 – COMPLAINT
1010077716

1    **B.    Manufacturer Defendants**

2                                    49.

3    **Defendant Eli Lilly and Company ("Eli Lilly")** is an Indiana corporation

4    with its principal place of business at Lilly Corporate Center, Indianapolis, Indiana

5    46285.

6                                    50.

7    Eli Lilly is registered to do business in Oregon and may be served through its

8    registered agent: National Registered Agents, Inc., 780 Commercial Street SE, Ste

9    100, Salem, Oregon 97301.

10                                   51.

11    Eli Lilly and Company holds 8 licenses with the Oregon Board of Pharmacy.

12                                   52.

13    In Oregon, Eli Lilly promotes and distributes several at-issue diabetes

14    medications: Humulin N, Humulin R, Humalog, Mounjaro, Trulicity, and Basaglar.

15                                   53.

16    Eli Lilly's global revenues in 2023 were $7.13 billion from Trulicity, $1.66

17    billion from Humalog, $852 million from Humulin, $5.16 billion from Mounjaro, and

18    $728 million from Basaglar.

19                                   54.

20    Eli Lilly's global revenues in 2022 were $7.43 billion from Trulicity, $2.06

21    billion from Humalog, $1.01 billion from Humulin, $482 million from Mounjaro, and

22    $760 million from Basaglar.

23                                   55.

24    Eli Lilly transacts business in Oregon, targeting Oregon for its products,

25    including the at-issue diabetes medications.

26

Page 15 – COMPLAINT
1010077716

1    56.

2    Eli Lilly employs sales representatives throughout Oregon to promote and sell

3    Humulin N, Humulin R, Humalog, Mounjaro, Trulicity and Basaglar.

4    57.

5    Eli Lilly also directs advertising and informational materials to Oregon

6    physicians, payors, pharmacies, and diabetics for the specific purpose of selling more

7    of the at-issue drugs in Oregon and profiting from the Insulin Pricing Scheme.

8    58.

9    At all times relevant hereto, in furtherance of the Insulin Pricing Scheme, Eli

10    Lilly caused its artificially-inflated list prices for the at-issue diabetes medications to

11    be published throughout Oregon with the express knowledge that payment and

12    reimbursement by Oregon diabetics and payors would be based on these prices.

13    59.

14    During the relevant time period, diabetics and payors in Oregon spent

15    millions of dollars per year out of pocket on Eli Lilly's at-issue drugs based on Eli

16    Lilly's artificially-inflated list prices.

17    60.

18    Oregon diabetics and payors paid for all of the Eli Lilly diabetes medications

19    in Oregon based on the specific inflated list prices Eli Lilly caused to be published in

20    Oregon in furtherance of the Insulin Pricing Scheme.

21    61.

22    **Defendant Sanofi-Aventis U.S. LLC ("Sanofi")** is a Delaware limited

23    liability company with its principal place of business at 55 Corporate Drive,

24    Bridgewater, New Jersey 08807.

25    62.

26    Sanofi is registered to do business in Oregon and may be served through its

Page 16 – COMPLAINT
1010077716

1   registered agent: Corporation Service Company, 1127 Broadway Street NE, Suite

2   310, Salem, Oregon 97301.

3                                          63.

4          Sanofi holds 3 licenses with the Oregon Board of Pharmacy and the Oregon

5   Department of Consumer and Business Services.

6                                          64.

7          Sanofi promotes and distributes pharmaceutical drugs in Oregon, including

8   several at-issue diabetes medications: Lantus, Toujeo, Soliqua, Adlyxin, and Apidra.

9                                          65.

10         Sanofi's global revenues in 2023 were $1.67 billion from Lantus and $1.32

11  billion from Toujeo, and $256 million from Soliqua. Apidra global revenues in 2020

12  were $391 million.

13                                         66.

14         Sanofi's global revenues in 2022 were $2.66 billion from Lantus, $1.31 billion

15  from Toujeo, and $253 million from Soliqua. Apidra global revenues in 2019 were

16  $405 million.

17                                         67.

18         Sanofi transacts business in Oregon and targets Oregon for its products,

19  including the at-issue diabetes medications.

20                                         68.

21         Sanofi employs sales representatives throughout Oregon to promote and sell

22  Lantus, Toujeo, Soliqua, Adlyxin, and Apidra.

23                                         69.

24         Sanofi also directs advertising and informational materials to Oregon

25  physicians, payors, pharmacies, and diabetics for the specific purpose of selling more

26  of the at-issue drugs in Oregon and profiting from the Insulin Pricing Scheme.

DEPARTMENT OF JUSTICE
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1    70.

2    At all times relevant hereto, in furtherance of the Insulin Pricing Scheme,

3    Sanofi caused its artificially-inflated list prices for the at-issue diabetes medications

4    to be published throughout Oregon with the express knowledge that payment and

5    reimbursement by Oregon diabetics and payors would be based on these prices.

6    71.

7    During the relevant time period, diabetics and payors in Oregon spent

8    millions of dollars per year out of pocket on Sanofi's at-issue drugs based on Sanofi's

9    artificially-inflated list prices.

10    72.

11    Oregon diabetics and payors paid for all of the Sanofi diabetes medications in

12    Oregon based on the specific inflated prices Sanofi caused to be published in Oregon

13    in furtherance of the Insulin Pricing Scheme.

14    73.

15    **Defendant Novo Nordisk Inc. ("Novo Nordisk")** is a Delaware

16    corporation with its principal place of business at 800 Scudders Mill Road,

17    Plainsboro, New Jersey 08536.

18    74.

19    Novo Nordisk is registered to do business in Oregon and may be served

20    through its registered agent: CT Corporation System, 780 Commercial Street SE, Ste

21    100, Salem, Oregon 97301.

22    75.

23    Novo Nordisk Inc holds 2 licenses with the Oregon Board of Pharmacy and

24    Oregon Department of Consumer and Business Services.

25    76.

26    Novo Nordisk promotes and distributes pharmaceutical drugs in Oregon,

**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1   including at-issue diabetic medications: Novolin R, Novolin N, Novolog, Levemir,

2   Tresiba, Victoza, Xultophy, Rybelsus, and Ozempic.

3                                    77.

4        Novo Nordisk's global revenues in 2023 were $3.13 billion from Novolog, $629

5   million from Levemir, $1.24 billion from Tresiba, $1.38 billion from Victoza, $515

6   million from Xultophy, $3 billion from Rybelsus, and $15.31 billion from Ozempic.

7                                    78.

8        Novo Nordisk's global revenues in 2022 were $3.7 billion from Novolog, $732

9   million from Levemir, $1.49 billion from Tresiba, $1.97 billion from Victoza, $449

10  million from Xultophy, $1.8 billion from Rybelsus, and $9.56 billion from Ozempic.

11                                 79.

12       Novo Nordisk transacts business in Oregon, targeting Oregon for its products,

13  including the at-issue diabetes medications.

14                                 80.

15       Novo Nordisk employs sales representatives throughout Oregon to promote

16  and sell Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza, Xultophy,

17  Rybelsus, and Ozempic.

18                                 81.

19       Novo Nordisk also directs advertising and informational materials to Oregon

20  physicians, payors, pharmacies, and diabetics for the specific purpose of selling more

21  of the at-issue drugs in Oregon and profiting from the Insulin Pricing Scheme.

22                                 82.

23       At all times relevant hereto, in furtherance of the Insulin Pricing Scheme,

24  Novo Nordisk caused its artificially-inflated list prices for the at-issue diabetes

25  medications to be published throughout Oregon with the express knowledge that

26

**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1  payment and reimbursement by Oregon diabetics and payors would be based on

2  these prices.

3                                          83.

4        During the relevant time period, diabetics and payors in Oregon spent

5  millions of dollars per year out of pocket on Novo Nordisk's at-issue drugs based on

6  Novo Nordisk's artificially-inflated list prices.

7                                          84.

8        Oregon diabetics and payors paid for all of the Novo Nordisk diabetes

9  medications in Oregon based on the specific inflated prices Sanofi caused to be

10  published in Oregon in furtherance of the Insulin Pricing Scheme.

11                                         85.

12       Collectively, Defendants Eli Lilly, Novo Nordisk, and Sanofi are referred to as

13  "Manufacturer Defendants" or "Manufacturers."

14  **C.     PBM Defendants**

15                                         86.

16  **Defendant CVS Health Corporation ("CVS Health")** is a Delaware

17  corporation with its principal place of business at One CVS Drive, Woonsocket,

18  Rhode Island 02895. CVS Health transacts business and has locations throughout

19  the United States and Oregon.

20                                         87.

21       CVS Health may be served through its registered agent: The Corporation

22  Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington,

23  Delaware 19801.

24                                         88.

25       CVS Health, through its executives and employees, including its CEO, Chief

26  Medical Officer, Executive Vice Presidents, Senior Executives in Trade Finance, and

Page 20 – COMPLAINT
1010077716

1     Chief Communication Officers, is directly involved in the PBM services and

2     formulary construction related to the Insulin Pricing Scheme that give rise to the

3     State's claims.

4                                89.

5       Throughout the relevant time, CVS Health and its predecessor[6] have

6     repeatedly, continuously, and explicitly stated that *CVS Health:*

7        (a)    "design[s] pharmacy benefit plans that minimize the costs to the client

8               while prioritizing the welfare and safety of the clients' members and

9               helping improve health outcomes;"

10       (b)    "negotiate[s] with pharmaceutical companies to obtain discounted

11             acquisition costs for many of the products on [CVS Health's] drug lists,

12             and these negotiated discounts enable [CVS Health] to offer reduced

13             costs to clients;"

14       (c)    "utilize[s] an independent panel of doctors, pharmacists and other

15             medical experts, referred to as its Pharmacy and Therapeutics

16             Committee, to select drugs that meet the highest standards of safety

17             and efficacy for inclusion on [CVS Health's] drug lists."

18                               90.

19       CVS Health publicly represents that CVS Health constructs programs that

20     lower the cost of the at-issue diabetes medications. For example, in 2016, CVS

21     Health announced a new program to "reduce overall spending in diabetes" that is

22     available in all states, including Oregon, stating:

23

24     ——————————

       [6] Until 2014, CVS Health was known as "CVS Caremark." In September 2014, CVS

25     Caremark Corporation announced that it is changing its corporate name to CVS
Health "to reflect its broader health care commitment and its expertise in driving

26     the innovations needed to shape the future of health."

Page 21 – COMPLAINT

**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1      *"CVS Health* introduced a new program available to help the
2      company's pharmacy benefit management (PBM) clients to
3      improve the health outcomes of their members, *lower pharmacy*
4      *costs [for diabetes medications]* through aggressive trend
5      management and decrease medical costs . . . [and that]
6      participating clients could save between $3000 to $5000 per year
7      for each member who successfully improves control of their
8      diabetes"* (emphasis supplied).

9                                                91.

10     In 2017, CVS Health stated that *"CVS Health* pharmacy benefit management

11     (PBM) strategies reduced trend for commercial clients to 1.9 percent per member per

12     year the lowest in five years. Despite manufacturer price increases of near 10

13     percent, *CVS Health* kept drug price growth at a minimal 0.2 percent."

14                                               92.

15     Throughout the relevant time period, the Manufacturer Defendants directly

16     engaged with CVS Health executives in furtherance of the Insulin Pricing Scheme.

17     Each Manufacturer Defendant has an entire team of executives dedicated

18     exclusively to interacting with CVS Health.

19                                               93.

20     Manufacturer Defendants have explicitly recognized that effectuating the

21     Insulin Pricing Scheme requires intimacy and connection between the Manufacturer

22     Defendants' leaders and CVS Health's leaders in order to align on strategic

23     formulary management initiatives to ensure profitable access.

24                                               94.

25     On a regular basis throughout the relevant period, the Manufacturer

26     Defendants' executive teams—which at times included their CEOs—met with CVS

Page 22 – COMPLAINT
1010077716

1  Health executives to discuss their coordinated efforts related to the at-issue drugs.

2  Examples include:

3     (a)   In at least 2011, 2012, 2014, and 2016, the leaders of CVS Health and
4           Novo Nordisk participated in executive exchange meetings in
5           furtherance of the Insulin Pricing Scheme. These meetings included the
6           Executive Vice President of CVS Health (Per Lofberg), the Chief
7           Medical Officer of CVS Health (Dr. Troy Brennan), members of CVS
8           Health's Enterprise Operating Committee (Matthew Leonard), and key
9           executives from Novo Nordisk.

10    (b)   In at least 2012, 2013, and 2017, the leaders of CVS Health and Eli
11          Lilly participated in numerous executive meetings in furtherance of the
12          Insulin Pricing Scheme. These meetings included the CEO of CVS
13          Health (Per Lofberg), the COO of CVS Health (Jon Roberts), members
14          of CVS Health's Enterprise Operating Committee (Matthew Leonard),
15          the President of Eli Lilly (Alex Azar), and the Senior Vice President of
16          Managed Care at Eli Lilly (Frank Cunningham), among others.

17    (c)   In at least 2012 and 2016, the leaders of CVS Health and Sanofi
18          participated in executive meetings which included discussions in
19          furtherance of the Insulin Pricing Scheme. These meetings included the
20          CEO of CVS Health, the COO of CVS Health and members of CVS
21          Health's Enterprise Operating Committee, among others.

22                                      95.

23        In November 2018, CVS Health acquired Aetna for $69 billion and became the

24  first combination of a major health insurer, PBM, mail order and retail pharmacy

25  chain. As a result, CVS Health controls the health plan/insurer, the PBM and the

26  pharmacies utilized by approximately 40 million Aetna members in the United

Page 23 – COMPLAINT
1010077716

1    States and in Oregon. CVS Health controls the entire drug pricing chain for these 40

2    million Americans.

3                                      96.

4        **Defendant CVS Pharmacy, Inc. ("CVS Pharmacy")** is a Rhode Island

5    corporation whose principal place of business is at the same location as CVS Health.

6    CVS Pharmacy is a wholly owned subsidiary of CVS Health.

7                                      97.

8        CVS Pharmacy owns and operates approximately 400 pharmacies throughout

9    Oregon that are directly involved in and profit from the Insulin Pricing Scheme.

10                                     98.

11       CVS Pharmacy, Inc. Holds 2 licenses with the Oregon Board of Pharmacy.

12                                     99.

13       In its capacity as a retail pharmacy, CVS Pharmacy, working in conjunction

14   with its corporate affiliate entities, knowingly assisted the CVS Health family in

15   profiting from the Insulin Pricing Scheme by pocketing the spread between

16   acquisition cost for the drugs at issue (an amount well below the list price generated

17   by the Insulin Pricing Scheme), and the amounts received from payors (which

18   amounts were based on the artificially-inflated list prices and, in many cases, were

19   set by CVS Caremark in its capacity as a PBM).

20                                     100.

21       CVS Pharmacy is the immediate and direct parent of Defendant Caremark

22   Rx, LLC.

23                                     101.

24       CVS Pharmacy is registered to do business in Oregon and may be served

25   through its registered agent: CT Corporation System, 780 Commercial Street SE, Ste

26   100, Salem, Oregon 97301.

Page 24 – COMPLAINT
1010077716

**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1    102.

2    During the relevant time period, CVS Pharmacy provided retail pharmacy

3    services in Oregon that gave rise to the Insulin Pricing Scheme, which damaged

4    Oregon diabetics and payors.

5    103.

6    **Defendant Caremark Rx, LLC** is a Delaware limited liability company and

7    its principal place of business is at the same location as CVS Pharmacy and CVS

8    Health.

9    104.

10    Caremark Rx, LLC is a wholly owned subsidiary of Defendant CVS Pharmacy.

11    105.

12    Caremark Rx, LLC may be served through its registered agent: The

13    Corporation Trust Company, Corporation Trust Center, 1209 Orange Street,

14    Wilmington, Delaware 19801.

15    106.

16    During the relevant time period, Caremark Rx, LLC provided PBM and mail

17    order pharmacy services in Oregon that gave rise to the Insulin Pricing Scheme and

18    damaged diabetics and payors in Oregon.

19    107.

20    **Defendant Caremark, LLC** is a California limited liability company whose

21    principal place of business is at the same location as CVS Health. Caremark, LLC is

22    a wholly owned subsidiary of Caremark Rx, LLC.

23    108.

24    Caremark, LLC is registered to do business in Oregon and may be served

25    through its registered agent: CT Corporation System, 780 Commercial Street SE, Ste

26    100, Salem, Oregon 97301.

Page 25 – COMPLAINT
1010077716

1          109.

2          Caremark, LLC holds 2 licenses with the Oregon Division of Financial

3    Regulation and the Oregon Department of Consumer and Business Services.

4          110.

5          During the relevant time period, Caremark, LLC provided PBM and mail

6    order pharmacy services in Oregon that gave rise to the Insulin Pricing Scheme,

7    which damaged diabetics in Oregon.

8          111.

9          **Defendant CaremarkPCS Health, LLC** is a Delaware limited liability

10   company whose principal place of business is at the same location as CVS Health.

11   CVS Health is the direct or indirect parent company of CaremarkPCS Health LLC.

12         112.

13         CaremarkPCS Health, LLC provides pharmacy benefit management services.

14         113.

15         CaremarkPCS Health, LLC is registered to do business in Oregon and may be

16   served through its registered agent: CT Corporation System, 780 Commercial Street

17   SE, Ste 100, Salem, Oregon 97301.

18         114.

19         CaremarkPCS Health, LLC holds 2 licenses with the Oregon Division of

20   Financial Regulation and the Oregon Department of Consumer and Business

21   Services.

22         115.

23         During the relevant time period, CaremarkPCS Health, LLC provided PBM

24   services in Oregon, which gave rise to the Insulin Pricing Scheme and damaged

25   diabetics and payors in Oregon.

26

Page 26 – COMPLAINT
1010077716

1     116.

2     **Defendant Zinc Health Ventures, LLC** is a Delaware limited liability

3     company whose principal place of business is at the same location as CVS Health.

4     117.

5     Zinc Health Ventures, LLC provides PBM services, including Manufacturer

6     Payment negotiations on behalf of Oregon payors and patients.

7     118.

8     Zinc Health Ventures, LLC may be served through its registered agent: The

9     Corporation Trust Company, Corporation Trust Center, 1209 Orange Street,

10    Wilmington, Delaware 19801.

11    119.

12    **Defendant Zinc Health Services, LLC** is a Delaware limited liability

13    company whose principal place of business is at the same location as CVS Health.

14    120.

15    Zinc Health Services, LLC provides PBM services, including Manufacturer

16    Payment negotiations on behalf of Oregon payors and patients.

17    121.

18    Zinc Health Services, LLC may be served through its registered agent: The

19    Corporation Trust Company, Corporation Trust Center, 1209 Orange Street,

20    Wilmington, Delaware 19801.

21    122.

22    Zinc Health Services, LLC and Zinc Health Ventures, LLC are referred to

23    collectively as "Zinc Health."

24    123.

25    As a result of numerous interlocking directorships and shared executives,

26    Caremark Rx, LLC, CVS Pharmacy, and CVS Health are directly involved in the

Page 27 – COMPLAINT
1010077716

1   conduct of and control CaremarkPCS Health, LLC, Zinc Health, and Caremark,

2   LLC's operations, management and business decisions related to the at-issue

3   formulary construction, Manufacturer Payments, and mail order and retail

4   pharmacy services to the ultimate detriment of diabetics in Oregon. For example:

5        (a)    During the relevant time period, these parent and subsidiaries have

6               had common officers and directors. Examples include:

7           (i)    Thomas S. Moffatt was Vice President and Secretary of

8                  Caremark Rx, LLC, CaremarkPCS Health, LLC, and Caremark,

9                  LLC at the same time he was a Vice President, Assistant

10               Secretary, and Assistant General Counsel at CVS Health and

11               Director, Vice President, and Secretary at CVS Pharmacy;

12          (ii)   Melanie K. Luker was the Assistant Secretary of CVS Pharmacy,

13               Caremark Rx, LLC, CaremarkPCS Health, LLC, and Caremark,

14               LLC at the same time she was a Senior Manager of Corporate

15               Services at CVS Health;

16          (iii)  Jonathan C. Roberts was an Executive Vice President and Chief

17               Operating Officer at CVS Health at the same time he was CEO

18               of Caremark Rx, LLC;

19          (iv)  Daniel P. Davison was the President of CaremarkPCS Health,

20               LLC at the same time he was a Senior Vice President at CVS

21               Health;

22          (v)    Annie E. Klis was a Vice President at CVS Health at the same

23               time she was CEO of Caremark, LLC.

24        (b)    CVS Health directly or indirectly owns all the stock of CVS Pharmacy,

25               Caremark Rx, LLC, Zinc Health, Caremark, LLC and CaremarkPCS

26               Health, LLC.

Page 28 – COMPLAINT

**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1      (c)     All of the executives of CaremarkPCS Health, LLC, Caremark, LLC,

2              Caremark Rx, LLC, Zinc Health, and CVS Pharmacy ultimately report

3              to the executives at CVS Health, including the President and CEO of

4              CVS Health.

5      (d)     CVS Health, as a corporate family, does not operate as separate

6              entities. The public filings, documents, and statements of CVS Health

7              presents its subsidiaries, including CVS Pharmacy, CaremarkPCS

8              Health, LLC, Caremark, LLC, Zinc Health, and Caremark Rx, LLC as

9              divisions or departments of one unified "diversified health services

10            company" that "works together across our disciplines" to "create

11            unmatched human connections to transform the health care

12            experience." The day-to-day operations of this corporate family reflect

13            these public statements. These entities are a single business enterprise

14            and should be treated as such as to all legal obligations discussed in

15            this Complaint. The CVS Health enterprise and each of these entities,

16            both individually and collectively, engaged in the at-issue conduct that

17            gave rise to the Insulin Pricing Scheme.

18                              124.

19      Collectively, Defendants CVS Health, CVS Pharmacy, Caremark Rx, LLC,

20  Caremark, LLC, Zinc Health, and CaremarkPCS Health, LLC, including all

21  predecessor and successor entities, are referred to as "CVS Caremark."

22                              125.

23      CVS Caremark is named as a Defendant in its capacities as a PBM and retail

24  and mail order pharmacy.

25                              126.

26      In its capacity as a PBM, CVS Caremark coordinates with Novo Nordisk, Eli

1010077716

DEPARTMENT OF JUSTICE
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1   Lilly, and Sanofi regarding the artificially-inflated list prices for the at-issue

2   diabetes medications, the placement of these firms' diabetes medications on CVS

3   Caremark's formularies, and the exclusion of lower-priced diabetes medications.

4                                      127.

5          CVS Caremark has the largest PBM market share based on total prescription

6   claims managed, representing approximately 40% of the national market. CVS

7   Caremark's pharmacy services segment generated over $150 billion in total revenues

8   last year. CVS Health's revenue increased to over $350 billion in 2023.

9                                      128.

10          At all times relevant hereto, CVS Caremark offered pharmacy benefit services

11  to Oregon payors and diabetics, and derived substantial revenue therefrom, and, in

12  doing so, made the at-issue misrepresentations (discussed below) and utilized the

13  artificially-inflated prices generated by the Insulin Pricing Scheme to profit off

14  Oregon diabetics and payors.

15                                      129.

16          At all times relevant hereto, CVS Caremark constructed standard formularies

17  that are used nationwide, including by CVS Caremark's payor clients in Oregon and

18  that are relied on by residents in Oregon with diabetes and payors as promoting

19  diabetic health, increasing access to affordable diabetes medications, and lowering

20  the price of the at-issue drugs. During the relevant time period, these standard

21  formularies included drugs produced by the Manufacturer Defendants, including the

22  at-issue diabetes medications.

23                                      130.

24          At all times relevant hereto, and contrary to all its express representations,

25  CVS Caremark has insisted that its payor clients, including in Oregon, use the

26

Page 30 – COMPLAINT
1010077716

1  artificially-inflated list prices produced by the Insulin Pricing Scheme as the basis

2  for payment and reimbursement for the at-issue drugs.

3                                              131.

4        At all times relevant hereto, CVS Caremark has concealed its critical role in

5  the generation of those artificially-inflated list prices.

6                                              132.

7        In its capacity as a mail order and retail pharmacy, CVS Caremark dispensed

8  the at-issue drugs to Oregon diabetics and received payments from Oregon diabetics

9  and payors based on the artificially-inflated prices produced by the Insulin Pricing

10 Scheme and, as a result, damaged Oregon diabetics and payors.

11                                             133.

12       In its capacity as a retail pharmacy, CVS Caremark further profited from the

13 artificially-inflated list prices produced by the Insulin Pricing Scheme by pocketing

14 the spread between acquisition cost for the drugs at issue (an amount well below the

15 list price generated by the Insulin Pricing Scheme), and the amounts they received

16 from payors (which amounts were based on the artificially-inflated list prices and, in

17 many cases, were set by CVS Caremark in its capacity as a PBM).

18                                             134.

19       CVS Caremark purchases drugs produced by the Manufacturer Defendants,

20 including the at-issue diabetes medications, for dispensing through its mail order

21 and retail pharmacies including those located in Oregon.

22                                             135.

23       At all times relevant hereto, CVS Caremark had express agreements with

24 Defendants Novo Nordisk, Sanofi, and Eli Lilly related to the Manufacturer

25 Payments paid to CVS Caremark and placement on CVS Caremark's standard

26 formularies, as well as agreements related to the Manufacturers' at-issue drugs sold

Page 31 – COMPLAINT
1010077716

1   through CVS Caremark's mail order and retail pharmacies, including those located

2   in Oregon.

3                                    136.

4          **Defendant Evernorth Health, Inc. ("Evernorth"),** formerly known as

5   Express Scripts Holding Company, is a Delaware corporation with its principal place

6   of business at 1 Express Way, St. Louis, Missouri 63121.

7                                    137.

8          Evernorth may be served through its registered agent: The Corporation Trust

9   Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware

10  19801.

11                                   138.

12         Evernorth, through its executives and employees is directly involved in

13  shaping the company policies that inform its PBM services and formulary

14  construction, including with respect to the at-issue drugs, related to the Insulin

15  Pricing Scheme. For example, during the relevant time period Evernorth's CEO Tim

16  Wentworth was involved in communications with the Manufacturer Defendants

17  related to the at-issue drugs and at-issue Manufacturer Payments.

18                                   139.

19         Evernorth's conduct has had a direct effect in Oregon and damaged diabetics

20  in Oregon.

21                                   140.

22         On a regular basis, Evernorth executives and employees communicate with

23  and direct its subsidiaries related to the at-issue PBM services and formulary

24  activities.

25                                   141.

26         Throughout the relevant time period, the Manufacturer Defendants directly

Page 32 – COMPLAINT

1010077716

1    engaged with Evernorth executives in furtherance of the Insulin Pricing Scheme.

2    Each Manufacturer Defendant has an entire team of executives dedicated

3    exclusively to interacting with Evernorth.

4                                    142.

5         Manufacturers recognize that effectuating the Insulin Pricing Scheme

6    requires relationships with the executives between the Manufacturers and

7    Evernorth.

8                                    143.

9         On a regular basis throughout the relevant time period, these Manufacturer

10   executive teams—which at times include the CEOs from these companies—met with

11   Evernorth to discuss their coordinated efforts related to the at-issue drugs.

12   Examples include:

13        (a)    In at least 2013, 2014, 2015, 2017, and 2018, the leaders of Evernorth

14               and Eli Lilly participated in executive meetings in furtherance of the

15               Insulin Pricing Scheme. These meetings included the CEO of Evernorth

16               (George Paz), Senior Director of Express Scripts Pharmaceutical

17               Strategies & Solutions (Jason Zilocchi), CEO of Eli Lilly (John

18               Lechlieter), and Head of Eli Lilly's diabetes division (Enrique

19               Conterno), among others.

20        (b)    In at least 2013, 2014, and 2016, the leaders of Evernorth and Novo

21               Nordisk participated in executive meetings in furtherance of the

22               Insulin Pricing Scheme.

23        (c)    In at least 2014, 2015, 2016, and 2017, the leaders of Evernorth and

24               Sanofi participated in "Customer Exchange" and Pharmaceutical Care

25               Management Association ("PCMA") executive meetings, which included

26               discussions in furtherance of the Insulin Pricing Scheme. These

Page 33 – COMPLAINT
1010077716

1    meetings included the Chairman and CEO of Evernorth, the former

2    President and current CEO of Evernorth, the Global CEO of Sanofi and

3    Chief Medical Officer of Sanofi, among others.

4                                            144.

5    Evernorth is the immediate or indirect parent of pharmacy and PBM

6    subsidiaries that operate throughout Oregon, which engaged in the activities that

7    gave rise to this Complaint.

8                                            145.

9    In December 2018, Evernorth merged with Cigna in a $67 billion deal to

10   consolidate their businesses as a major health insurer, PBM and mail order

11   pharmacy. As a result, the Evernorth corporate family controls the health

12   plan/insurer, the PBM and the mail order pharmacies utilized by approximately 15

13   million Cigna members in the United States, including many in Oregon. Evernorth

14   controls the entire drug pricing chain for these 15 million Americans.

15                                           146.

16   In each annual report for at least the last decade, Evernorth has repeatedly,

17   continuously, and explicitly stated:

18   (a)    "[Evernorth] is one of the largest PBMs in North America . . . [and

19          Evernorth] help[s] health benefit providers address access and

20          affordability concerns resulting from rising drug costs while helping to

21          improve healthcare outcomes."

22   (b)    "[Evernorth] manage[s] the cost of the drug benefit by . . . assist in

23          controlling costs; evaluat[es] drugs for efficacy, value and price to

24          assist[ing] clients in selecting a cost-effective formulary; [and] offer[s]

25          cost-effective home delivery pharmacy and specialty services that result

26          in cost savings for plan sponsors [and better care for members]

Page 34 – COMPLAINT
1010077716

1  leveraging purchasing volume to deliver discounts to health benefit

2  providers."

3  (c)  "[Evernorth] works with clients, manufacturers, pharmacists and

4  physicians to increase efficiency in the drug distribution chain, to

5  manage costs in the pharmacy benefit chain and to improve members'

6  health outcomes."

7  147.

8  **Defendant Express Scripts, Inc.** is a Delaware corporation and is a wholly

9  owned subsidiary of Defendant Evernorth. Express Scripts, Inc.'s principal place of

10  business is at the same location as Evernorth.

11  148.

12  Express Scripts, Inc. is registered to do business in Oregon and may be served

13  through its registered agent: CT Corporation System, 780 Commercial Street SE, Ste

14  100, Salem, Oregon 97301.

15  149.

16  Express Scripts, Inc. holds 9 licenses with the Oregon Board of Pharmacy and

17  the Oregon Department of Consumer and Business Services.

18  150.

19  Express Scripts, Inc. is the immediate or indirect parent of pharmacy and

20  PBM subsidiaries that operate throughout Oregon that engaged in the conduct,

21  which gives rise to this Complaint.

22  151.

23  During the relevant time period, Express Scripts Inc. was directly involved in

24  the PBM and mail order pharmacy services, which gave rise to the Insulin Pricing

25  Scheme and damaged diabetics and payors in Oregon.

26

Page 35 – COMPLAINT
1010077716

1        152.

2        **Defendant Express Scripts Administrators, LLC,** is a Delaware limited

3    liability company and is a wholly owned subsidiary of Evernorth. Express Scripts

4    Administrators, LLC's principal place of business is at the same location as

5    Evernorth.

6        153.

7        Express Scripts Administrators, LLC may be served through its registered

8    agent: CT Corporation System, 780 Commercial Street SE, Ste 100, Salem, Oregon

9    97301.

10        154.

11        Express Scripts Administrators, LLC holds 2 licenses with Oregon Division of

12    Financial Regulation and the Oregon Department of Consumer and Business

13    Services.

14        155.

15        During the relevant time period, Express Scripts Administrators, LLC

16    provided the PBM services in Oregon discussed in this Complaint that gave rise to

17    the Insulin Pricing Scheme that damaged diabetics and payors in Oregon.

18        156.

19        **Defendant Medco Health Solutions, Inc. ("Medco")** is a Delaware

20    Corporation with its principal place of business located at 100 Parsons Pond Road,

21    Franklin Lakes, New Jersey.

22        157.

23        Medco is registered to do business in Oregon and may be served through its

24    registered agent: CT Corporation System, 780 Commercial Street SE, Ste 100,

25    Salem, Oregon 97301.

26

Page 36 – COMPLAINT
1010077716

1        158.

2        Prior to merging with Express Scripts, Medco provided the at-issue PBM and

3    mail order pharmacy services in Oregon, which gave rise to the Insulin Pricing

4    Scheme and damaged diabetics and payors in Oregon.

5        159.

6        In 2012, Express Scripts acquired Medco for $29 billion.

7        160.

8        Prior to the merger, Express Scripts and Medco were two of the largest PBMs

9    in the United States and in Oregon.

10       161.

11       Prior to the merger, Medco provided the at-issue PBM and mail-order

12   pharmacy services in Oregon, which gave rise to the Insulin Pricing Scheme and

13   damaged diabetics and payors in Oregon.

14       162.

15       Following the merger, all of Medco's PBM and mail order pharmacy functions

16   were combined into Express Scripts. The combined company (Medco and Express

17   Scripts) continued under the name Express Scripts with all of Medco's payor

18   customers becoming Express Scripts' customers. The combined company covered

19   over 155 million lives at the time of the merger.

20       163.

21       At the time of the merger, on December 6, 2011, in his testimony before the

22   Senate Judiciary Committee, then CEO of Medco, David B Snow, publicly

23   represented that "the merger of Medco and Express Scripts will result in immediate

24   savings to our clients and, ultimately, to consumers. This is because our combined

25   entity will achieve even greater [Manufacturer Payments] from drug manufacturers

26   and other suppliers."

Page 37 – COMPLAINT

DEPARTMENT OF JUSTICE
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1      164.

2      The then-CEO of Express Scripts, George Paz, during a Congressional

3  subcommittee hearing in September 2011, echoed these sentiments: "A combined

4  Express Scripts and Medco will be well-positioned to protect American families from

5  the rising cost of prescription medicines."

6      165.

7      **Defendant ESI Mail Pharmacy Service, Inc.** is a Delaware corporation

8  and is a wholly owned subsidiary of Defendant Evernorth. ESI Mail Pharmacy

9  Service, Inc.'s principal place of business is at the same location as Evernorth.

10      166.

11      ESI Mail Pharmacy Service, Inc. may be served through its registered agent:

12  CT Corporation System, 780 Commercial Street SE, Ste 100, Salem, Oregon 97301.

13      167.

14      During the relevant time period, ESI Mail Pharmacy Service, Inc. provided

15  the mail order pharmacy services in Oregon discussed in this Complaint, which gave

16  rise to the Insulin Pricing Scheme and damaged diabetics in Oregon.

17      168.

18      **Defendant Express Scripts Pharmacy, Inc.** is a Delaware corporation and

19  is a wholly owned subsidiary of Defendant Evernorth. Express Scripts Pharmacy,

20  Inc.'s principal place of business is at the same location as Evernorth.

21      169.

22      Express Scripts Pharmacy, Inc. is registered to do business in Oregon and

23  may be served through its registered agent: CT Corporation System, 780

24  Commercial Street SE, Ste 100, Salem, Oregon 97201.

25      170.

26      During the relevant time period, Express Scripts Pharmacy, Inc. provided the

Page 38 – COMPLAINT
1010077716

1    mail order pharmacy services in Oregon discussed in this Complaint, which gave rise

2    to the Insulin Pricing Scheme and damaged diabetics and payors in Oregon.

3                                        171.

4           Collectively, ESI Mail Pharmacy Service, Inc and Express Scripts Pharmacy,

5    Inc are referred to herein as "Express Scripts Pharmacy."

6                                        172.

7           **Defendant Ascent Health Services LLC. ("Ascent Health")** is a

8    Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth.

9    Ascent Health's principal place of business is at Muhlentalstrasse 36, 8200

10   Schaffhausen, Switzerland.

11                                       173.

12          Ascent Health may be served through its registered agent: The Corporation

13   Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington,

14   Delaware 19801.

15                                       174.

16          During the relevant time period, Ascent Health provided PBM services,

17   including Manufacturer Payment negotiations on behalf of Oregon diabetics and

18   payors.

19                                       175.

20          As a result of numerous interlocking directorships and shared executives,

21   Evernorth and Express Scripts, Inc. are directly involved in the conduct of and

22   control Express Scripts Administrators, LLC, Ascent Health, Medco Health

23   Solutions, Inc., ESI Mail Pharmacy Service, Inc., and Express Scripts Pharmacy,

24   Inc's operations, management and business decisions related to the at-issue

25   formulary construction, Manufacturer Payments, and mail order pharmacy services

26   to the ultimate detriment of Oregon diabetics. For example:

Page 39 – COMPLAINT
1010077716

1     (a)    During the relevant time period, these parent and subsidiaries have

2          had common officers and directors:

3           (i)    Shared officers and/or directors between Express Scripts, Inc.

4                 and Evernorth include Bradley Phillips, Chief Financial Officer;

5                 David Queller, President; Jill Stadelman, Secretary; Timothy

6                 Smith, Vice President; and Scott Lambert, Treasury Manager

7                 Director;

8           (ii)   Common executives between Express Scripts Administrators,

9                 LLC and Evernorth include Bradley Phillips, Chief Financial

10               Officer; and Priscilla Duncan, Associate Secretary;

11        (iii)  Shared officers and/or directors between ESI Mail Pharmacy

12               Service, Inc. and Evernorth include Bradley Phillips, Chief

13               Financial Officer; Priscilla Duncan, Associate Secretary; and

14               Joanne Hart, Associate Treasurer;

15        (iv)  Shared officers and/or directors between Express Scripts

16               Pharmacy, Inc. and Evernorth include Bradley Phillips, Chief

17               Financial Officer; Jill Stadelman, Secretary; Scott Lambert,

18               Treasury Manager Director; and Joanne Hart, Associate

19               Treasurer; and

20        (v)   Shared officers and/or directors between Medco Health Solutions,

21               Inc. and Evernorth include David Queller, President and Senior

22               VP of Sales & Accounting; Christine Houston, VP and COO;

23               Timothy Smith, VP and Treasurer; and all of the officers of

24               Medco Health Solutions are also officers of Express Scripts, Inc.

25    (b)    Evernorth directly or indirectly owns all the stock of Express Scripts

26          Administrators, LLC, Medco Health Solutions, Inc., ESI Mail

Page 40 – COMPLAINT
1010077716

1    Pharmacy Service, Inc., Express Scripts Pharmacy, Inc. and Express

2    Scripts, Inc.

3    (c)    The Evernorth corporate family does not operate as separate entities.

4         The public filings, documents, and statements of Evernorth presents its

5         subsidiaries, including Express Scripts Administrators, LLC, Medco

6         Health Solutions, Inc., Ascent Health, ESI Mail Pharmacy Service, Inc.,

7         Express Scripts Pharmacy, Inc., and Express Scripts, Inc. as divisions

8         or departments of a single company that "unites businesses that have

9         as many as 30+ years of experience . . . [to] tak[e] health services

10         further with integrated data and analytics that help us deliver better

11         care to more people." The day-to-day operations of this corporate family

12         reflect these public statements. All of these entities are a single

13         business enterprise and should be treated as such as to all legal

14         obligations detailed in this Complaint. The Evernorth enterprise and

15         each of these entities, both individually and collectively, engaged in the

16         at-issue conduct that gave rise to the Insulin Pricing Scheme.

17    (d)    All of the executives of Express Scripts Administrators, LLC, ESI Mail

18         Pharmacy Service, Inc., Ascent Health, Medco Health Solutions, Inc.,

19         Express Scripts Pharmacy, Inc., and Express Scripts, Inc. ultimately

20         report to the executives, including the CEO, of Evernorth.

21    (e)    As stated above, Evernorth's CEO and other executives and officers are

22         directly involved in the policies and business decisions of Express

23         Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Medco

24         Health Solutions, Inc., Ascent Health, Express Scripts Pharmacy, Inc.,

25         and Express Scripts, Inc. that give rise to the State's claims in this

26         Complaint.

Page 41 – COMPLAINT
1010077716

1    176.

2    Collectively, Defendants Evernorth Health, Inc., Express Scripts, Inc.,

3    Express Scripts Administrators, LLC, Ascent Health, ESI Mail Pharmacy Service,

4    Inc., Medco Health Solutions, Inc., and Express Scripts Pharmacy, Inc., including all

5    predecessor and successor entities, are referred to as "Express Scripts."

6    177.

7    Express Scripts is named as a Defendant in its capacities as a PBM and mail

8    order pharmacy.

9    178.

10    In its capacity as a PBM, Express Scripts coordinates with Novo Nordisk, Eli

11    Lilly, and Sanofi regarding the artificially-inflated list prices for the at-issue

12    diabetes medications, the placement of these firms' diabetes medications on Express

13    Scripts' formularies, and the exclusion of lower priced diabetes medications.

14    179.

15    Prior to merging with Cigna in 2019, Express Scripts was the largest

16    independent PBM in the United States. During the relevant period of this

17    Complaint, Express Scripts controlled 30% of the PBM market in the United States.

18    180.

19    Express Scripts has only grown larger since the Cigna merger.

20    181.

21    Express Scripts' annual revenue is over $100 billion.

22    182.

23    Express Scripts has approximately 65,000 retail pharmacies in its pharmacy

24    networks, representing over 98% of all retail pharmacies in the nation.

25    183.

26    At all times relevant hereto, Express Scripts offered pharmacy benefit

Page 42 – COMPLAINT
1010077716

1  services, and derived substantial revenue therefrom, in Oregon and provided the at-

2  issue PBM services to numerous payors and diabetics in Oregon.

3                                                    184.

4        At all times relevant hereto, and contrary to all of their express

5  representations, Express Scripts has insisted that its payor clients, including those

6  in Oregon, use the artificially-inflated list prices produced by the Insulin Pricing

7  Scheme as the basis for reimbursement of the at-issue drugs.

8                                                    185.

9        At all times relevant hereto, Express Scripts has concealed its critical role in

10  the generation of those artificially-inflated list prices.

11                                                   186.

12       At all times relevant hereto, Express Scripts constructed standard formularies

13  that are used nationwide, including by Express Scripts' payor clients in Oregon, and

14  that are relied on by Oregon diabetics and payors as promoting diabetic health,

15  increasing access to affordable diabetes medications, and lowering the price of the

16  at-issue drugs. During the relevant time period, these standard formularies included

17  the at-issue diabetes medications and excluded lower-priced drugs.

18                                                   187.

19       During certain years when some of the largest at-issue price increases

20  occurred, including in 2013 and 2014, Express Scripts worked directly with

21  OptumRx to obtain Manufacturer Payments on behalf of OptumRx and its clients in

22  exchange for preferred formulary placement. For example, in a February 2014 email

23  released by the U.S. Senate in conjunction with its January 2021 report titled

24  "Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug"

25  ("January 2021 Senate Insulin Report"), Eli Lilly describes a "Russian nested doll

26  situation" in which Express Scripts was negotiating rebates on behalf of OptumRx

Page 43 – COMPLAINT

DEPARTMENT OF JUSTICE
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1  related to the at-issue drugs for Cigna (which later would become part of Express

2  Scripts).

3                                    188.

4          In its capacity as a mail order pharmacy, Express Scripts dispensed the at-

5  issue drugs to Oregon diabetics and received payments from Oregon diabetics based

6  on the artificially-inflated prices produced by the Insulin Pricing Scheme and, as a

7  result, damaged Oregon diabetics.

8                                    189.

9          At all times relevant hereto, Express Scripts derived substantial revenue

10  providing mail order pharmacy services in Oregon.

11                                    190.

12          Express Scripts purchases drugs produced by the Manufacturer Defendants,

13  including the at-issue diabetes medications, for dispensing through its mail order

14  pharmacies, including in Oregon.

15                                    191.

16          At all times relevant hereto, Express Scripts had express agreements with

17  Defendants Novo Nordisk, Sanofi, and Eli Lilly related to the Manufacturer

18  Payments paid to Express Scripts and placement on Express Scripts' standard

19  formularies, as well as agreements related to the Manufacturers' at-issue drugs sold

20  through Express Scripts' mail order pharmacies, including those located in Oregon.

21                                    192.

22          In addition, starting in 2019, Express Scripts contracted with another large

23  PBM, Prime Therapeutics, to (among other things) negotiate Manufacturer

24  Payments and to provide mail order and specialty pharmacy services for Prime

25  Therapeutics' covered lives.

26

Page 44 – COMPLAINT
1010077716

1    193.

2    **Defendant UnitedHealth Group, Inc**. ("UnitedHealth Group" or "UHG") is

3    a corporation organized under the laws of Delaware with its principal place of

4    business at 9900 Bren Road East, Minnetonka, Minnesota 55343.

5    194.

6    UnitedHealth Group, Inc. may be served through its registered agent: United

7    Agent Group Inc., 1521 Concord Pike Street, Suite 201, Wilmington, Delaware

8    19803.

9    195.

10   UnitedHealth Group, Inc. is a diversified managed healthcare company.

11   UnitedHealth Group's revenue was in excess of $370 billion in 2023, and the

12   company is currently ranked fifth on the Fortune 500 list. UnitedHealth Group, Inc.

13   offers a spectrum of products and services including health insurance plans and

14   pharmacy benefits through its wholly-owned subsidiaries.

15   196.

16   More than one-third of the overall revenues of UnitedHealth Group come from

17   OptumRx and OptumInsight.

18   197.

19   UnitedHealth Group, through its executives and employees, is directly

20   involved in the company policies that inform its PBM services and formulary

21   construction, including with respect to the at-issue drugs and related to the Insulin

22   Pricing Scheme. For example, executives of UnitedHealth Group structure, analyze,

23   and direct the company's overarching, enterprise-wide policies, including PBM and

24   mail-order services, as a means of maximizing profits across the corporate family.

25   198.

26   UnitedHealth Group's Sustainability Report states that "OptumRx works

Page 45 – COMPLAINT

**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1  directly with pharmaceutical manufacturers to secure discounts that lower the

2  overall cost of medications and create tailored formularies—or drug lists—to ensure

3  people get the right medications. [*UnitedHealth Group*] then negotiate[s] with

4  pharmacies to lower costs at the point of sale . . . [*UnitedHealth Group*] also

5  operate[s] [mail order pharmacies] . . . [*UnitedHealth Group*] work[s] directly with

6  drug wholesalers and distributors to ensure consistency of the brand and generic

7  drug supply, and a reliance on that drug supply."

8                                    199.

9         On a regular basis throughout the relevant time period, executive teams from

10  each Manufacturer Defendant—including at times their CEOs—met with executives

11  from UnitedHealth Group to discuss their coordinated efforts in furtherance of the

12  Insulin Pricing Scheme. Examples include:

13  (a)     In at least in 2010, 2016, 2017, and 2018, executives from UnitedHealth

14          Group, including its CEOs (including Steve Hemsley), the Executive

15          Vice President of Corporate Affairs, Senior Directors of Diabetes

16          Alliance, CEOs of OptumRx (including Mark Thierer), and the

17          Executive Vice President of OptumRx, met and/or engaged in

18          discussions with executives at Eli Lilly, including CEO Dave Ricks, that

19          included discussions in furtherance of the Insulin Pricing Scheme.

20  (b)     In 2014, the CEO and Senior Vice President of UnitedHealth Group

21          met with executives at Novo Nordisk and engaged in discussions in

22          furtherance of the Insulin Pricing Scheme.

23  (c)     In at least 2014 and 2018, executives at UnitedHealth Group, including

24          CEOs, met with executives at Sanofi, including the CEO of Sanofi, to

25          engage in discussions in furtherance of the Insulin Pricing Scheme.

26          Sanofi's stated objective for these meetings was to "[l]everage the entire

Page 46 – COMPLAINT

1010077716

1       Sanofi portfolio of assets to set the stage for future business

2       development with UHG, along with establishing a stronger executive

3       level strategic relationship with UHG."

4    (d)    In April 2015, the Executive Vice President at UnitedHealth Group, the

5       Chief Commercial Officer at Optum Analytics, the Vice President of

6       OptumRx, the Vice President of OptumInsight, among other executives,

7       met with Novo Nordisk's Vice President of Market Access and the

8       Executive Vice President of Strategic Accounts, among other executives

9       from Novo Nordisk, at UnitedHealth Group's corporate headquarters to

10       discuss their strategic overview and prioritized opportunities in

11       diabetes in furtherance of the Insulin Pricing Scheme.

12             200.

13      In 2011, UnitedHealth Group aligned its formularies across all their segments

14 (Medicare, commercial and managed care) and moved to one Pharmacy &

15 Therapeutics Committee in 2012. This effort also included tasking OptumRx with

16 negotiating Manufacturer Payments and Manufacturer contracts for all

17 UnitedHealth Group enterprise-wide formularies.

18             201.

19      UnitedHealth Group's conduct had a direct effect in Oregon and damaged

20 diabetics in Oregon.

21             202.

22      **Defendant Optum, Inc.**, is a Delaware corporation with its principal place of

23 business located in Eden Prairie, Minnesota. Optum, Inc. is a health services

24 company managing subsidiaries that administer pharmacy benefits, including

25 Defendant OptumRx, Inc.[7]

26       [7] UnitedHealth Group, Annual Report (Form 10-K, Exhibit 21) (Dec. 31, 2018).

DEPARTMENT OF JUSTICE
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1    203.

2    Optum, Inc. may be served through its registered agent: United Agent Group

3    Inc., 1521 Concord Pike Street, Suite 201, Wilmington, Delaware 19803.

4    204.

5    Optum, Inc. is directly involved, through its executives and employees, in the

6    company policies that inform its PBM services and formulary construction, including

7    with respect to the at-issue drugs and related to the Insulin Pricing

8    Scheme, which had a direct effect in Oregon and damaged diabetics and payors in

9    Oregon.

10    205.

11    For example, according to Optum Inc.'s press releases, Optum, Inc. is

12    "UnitedHealth Group's information and technology-enabled health services business

13    platform serving the broad healthcare marketplace, including care providers, plan

14    sponsors, payors, life sciences companies and consumers." In this role, Optum, Inc. is

15    directly responsible for the "business units – OptumInsight, OptumHealth and

16    OptumRx" and the CEOs of all these companies report directly to Optum, Inc.

17    regarding their policies, including those that inform the at-issue formulary

18    construction and mail-order activities.

19    206.

20    **Defendant OptumInsight, Inc.** is a Delaware corporation with its principal

21    place of business located in Eden Prairie, Minnesota.

22    207.

23    OptumInsight, Inc. is registered to do business in Oregon and may be served

24    through its registered agent: United Agent Group Inc., 5708 SE 136th Avenue, Suite

25    2, Portland, Oregon 97236.

26

Page 48 – COMPLAINT
1010077716

1      208.

2      OptumInsight, Inc. holds 1 license with the Oregon Division of Financial

3  Regulation.

4      209.

5      **Defendant OptumInsight Life Sciences, Inc.** is a Delaware corporation

6  with its principal place of business located in Eden Prairie, Minnesota.

7      210.

8      OptumInsight Life Sciences, Inc. may be served through its registered agent:

9  United Agent Group, Inc., 1521 Concord Pike Suite 201, Wilmington, Delaware

10  19803.

11      211.

12      OptumInsight Life Sciences, Inc. and OptumInsight, Inc. are referred to

13  herein as "OptumInsight."

14      212.

15      During the relevant time period, due to name changes and mergers, a number

16  of different entities make up what is now known as OptumInsight, including

17  Ingenix, Innovus, i3, QualityMetric, Htanalytics, ChinaGate, CanReg, and the Lewin

18  Group. For the purposes of this Complaint, "OptumInsight" refers to and includes

19  each of these entities.

20      213.

21      OptumInsight is an integral part of the Insulin Pricing Scheme. During the

22  relevant time period, OptumInsight coordinated directly with the Manufacturer

23  Defendants in furtherance of the Scheme. OptumInsight analyzed data and other

24  information from the PBM and Manufacturer Defendants to advise Defendants as to

25  the profitability of the Insulin Pricing Scheme for the benefit of all Defendants.

26

Page 49 – COMPLAINT
1010077716

1    214.

2    Each Manufacturer Defendant has dedicated executives assigned to

3    OptumInsight for the purpose of collaborating with key executives and coordinating

4    with OptumInsight for data acquisition and utilization.

5    215.

6    The Manufacturers utilize their relationships with OptumInsight to deepen

7    their ties to the overall UnitedHealth Group corporate family and to secure

8    formulary wins for their diabetes medications. During the relevant time period,

9    OptumInsight provided data and analytics to the Manufacturer Defendants related

10   to the at-issue drugs, including the identity of particular pharmacies selling the most

11   at-issue drugs. The Manufacturers used this data to increase sales in furtherance of

12   the Insulin Pricing Scheme.

13   216.

14   Each Manufacturer Defendant also contracted with OptumInsight during the

15   relevant time period.

16   217.

17   During the relevant time period, OptumInsight partnered with OptumRx to

18   provide the at-issue pharmacy benefit and data and cost analytic services that gave

19   rise to the Insulin Pricing Scheme which resulted in harm to Oregon diabetics.

20   218.

21   During the relevant time period, OptumInsight's data collection and analysis

22   included prescription claims data related to Oregon diabetics' and payors' utilization

23   of the at-issue drugs, for use in its data and cost analytics efforts in furtherance of

24   the Insulin Pricing Scheme.

25

26

DEPARTMENT OF JUSTICE
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1       219.

2       **Defendant OptumRx, Inc. ("OptumRx")** is a California corporation with

3   its principal place of business at 2300 Main St., Irvine, California, 92614.

4       220.

5       OptumRx is registered to do business in Oregon and may be served through

6   its registered agent: United Agent Group Inc., 5708 SE 136th Avenue, Suite 2,

7   Portland, Oregon 97236.

8       221.

9       OptumRx holds 5 licenses with the Oregon Board of Pharmacy, the Oregon

10  Division of Financial Regulation, and the Oregon Department of Consumer and

11  Business Services.

12      222.

13      During the relevant time period, OptumRx, Inc. provided the PBM and mail-

14  order pharmacy services in Oregon that gave rise to the Insulin Pricing Scheme,

15  which damaged diabetics and payors in Oregon.

16      223.

17      **Defendant Emisar Pharma Services LLC ("Emisar")** is a Delaware

18  limited liability company with its principal place of business located in Ireland.

19      224.

20      Emisar Pharma Services LLC may be served through its registered agent:

21  United Agent Group Inc., 1521 Concord Pike, Suite 201, Wilmington, Delaware

22  19803.

23      225.

24      In 2021, UnitedHealth Group and OptumRx established Emisar as a rebate

25  aggregator for OptumRx's PBM business. Emisar is wholly owned indirect

26  subsidiary of UnitedHealth Group.

Page 51 – COMPLAINT
1010077716

1          226.

2          During the relevant time period, Emisar provided PBM services, including

3    Manufacturer Payment negotiations on behalf of Oregon diabetics and payors.

4          227.

5          As a result of numerous interlocking directorships and shared executives,

6    UnitedHealth Group is directly involved in the conduct and control of

7    OptumInsight's, Emisar's, and OptumRx's operations, management, and business

8    decisions related to the at-issue formulary construction, negotiations, and mail-order

9    pharmacy services to the ultimate detriment of Oregon diabetics. For example:

10    (a)    These parent and subsidiaries have common officers and directors,

11          including:

12          (i)    Sir Andrew Witty is president of UnitedHealth Group and CEO

13                of Optum, Inc.;

14          (ii)    Dan Schumacher is president of Optum, Inc., the Chief Strategy

15                and Growth Officer at UnitedHealth Group, Inc. and oversees

16                OptumInsight;

17          (iii)    Terry Clark is a senior vice president and chief marketing officer

18                at UnitedHealth Group and also oversees the branding,

19                marketing, and advertising for UnitedHealth Group and Optum,

20                Inc.;

21          (iv)    Tom Roos serves as chief accounting officer for UnitedHealth

22                Group and Optum, Inc.;

23          (v)    Heather Lang is Deputy General Counsel, Subsidiary

24                Governance at UnitedHealth Group, Inc. and also Assistant

25                Secretary at OptumRx, Inc.;

26

Page 52 – COMPLAINT
1010077716

1    (vi) Peter Gill is Vice President at UnitedHealth Group, Inc. and also

2       Treasurer at OptumRx, Inc.;

3    (vii) John Santelli leads Optum Technology, the leading technology

4       division of Optum, Inc. serving the broad customer base of

5       Optum and UnitedHealthcare and also serves as UnitedHealth

6       Group's chief information officer;

7    (viii) Eric Murphy is the Chief Growth and Commercial Officer for

8       Optum, Inc. and has also led OptumInsight, Inc.; and

9    (ix) Timothy Wicks, CFO and Executive Vice President of Industry

10       and Network relations for OptumRx, Inc. also held "executive

11       management positions" with UnitedHealth Group "including

12       operations product management and business development roles

13       at UnitedHealthcare, OptumInsight and most recently, Optum

14       Shared Services."

15  (b) UnitedHealth Group directly or indirectly owns all the stock of

16    OptumRx, Inc. and OptumInsight, Inc.

17  (c) The UnitedHealth Group corporate family does not operate as separate

18    entities. The public filings, documents, and statements of UnitedHealth

19    Group presents its subsidiaries, including OptumRx, Inc., Emisar, and

20    OptumInsight as divisions or departments of a single company that is

21    "a diversified family of businesses" that "leverages core competencies"

22    to "help[] people live healthier lives and helping make the health

23    system work better for everyone." The day-to-day operations of this

24    corporate family reflect these public statements. These entities are a

25    single business enterprise and should be treated as such as to all legal

26    obligations detailed in this Complaint. Indeed, UHG and OptumRx

Page 53 – COMPLAINT
1010077716

1    represent directly to their clients and potential clients in Oregon that

2    the "Optum family of companies—OptumRx, OptumHealth and

3    OptumInsight—each wholly owned subsidiaries of UnitedHealth

4    Group" work as a cohesive unit to offer the at-issue services related to

5    the Insulin Pricing Scheme in Oregon.

6    (d)    The UnitedHealth Group enterprise and each of these entities, both

7    individually and collectively, engaged in the at-issue conduct that gave

8    rise to the Insulin Pricing Scheme.

9    (e)    All the executives of OptumRx, Inc. and OptumInsight ultimately

10    report to the executives, including the CEO, of UnitedHealth Group.

11                                    228.

12    As stated above, UnitedHealth Group's executives and officers are directly

13    involved in the policies and business decisions of OptumRx, Inc., Emisar, and

14    OptumInsight that give rise to the State's claims in this Complaint.

15                                    229.

16    Collectively, Defendants UnitedHealth Group, Emisar, OptumRx, Inc., and

17    OptumInsight, including all predecessor and successor entities, are referred to as

18    "OptumRx."

19                                    230.

20    OptumRx is named as a Defendant in its capacities as a PBM and mail order

21    pharmacy.

22                                    231.

23    In its capacity as a PBM, OptumRx coordinates with Novo Nordisk, Eli Lilly,

24    and Sanofi regarding the artificially-inflated list prices for the at-issue diabetes

25    medications, the placement of these firms' diabetes medications on OptumRx's

26    formularies, and the exclusion of lower-priced diabetes medications.

Page 54 – COMPLAINT

1010077716

1                                           232.

2        OptumRx provides PBM services to more than 65 million people in the nation

3  through a network of more than 67,000 retail pharmacies and multiple delivery

4  facilities.

5                                           233.

6        OptumRx and OptumInsight generate over $200 billion in annual revenue.

7                                         234.

8        Prior to 2011, OptumRx was known as Prescription Solutions. In addition,

9  OptumRx rose to power through numerous mergers with other PBMs. For example,

10  in 2012, a large PBM, SXC Health Solutions Corp. bought one of its largest rivals,

11  Catalyst Health Solutions Inc. in a roughly $4.14 billion deal. Shortly thereafter,

12  SXC Health Solutions Corp. renamed the company Catamaran Corp. Thereafter,

13  OptumRx's parent company, UnitedHealth Group, bought Catamaran Corp. in a

14  deal worth $12.8 billion and combined Catamaran with OptumRx.

15                                       235.

16        Prior to merging with OptumRx (or being renamed), Prescription Health

17  Solutions, Catalyst Health Solutions, Inc., and Catamaran Corp. were conducting

18  business in Oregon and engaged in the at-issue PBM and mail order activities in

19  Oregon.

20                                       236.

21        At all times relevant hereto, OptumRx derived substantial revenue providing

22  pharmacy benefits in Oregon.

23                                       237.

24        At all times relevant hereto, and contrary to all their express representations,

25  OptumRx has insisted that its payor clients, including its payor clients in Oregon,

26

Page 55 – COMPLAINT
1010077716

1    use the artificially-inflated list prices produced by the Insulin Pricing Scheme as the

2    basis for reimbursement of the at-issue drugs.

3                                                    238.

4          At all times relevant hereto, OptumRx has concealed its critical role in the

5    generation of those artificially-inflated list prices.

6                                                    239.

7          At all times relevant hereto, OptumRx offered pharmacy benefit management

8    services nationwide and constructed standard formularies that are used throughout

9    Oregon by payors and diabetics, and that are relied on by Oregon diabetics and

10   payors as promoting diabetic health, increasing access to affordable diabetes

11   medications, and lowering the price of the at-issue drugs. During the relevant time

12   period, these standard formularies included the at-issue diabetes medications and

13   excluded lower-priced drugs.

14                                                   240.

15         In its capacity as a mail order pharmacy, OptumRx dispensed the at-issue

16   drugs to Oregon diabetics and received payments from Oregon diabetics and payors

17   based on the artificially-inflated prices produced by the Insulin Pricing Scheme and,

18   as a result, damaged Oregon diabetics.

19                                                   241.

20         At all times relevant hereto, OptumRx purchased drugs produced by the

21   Manufacturer Defendants, including the at-issue diabetes medications, and

22   dispensed the at-issue medications to diabetics in Oregon through its mail order

23   pharmacies.

24                                                   242.

25         At all times relevant hereto, OptumRx had express agreements with

26   Defendants Novo Nordisk, Sanofi, and Eli Lilly related to the Manufacturer

Page 56 – COMPLAINT
1010077716

1    Payments paid by the Manufacturer Defendants to OptumRx, as well as agreements

2    related to the Manufacturers' at-issue drugs sold through OptumRx's mail order

3    pharmacies.

4                                            243.

5          Collectively, CVS Caremark, OptumRx, and Express Scripts are referred to as

6    "PBM Defendants" or "PBMs."

7                                            244.

8          Collectively, the "PBM Defendants" and the "Manufacturer Defendants" are

9    referred to as "Defendants."

10                          **JURISDICTION AND VENUE**

11                                           245.

12         This Court has jurisdiction over the subject matter of this action and over

13   Defendants, pursuant to ORCP 4 A (4), 4 D, 4 E (5), and 4 L.

14                                           246.

15         This Court has personal jurisdiction over each Defendant because, as set forth

16   in detail in this Complaint, each Defendant is engaged in substantial and not

17   isolated activities within the state by: (a) transacting business and/or is registered to

18   do business within Oregon; (b) maintaining substantial contacts in Oregon; and (c)

19   committing the violations of Oregon statutes and the common law at issue in this

20   lawsuit in whole or part within Oregon. The Insulin Pricing Scheme has been

21   directed at, and has had the foreseeable and intended effect of, causing injury to

22   consumers residing in, located in, or doing business in Oregon.

23                                           247.

24         All of the at-issue transactions occurred in Oregon and/or involved Oregon

25   consumers.

26

Page 57 – COMPLAINT
1010077716

1    248.

2        Venue of this suit lies in Multnomah County, Oregon for the following

3    reasons: (a) pursuant to ORS 646.632(1) and ORS 646.605(1)(c) and (d), venue is

4    proper because Defendants have all done business in Multnomah County, Oregon,

5    by selling the at-issue drugs in Multnomah County and providing the at-issue

6    pharmacy and PBM services in Multnomah County and (b) at all relevant times,

7    Defendants have purposefully availed themselves of this forum.

8    249.

9        The State has satisfied the notice requirements of ORS 646.632.

10        **FACTUAL ALLEGATIONS**

11    **D.    Diabetes and Insulin Therapy**

12        (1)    Diabetes: A growing epidemic

13    250.

14        Diabetes is a disease that occurs when a person's blood glucose, also called

15    blood sugar, is too high. In a non-diabetic person, the pancreas secretes the hormone

16    insulin, which controls the rate at which food is converted to glucose, or sugar, in the

17    blood. When there is not enough insulin or cells stop responding to insulin, too much

18    blood sugar stays in the bloodstream. Over time, that can cause serious health

19    problems, such as heart disease, vision loss, and kidney disease.

20    251.

21        There are two basic types of diabetes. Roughly 90-95% of diabetics developed

22    the disease because they do not produce enough insulin or have become resistant to

23    the insulin their bodies do produce. Known as Type 2, this form of diabetes is often

24    developed later in life. While Type 2 patients can initially be treated with tablets

25    and other medications, in the long term most patients have to switch to insulin

26    injections.

Page 58 – COMPLAINT
1010077716

1       252.

2       Type 1 diabetes occurs when a patient completely ceases insulin production.

3  In contrast to Type 2 patients, people with Type 1 diabetes do not produce any

4  insulin and, without regular injections of insulin, they will die.

5       253.

6       Insulin and other diabetic treatments are a necessary part of life for those

7  who have diabetes and interruptions to a diabetic's medication regimen can have

8  severe consequences. Missed or inadequate therapy can trigger hyperglycemia and

9  then diabetic ketoacidosis. Left untreated, diabetic ketoacidosis can lead to loss of

10  consciousness and death within days.

11       254.

12       The number of Americans with diabetes has exploded in the last half century.

13  In 1958, only 1.6 million people in the United States had diabetes. By the turn of the

14  century, that number had grown to over 10 million. Fourteen years later, the count

15  tripled again. Now nearly 40 million people—10% of the country—live with the

16  disease.

17       255.

18       Likewise, the prevalence of diabetes in Oregon has been steadily increasing.

19  Approximately 350,000 residents of Oregon are now living with diabetes and an

20  additional 1.1 million Oregon residents have prediabetes.

21       256.

22       The burden of diabetes is not equally distributed. Diabetes is significantly

23  more prevalent in impoverished regions; nearly 1 in 4 people who earn less than

24  $25,000 a year are diabetic.

25

26

Page 59 – COMPLAINT
1010077716

1       (2)      Insulin: A century old drug

2                                257.

3       Despite its potentially deadly impact, diabetes is a highly treatable illness.

4    For patients who are able to follow a prescribed treatment plan consistently, the

5    health complications associated with the disease are avoidable.

6                                258.

7       Unlike many high-burden diseases, treatment for diabetes has been available

8    for almost a century.

9                                259.

10      In 1922, Frederick Banting and Charles Best, while working at the University

11   of Toronto, pioneered a technique for removing insulin from an animal pancreas that

12   could then be used to treat diabetes. After discovery, Banting and Best obtained a

13   patent and then sold it to the University of Toronto for $1 (equivalent to $14 today),

14   explaining "[w]hen the details of the method of preparation are published anyone

15   would be free to prepare the extract, but no one could secure a profitable monopoly."

16                               260.

17      After purchasing the patent, the University of Toronto contracted with

18   Defendants Eli Lilly and Novo Nordisk to scale their production. Under this

19   arrangement, Eli Lilly and Novo Nordisk were allowed to apply for patents on

20   variations to the manufacturing process.

21                               261.

22      Although early iterations of insulin were immediately perceived as lifesaving,

23   there have been numerous incremental improvements since its discovery. The

24   earliest insulin was derived from animals and, until the 1980s, was the only

25   treatment for diabetes.

26

Page 60 – COMPLAINT
1010077716

1          262.

2          While effective, animal-derived insulin created the risk of allergic reaction.

3    This risk was lessened in 1982 when synthetic insulin, known as human insulin, was

4    developed by Defendant Eli Lilly. Eli Lilly marketed this insulin as Humulin. The

5    development of human insulin benefited heavily from government and non-profit

6    funding through the National Institute of Health and the American Cancer Society.

7          263.

8          Over a decade later, Defendant Eli Lilly developed the first analog insulin,

9    Humalog, in 1996.

10          264.

11          Analog insulin is laboratory grown and genetically altered insulin. Analogs

12    are slight variations on human insulin that make the injected treatment act more

13    like the insulin naturally produced and regulated by the body.

14          265.

15          Other rapid-acting analogs are Defendant Novo Nordisk's Novolog and

16    Defendant Sanofi's Apidra, with similar profiles. Diabetics use these rapid-acting

17    insulins in combination with longer-acting insulins, such as Sanofi's Lantus and

18    Novo Nordisk's Levemir.

19          266.

20          Manufacturer Defendants introduced these rapid-acting and long-acting

21    analog insulins between 1996 and 2007.

22          267.

23          In 2015, Sanofi introduced Toujeo, another long-acting insulin also similar to

24    Lantus, however Toujeo is highly concentrated, making injection volume smaller

25    than Lantus.

26

Page 61 – COMPLAINT
1010077716

1        268.

2        In 2016, Eli Lilly introduced Basaglar, which is a long-acting insulin that is

3    biologically similar to Sanofi's Lantus.

4        269.

5        Even though insulin was first extracted nearly one hundred (100) years ago,

6    only Defendants Eli Lilly, Novo Nordisk, and Sanofi manufacture insulin in the

7    United States.

8        270.

9        Many of the at-issue diabetes medications are now off patent. However, due in

10   large part to their ability to stifle all competition, Manufacturer Defendants make

11   99% of the insulins in the market today.

12       (3)    Current diabetes medication landscape

13       271.

14       While insulin today is generally safer and more convenient to use than when

15   originally developed in 1922, there remain questions as to whether the overall

16   efficacy of insulin has significantly improved over the last twenty (20) years.

17       272.

18       For example, while long-acting analogs may have certain advantages over

19   human insulins, such as affording more flexibility around mealtime planning, it has

20   yet to be shown that analogs lead to better long-term outcomes.

21       273.

22       A recent study published in the Journal of American Medical Association

23   suggests that older human insulins may work just as well as newer analog insulins

24   for patients with Type 2 diabetes.

25

26

Page 62 – COMPLAINT
1010077716

274.

When discussing the latest iterations of insulins, Harvard Medical School professor David Nathan recently stated:

> I don't think it takes a cynic such as myself to see most of these [insulins] are being developed to preserve patent protection. The truth is they are marginally different, and the clinical benefits of them over the older drugs have been zero.

275.

Moreover, all of the insulins at issue in this case have either been available in the same form since the late 1990s/early 2000s or are biologically equivalent to insulins that were available then.

276.

Dr. Kasia Lipska, a Yale researcher and author of a 2018 study in the Journal of the American Medical Association on the cost of insulin, explained:

> We're not even talking about rising prices for better products here. I want to make it clear that we're talking about rising prices for the same product . . . there's nothing that's changed about Humalog. It's the same insulin that's just gone up in price and now costs ten times more.

277.

Nor have the production or research and development costs increased. In fact, in the last 10 years, the production costs of insulin have decreased as manufacturers simplified and optimized processes. A September 2018 study published in BMJ Global Health calculated that, based on production costs, a reasonable price for a year's supply of human insulin is $48 to $71 per person and between $78 and $133 for analog insulins—which includes delivering a profit to manufacturers.

Page 63 – COMPLAINT
1010077716

1          278.

2          Another recent study noted anecdotal evidence that the Manufacturers could

3   be *comfortably profitable charging under $2 a vial.*

4          279.

5          These figures stand in stark contrast to the $5,705 that a diabetic spent, on

6   average, for insulin in 2016. Indeed, Americans must sometimes travel to different

7   countries entirely to acquire affordable insulin.

8          280.

9          Further, while research and development costs often make up a large

10  percentage of the price of a drug, in the case of insulin the initial basic research—

11  original drug discovery and patient trials—was performed 100 years ago.

12         281.

13         Even the more recent costs, such as developing the recombinant DNA

14  fermentation process and the creation of insulin analogs, were incurred by the

15  Manufacturers decades ago.

16         282.

17         Today, Manufacturer Defendants only spend a fraction of the billions of

18  dollars in revenue they generate from the at-issue drugs on research and

19  development.

20         283.

21         Despite this decrease in production costs and no new research and

22  development, the reported price of the at-issue drugs has risen astronomically over

23  the last 15 years.

24         (4)     Insulin adjuncts: Type 2 medications

25         284.

26         Over the past fifteen years, Manufacturer Defendants have also released a

Page 64 – COMPLAINT

DEPARTMENT OF JUSTICE
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1  number of non-insulin medications that have become critically important for

2  millions of diabetics in their efforts to manage their disease.

3                                    285.

4       In 2010, Novo Nordisk released Victoza as an adjunct to insulin to improve

5  glycemic control. In 2014, Eli Lilly released a similar drug, Trulicity. Sanofi did the

6  same with Soliqua in 2016, and, in 2017, Novo Nordisk did the same with Ozempic.

7  Eli Lilly released Mounjaro in 2022.

8                                    286.

9       Victoza, Trulicity, Ozempic, and Mounjaro are all medications known as

10  glucagon-like peptide-1 receptor agonists ("GLP-1") and are similar to the GLP-1

11  hormone that is already produced in the body. Soliqua is a combination long-acting

12  insulin and GLP-1 drug. Each of these drugs can be used in conjunction with

13  insulins to control diabetes.

14                                    287.

15       Like insulins, the list prices that the Manufacturers set for their GLP-1 drugs

16  are completely untethered from the extremely low costs to manufacture these drugs.

17  For example, in March 2024 a study conducted by a team of researchers from Yale

18  University, King's College Hospital in London, and Boston-based Harvard Medical

19  School found that GLP-1s and other Type 2 diabetes medications, including those at-

20  issue in this Complaint, could be manufactured for between 89 cents and $4.73 per

21  month. Notably, these "cost-based" estimates both for GLP-1s and insulins are based

22  on manufacturing costs plus a profit margin with an allowance for tax.

23                                    288.

24       Despite the fact that the Manufacturers could profitably price their GLP-1

25  drugs at under $5 a month, they nonetheless charge nearly $1000 (or more) a month

26  for these drugs.

Page 65 – COMPLAINT

1010077716

1                                   289.

2          Today, Manufacturer Defendants have a dominant position in the market for

3    all diabetes medications. The following is a list of diabetes medications at issue in

4    this lawsuit:

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Page 66 – COMPLAINT
1010077716

**Table 1: Diabetes medications at issue in this case**

| Insulin Type | Action | Name | Company | FDA Approval |
|---|---|---|---|---|
| *Human* | **Rapid-Acting** | Humulin R | Eli Lilly | 1982 |
| | | Humulin R 500 | Eli Lilly | 1994 |
| | | Novolin R | Novo Nordisk | 1991 |
| | **Intermediate** | Humulin N | Eli Lilly | 1982 |
| | | Humulin 70/30 | Eli Lilly | 1989 |
| | | Novolin N | Novo Nordisk | 1991 |
| | | Novolin 70/30 | Novo Nordisk | 1991 |
| *Analog* | **Rapid-Acting** | Humalog | Eli Lilly | 1996 |
| | | Novolog | Novo Nordisk | 2000 |
| | | Apidra | Sanofi | 2004 |
| | **Long-Acting** | Lantus | Sanofi | 2000 |
| | | Levemir | Novo Nordisk | 2005 |
| | | Basaglar | Eli Lilly | 2016 |
| | | Toujeo | Sanofi | 2015 |
| | | Tresiba | Novo Nordisk | 2015 |
| *Type 2 Medications* | | Trulicity | Eli Lilly | 2014 |
| | | Mounjaro | Eli Lilly | 2022 |
| | | Victoza | Novo Nordisk | 2010 |
| | | Ozempic | Novo Nordisk | 2017 |
| | | Xultophy | Novo Nordisk | 2016 |
| | | Rybelsus | Novo Nordisk | 2019 |
| | | Soliqua | Sanofi | 2016 |
| | | Adlyxin | Sanofi | 2016 |

Page 67 – COMPLAINT
1010077716

1    **E.      The Dramatic Rise in the Price of Diabetes Medications**

2          (1)      <u>Diabetes medication price increases</u>

3                                        290.

4          In 2003, PBMs began their rise to power (which will be discussed in greater

5    detail in the next section).

6                                        291.

7          That same year, the price of diabetic treatments began its dramatic rise to its

8    current exorbitant level.

9                                        292.

10         Since 2003, the list price of certain insulins has increased in some cases by

11   more than 1000%.

12                                       293.

13         By 2016, the average price per month of the four most popular types of insulin

14   rose to $450 — and costs continue to rise, so much so that now one in four diabetics

15   are skimping on or skipping lifesaving doses. This behavior is dangerous to a

16   diabetic's health and can lead to a variety of complications and even death.

17                                       294.

18         Since 1997, Defendant Eli Lilly has artificially inflated the list price of a vial

19   of Humulin R (500U/ML) from $165 to $1784 (See Figure 1).

20

21

22

23

24

25

26

Page 68 – COMPLAINT

**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1

**Figure 1: Rising list prices of Humulin R (500U/mL) Vial**

**1997 –2023**



295.

Since the early 2000s, both Eli Lilly and Novo Nordisk have substantially

increased the prices for their human insulins, Humulin and Novolin (*See* Figure 2).

**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1



**Figure 2: Rising list price increases for human insulins**

18                                              296.

19      Since 1996, Defendant Eli Lilly has artificially inflated the list price for a

20  package of pens of Humalog from less than $100 to $663 and from less than $50 for a

21  vial to $342 (*See* Figure 3).

22

23

24

25

26

DEPARTMENT OF JUSTICE
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1

**Figure 3: Rising list prices of Humalog vials and pens**

2

**1996 –2023**



297.

Novo Nordisk has also artificially-inflated list prices. Since 2006, Levemir rose from $162 to $555 for pens and from under $100 to $370 per vial (*See* Figure 4).

DEPARTMENT OF JUSTICE
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1

**Figure 4: Rising list prices of Levemir**

2

**2006 –2023**



17                                 298.

18     From 2002 to 2023, Novo Nordisk has artificially inflated the list price of

19  Novolog from $108 to $671 for a package of pens and from less than $50 to $347 for a

20  vial (*See* Figure 5).

21

22

23

24

25

26

1010077716

**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1

**Figure 5: Rising list prices of Novolog vials and pens**

2

**2001 –2023**



18

299.

19     Defendant Sanofi has kept pace as well, artificially inflating the list price for

20     Lantus, the top-selling analog insulin, from less than $200 in 2006, to over $500 in

21     2023 for a package of pens and from less than $50 to $340 for a vial (*See* Figure 6).

22

23

24

25

26

Page 73 – COMPLAINT

DEPARTMENT OF JUSTICE
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1

**Figure 6: Rising list prices of Lantus vials and pens**

2

**2001 –2023**



18

300.

19

The timing of the list price increases reveal that each Manufacturer

20

Defendant has not only dramatically increased prices for the at-issue diabetes

21

treatments, they have also done so in perfect lockstep.

22

301.

23

In thirteen (13) instances since 2009, competitors Sanofi and Novo Nordisk

24

raised the list prices of their insulins, Lantus and Levemir, in tandem, taking the

25

same price increase down to the decimal point within a few days of each other.

26

**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1          302.

2          This practice of increasing drug prices in lockstep with competitors is known

3     as "shadow pricing" and, as healthcare expert Richard Evans from SSR Health

4     recently stated, "is pretty much a clear signal that your competitor does not intend to

5     price-compete with you."

6          303.

7          In 2016, Novo Nordisk and Sanofi's lockstep increases for the at-issue drugs

8     were responsible for the highest drug price increases in the entire pharmaceutical

9     industry.

10          304.

11          Eli Lilly and Novo Nordisk have engaged in the same lockstep behavior with

12     respect to their rapid-acting analog insulins, Humalog and Novolog. Figure 7

13     demonstrates these price increases with respect to Lantus and Levemir. Figure 8

14     demonstrates this behavior with respect to Novolog and Humalog.

15

16

17

18

19

20

21

22

23

24

25

26

Page 75 – COMPLAINT
1010077716

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

**Figure 7:**

**Rising list prices of long-acting insulins**

**from 2006-2021**



21

22

23

24

25

26

DEPARTMENT OF JUSTICE
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1  **Figure 8:**

2  **Rising list prices of rapid-acting insulins**

3  **from 2000-2021**



Figure 8: Rising list prices of rapid-acting insulins from 2000-2021. Line chart with y-axis "Calculated AWP" from $0 to $700, x-axis years 2000–2021. Legend: Eli Lilly — Humalog KwikPen (light blue), Humalog Vial (dark blue); Novo Nordisk — Novolog FlexPen (orange), Novolog Vial (purple).

305.

Manufacturer Defendants' non-insulin diabetes medications have experienced similar and exorbitant price increases. For example, since the release of their GLP-1 drugs, Eli Lilly and Novo Nordisk have more than tripled the prices of Victoza, Ozempic, and Trulicity, as demonstrated in Figure 9.

DEPARTMENT OF JUSTICE
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1



**Figure 9: Rising list prices of Type 2 drugs**

306.

Because of Manufacturer Defendants' price increases, nearly a century after the discovery of insulin, diabetes medications have become unaffordable for many diabetics.

**F.      Pharmaceutical Payment and Supply Chain**

307.

The prescription drug industry consists of a deliberately opaque network of entities engaged in multiple distribution and payment structures. These entities include drug manufacturers, wholesalers, pharmacies, health plans/third party payors, pharmacy benefit managers, and patients.

DEPARTMENT OF JUSTICE
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1      308.

2      Generally speaking, branded prescription drugs, such as the at-issue diabetes

3  medications, are distributed in one of two ways: (1) from manufacturer to

4  wholesaler, wholesaler to pharmacy and pharmacy to patient; or (2) from

5  manufacturer to mail order pharmacy to patient.

6      309.

7      The pharmaceutical industry, however, is unique in that the pricing chain is

8  distinct from the distribution chain. The prices for the drugs distributed in the

9  pharmaceutical chain are different for each participating entity: different actors pay

10  different prices set by different entities for the same drugs. The unifying factor is

11  that the price that almost every entity in the pharmaceutical chain pays for a drug is

12  directly tied to manufacturer's list price.

13      310.

14      The PBMs ensure there is no transparency in this pricing system and that all

15  of their clients' and patients' payments are tied to the "list prices," typically

16  wholesale acquisition cost ("WAC"), or average wholesale price ("AWP").

17      311.

18      Manufacturers set the WAC price. Even though the WAC name implies that it

19  is the price that wholesalers pay for drugs, that is not true in practice. After

20  chargebacks and other discounts, wholesalers pay substantially less than the WAC

21  price.

22      312.

23      Drug manufacturers self-report list prices to publishing compendiums such as

24  First DataBank, Redbook and others who then publish the prices.

25      313.

26      AWP prices are either set by the manufacturer and then reported to

Page 79 – COMPLAINT
1010077716

1  publishing compendiums or are calculated by the publishing compendium based on

2  the WAC price and then published. AWPs are set at generally 20% greater than

3  WAC.

4                                            314.

5        PBMs use AWP prices to set the amount that their payor clients pay for

6  prescription drugs.

7                                            315.

8        Notwithstanding their knowledge that list prices are disconnected from actual

9  transaction costs, the PBM Defendants insist that their clients make payments for

10  the at-issue drugs based on list prices. Even while PBM Defendants have more

11  accurate pricing available, they persist in requiring AWP to be used by payors and

12  patients.

13                                            316.

14        As a direct result of Defendants' conduct, their misleading, unconscionable,

15  and deceptive list prices persist as the most commonly and continuously used prices

16  in reimbursement and payment calculations and negotiations for all payors.

17                                            317.

18        Notably, the Manufacturer Defendants are not required to report or publish

19  only WAC and/or AWP list prices. Nothing prevents them from publishing their net

20  prices, but they choose not to in furtherance of the Scheme.

21                                            318.

22        Moreover, the PBM Defendants are not required to use list prices to set the

23  prices paid by their clients and diabetics.

24                                            319.

25        Rather, the PBM Defendants continue to perpetuate the use of list prices as

26  the backbone of their contracts with their clients and pharmacies because it opens

Page 80 – COMPLAINT
1010077716

1    the door to unchecked profitability—through Manufacturer Payments and pharmacy

2    spread pricing (discussed in detail below).

3            (1)     Drug Costs for Diabetics

4                          320.

5        Whether insured or not, all Oregon diabetics pay a substantial part of their

6    diabetic drug costs based on the misleading and deceptive list prices generated by

7    the Insulin Pricing Scheme.

8                          321.

9        Uninsured diabetics must pay the full, point-of-sale prices (based on the

10    artificial prices generated by the Insulin Pricing Scheme) every time they fill their

11    prescriptions. In Oregon, nearly 300,000 Oregon residents are uninsured.

12    Approximately 18% of uninsured Oregon residents are diabetic. As a direct result of

13    the Insulin Pricing Scheme, the prices uninsured Oregon residents with diabetes pay

14    for the at-issue life-sustaining drugs has skyrocketed over the last fifteen years.

15                          322.

16        The uninsured are not the only patients saddled with high costs. Insured

17    diabetics also often pay a significant portion of a drug's price out-of-pocket including

18    in deductibles, coinsurance requirements, and/or copayment requirements based on

19    the artificially-inflated list prices generated by the Insulin Pricing Scheme.

20                         323.

21        Thus, nearly all Oregon diabetics have been damaged by having to pay for

22    diabetes medications out-of-pocket based upon the specific artificially-inflated prices

23    generated by the Insulin Pricing Scheme. In many cases, Oregon diabetics have been

24    priced out of these life-sustaining drugs.

25                         324.

26        In addition, these exorbitant indefensible out-of-pocket costs created by the

Page 81 – COMPLAINT
1010077716

1    Insulin Pricing Scheme make it more difficult for patients to adhere to their

2    medications, resulting in avoidable complications and higher overall healthcare

3    costs. An American Diabetes Association working group recently noted that "people

4    with high cost-sharing are less adherent to recommended dosing, which results in

5    short- and long-term harm to their health."

6                                         325.

7          As executives from the PBM Defendants have explicitly recognized, lack of

8    adherence drives up costs for Oregon diabetics, payors, and the healthcare system.

9                                         326.

10         On May 10, 2023, the Senate Health, Education, Labor, and Pensions (HELP)

11   Committee held a hearing entitled "The Need to Make Insulin Affordable for All

12   Americans" ("2023 Senate Hearing") (discussed in greater detail below).

13                                        327.

14         President of CVS Caremark, David Joyner stated in his opening statement at

15   the 2023 Senate Hearing, "When people can afford their medications, like insulin,

16   they are more likely to adhere to prescribed therapies. Adherence means better

17   outcomes; better outcomes mean the health care system will spend far less on

18   complications and hospitalizations."

19                                        328.

20         The overall economic impact from the loss of productivity and increased

21   healthcare costs that result from diabetics underdosing their medications has been

22   deeply damaging to the State.

23         (2)    PBMs' role in the pharmaceutical payment chain

24                                        329.

25         PBMs are at the center of the convoluted pharmaceutical payment chain, as

26   illustrated in Figure 10:

Page 82 – COMPLAINT
1010077716

1

## Figure 10: Diabetes drug distribution and payment chain



14          330.

15       The PBM Defendants develop drug formularies, process claims, create a

16   network of retail pharmacies, set the prices in coordination with the Manufacturers

17   that payors and diabetics pay for prescription drugs, and are paid by payors and

18   diabetics for the drugs utilized by a payor's beneficiaries.

19          331.

20       The PBM Defendants provide services to both payors and consumers by

21   administering prescription drug benefits. As CVS Caremark explains to consumers

22   through its welcome kit: "We manage your prescription drug benefits just like your

23   health insurance company manages your medical benefits."

24          332.

25       The PBM Defendants have consumer-facing websites representing that they

26   "serve" consumers and that consumers are their "members."

DEPARTMENT OF JUSTICE
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1          333.

2          The PBM Defendants further represent that giving consumers access to

3    necessary prescription drugs at an affordable price is a top priority.

4          334.

5          PBMs also contract with a network of retail pharmacies, including those

6    pharmacies that are affiliated with the PBM Defendants. Pharmacies agree to

7    dispense drugs to patients and pay fees back to the PBMs. PBMs reimburse

8    pharmacies for the drugs dispensed.

9          335.

10         PBM Defendants also own mail-order, retail and specialty pharmacies, which

11   purchase and take possession of prescription drugs, including those at-issue here,

12   and directly supply those drugs to patients.

13         336.

14         Often times—including for the at-issue drugs—the PBM Defendants purchase

15   drugs from the Manufacturers and dispense them to the patients.

16         337.

17         Even where PBM Defendant's pharmacies purchase drugs from wholesalers,

18   their costs are set by direct contracts with the Manufacturers.

19         338.

20         In addition, and of particular significance here, PBM Defendants contract

21   with pharmaceutical manufacturers, including Manufacturer Defendants.

22         339.

23         These relationships allow PBMs to exert tremendous influence over what

24   drugs are available throughout Oregon and at what prices.

25

26

Page 84 – COMPLAINT
1010077716

1      340.

2          Thus, PBMs are at the center of the flow of money in the pharmaceutical

3    supply chain. In sum:

4      (a)    PBMs negotiate the price that payors pay for prescription drugs (for the

5             at-issue drugs based on artificially-inflated prices generated by the

6             Insulin Pricing Scheme);

7      (b)    they separately negotiate a different (and often lower) price that

8             pharmacies in their networks receive for that same drug;

9      (c)    they set the amount in fees that the pharmacy pays back to the PBM

10            for each drug sold (for the at-issue drugs based on artificially-inflated

11            prices generated by the Insulin Pricing Scheme);

12     (d)    they set the amount of out-of-pocket payments paid by diabetics (often

13            based on artificially-inflated prices generated by the Insulin Pricing

14            Scheme);

15     (e)    they set the price paid for each drug sold through their mail order

16            pharmacies (for the at-issue drugs based on artificially-inflated prices

17            generated by the Insulin Pricing Scheme); and

18     (f)    they determine the amount of Manufacturer Payments that the

19            Manufacturers pay back to the PBM for each drug sold (for the at-issue

20            drugs based on artificially-inflated prices generated by the Insulin

21            Pricing Scheme).

22     341.

23         Yet, for the majority of these transactions, only the PBMs are privy to the

24   amount that any other entity in this pricing chain is paying or receiving for the exact

25   same drugs.

26

Page 85 – COMPLAINT
1010077716

1      342.

2      In every interaction that PBMs have within the pharmaceutical pricing chain

3  they stand to profit from the artificial prices generated by the Insulin Pricing

4  Scheme.

5      (3)     The rise of the PBMs in the pharmaceutical supply chain

6      343.

7      When they first came into existence in the 1960s, PBMs functioned largely as

8  claims processors. Over time, however, they have taken on a larger and larger role in

9  the pharmaceutical industry. Today, PBMs wield significant control over the drug

10  pricing system.

11      344.

12      One of the roles PBMs took on was negotiating with drug manufacturers

13  ostensibly on behalf of payors and patients.

14      345.

15      In the early 2000s, PBMs started buying pharmacies.

16      346.

17      When a PBM combines with a pharmacy, it has increased incentive to collude

18  with Manufacturers to keep certain prices high.

19      347.

20      These perverse incentives still exist today with respect to both retail and mail

21  order pharmacies housed within the PBMs' corporate families.

22      348.

23      More recently, further consolidation in the industry has afforded PBMs a

24  disproportionate amount of market power.

25

26

Page 86 – COMPLAINT
1010077716

1          349.

2          In total, nearly 40 different PBM entities have merged or otherwise been

3    absorbed into what are now the PBM Defendants.

4          350.

5          Figure 11 depicts this consolidation within the PBM market.

6                    **Figure 11: PBM consolidation**



21          351.

22          After merging or acquiring all their competitors and now backed by multi-

23    billion-dollar corporations, PBM Defendants have taken over the market in the past

24    decade—controlling over 80% of the market and managing pharmacy benefits for

25    over 270 million Americans.

26

Page 87 – COMPLAINT
1010077716

1      352.

2      Importantly, PBM Defendants have near *complete* control over the

3  Manufacturer Payment market, given that in addition to their own clients' members

4  (which represent 80% of the market), most smaller pharmacy benefit managers—

5  including the largest pharmacy benefit manager in the United States outside the

6  PBM Defendants, Prime Therapeutics—contract with the PBM Defendants (or their

7  controlled affiliate rebate aggregator companies) to negotiate Manufacturer

8  Payments on behalf of their members as well.

9      353.

10      Business is booming for PBM Defendants. Together, they report more than

11  $300 billion in annual revenue.

12      354.

13      PBMs are able to use the consolidation in the market as leverage when

14  negotiating with other entities in the pharmaceutical pricing chain. Last year,

15  industry expert Lindsay Bealor Greenleaf from the Advice and Vision for the

16  Healthcare Ecosystem (ADVI) consulting firm described this imbalance in power,

17  "it's really difficult to engage in any type of fair negotiations when one of the parties

18  has that kind of monopoly power . . . I think that is something that is going to

19  continue getting attention, especially as we see more of these payors and PBMs

20  continue to try to further consolidate."

21          (4)    Insular nature of the pharmaceutical industry

22      355.

23      The insular nature of the PBM and pharmaceutical industry has provided

24  PBM Defendants with ample opportunity for contact and communication amongst

25  themselves, as well as with Manufacturer Defendants, in order to devise and agree

26  to the Insulin Pricing Scheme.

Page 88 – COMPLAINT
1010077716

1                                          356.

2          Each Manufacturer Defendant is a member of the Pharmaceutical Research

3   and Manufacturers of America ("PhRMA") and has routinely communicated through

4   PhRMA's meetings and platforms in furtherance of the Insulin Pricing Scheme.

5                                          357.

6          David Ricks, CEO of Eli Lilly, Paul Hudson, CEO of Sanofi and Douglas

7   Langa, Executive Vice President of Novo Nordisk, are all members of the PhRMA

8   board of directors and/or PhRMA executive leadership team.

9                                          358.

10         PBM Defendants also routinely communicate through direct interaction with

11  their competitors and the Manufacturers at PBM trade associations and industry

12  conferences.

13                                         359.

14          Each year during the relevant time period, the main PBM trade association,

15  the Pharmaceutical Care Management Association ("PCMA"), held several yearly

16  conferences, including its Annual Meeting and its Business Forum conferences.

17                                         360.

18         The board of the PCMA has included executives from all Defendants,

19  including: David Joyner (chairman), Executive Vice President and President,

20  Pharmacy Services, at CVS Health Corp.; Dr. Patrick Conway, CEO of OptumRx;

21  Adam Kautzner, President of Express Scripts, Heather Cianfrocco, CEO of

22  OptumRx; John Prince, President and COO of Optum, Inc. and former CEO of

23  OptumRx; Jon Roberts, Executive Vice President and COO of CVS Health Corp.;

24  Amy Bricker, Chief Product Officer of CVS Health Corp. (and former President of

25  Express Scripts); Alan Lotvin, Executive Vice President of CVS Health Corp. and

26

Page 89 – COMPLAINT
1010077716

1  President of CVS Caremark; and Tim Wentworth, CEO of Evernorth and Express

2  Scripts.

3                                    361.

4        All PBM Defendants are members of and, as a result of their leadership

5  positions, control the PCMA. Each Manufacturer Defendant is an affiliate member of

6  this organization.

7                                    362.

8        The PCMA annual conferences appear to be at the center of the Insulin

9  Pricing Scheme.

10                                   363.

11       Every year, high-level representatives and corporate officers from both PBM

12  and Manufacturer Defendants attend these conferences to meet in person to discuss

13  their shared business opportunities within the pharmaceutical industry. Defendants

14  also have used these conferences to engage in private meetings in furtherance of the

15  Insulin Pricing Scheme.

16                                   364.

17       In fact, for at least the last six years, all of the Manufacturer Defendants have

18  been "Presidential Sponsors" of these PBM conferences.

19                                   365.

20       Notably, many of the forums at these conferences are specifically advertised

21  as offering opportunities for private, non-public communications. For example, as

22  Presidential Sponsors of these conferences, Manufacturer Defendants each hosted

23  "private meeting rooms" that offer "excellent opportunities for . . . one-on-one

24  interactions between PBM and pharma executives."

25                                   366.

26       Representatives from each Manufacturer Defendant regularly meet privately

Page 90 – COMPLAINT
1010077716

1    with representatives from each PBM Defendant during both the Annual Meetings

2    and Business Forum conferences that the PCMA holds each year.

3                                    367.

4         Prior to these meetings dedicated teams of executives from each Defendant

5    spend weeks preparing PCMA "pre-reads" and reports in preparation for these

6    meetings. These reports not only demonstrate the deep involvement of each

7    Defendant in the Insulin Pricing Scheme, but they also reflect the tangled web that

8    gave rise to the Scheme.

9                                    368.

10        In addition, all PCMA members, affiliates and registered attendees of these

11   conferences are invited to join PCMA-Connect, "an invitation-only LinkedIn Group

12   and online networking community." As PCMA members, PCMA-Connect provides

13   PBM and Manufacturer Defendants with a year-round, non-public online forum to

14   engage in private discussions in furtherance of the Insulin Pricing Scheme.

15                                   369.

16        Notably, key price increases occurred shortly after the Defendants met at

17   PCMA meetings. For example, on September 26 and 27, 2017 the PCMA held its

18   annual meeting where each of the Manufacturer Defendants and PBM Defendants

19   engaged in meetings. Several days after the conference, on October 1, 2017, Sanofi

20   increased Lantus's list price by 3% and Toujeo's list price by 5.4%. A few weeks later

21   Novo Nordisk recommended that the company make a 4% list price increase on

22   January 1, 2018 to match the Sanofi increase, which was approved Nov 3, 2017.

23                                   370.

24        Likewise, on May 30, 2014, Novo Nordisk raised the list price of Levemir

25   several hours after Sanofi increased its list price on Lantus, and this occurred only a

26

Page 91 – COMPLAINT
1010077716

1  few weeks after a PCMA spring conference in Washington DC attended by

2  representatives from all the PBM Defendants.

3                                    371.

4          Further, the PBMs control the PCMA and have weaponized it to further their

5  interests and to conceal the Insulin Pricing Scheme. The PCMA has brought

6  numerous lawsuits and lobbying campaigns aimed at blocking PBM and drug pricing

7  transparency efforts, including recently suing the Department of Health and Human

8  Services (HHS) to block the finalized HHS "rebate rule," which would eliminate anti-

9  kickback safe harbors for Manufacturer Payments and instead offer them to direct-

10  to-consumer discounts.

11      **G.      The Insulin Pricing Scheme**

12                                    372.

13          The market for the at-issue diabetes medications is unique in that it is highly

14  concentrated with, until recently, little to no generic/biosimilar options and the

15  drugs have similar efficacy and risk profiles. In fact, PBMs treat the at-issue drugs

16  as commodity products in constructing their formularies.

17                                    373.

18          In such a market, where manufacturing costs have significantly decreased,

19  PBMs should have great leverage in negotiating with the Manufacturer Defendants

20  to drive prices down in exchange for formulary placement.

21                                    374.

22          But the PBMs do not want the prices for diabetes medications to go down

23  because they make more money on higher prices. So do the Manufacturers.

24                                    375.

25          As a result, Defendants have found a way to game the system for their mutual

26  benefit—the Insulin Pricing Scheme.

DEPARTMENT OF JUSTICE
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1                                    376.

2          PBM Defendants' formularies are at the center of the Insulin Pricing Scheme.

3   Given the asymmetry of information and disparity in market power between payors

4   and patients and PBM Defendants and the costs associated with making formulary

5   changes, most payors and patients accept the standard formularies offered by the

6   PBMs.

7                                    377.

8          Manufacturer Defendants recognize that because PBM Defendants have such

9   a dominant market share, if they chose to exclude a particular diabetes medication

10  from their standard formularies, or give it a non-preferred position, it could mean

11  billions of dollars in profit loss for Manufacturer Defendants.

12                                   378.

13         For example, Olivier Brandicourt, Sanofi's Chief Executive Officer, in a recent

14  interview stressed the importance of the PBMs' standard formularies: "if you look at

15  the way [CVS Caremark] is organized in the U.S. . . . 15 million [lives] are part of

16  [CVS Caremark's standard] formulary and that's very strict, all right. So, [if we were

17  not included in CVS Caremark's standard formulary] we wouldn't have access to

18  those 15 million lives."

19                                   379.

20         Manufacturer Defendants also recognize that the PBM Defendants' profits are

21  directly tied to the Manufacturers' list prices. For example, the January 2021 Senate

22  Insulin Report noted this in summarizing the internal documents produced by the

23  Manufacturers:

24              [B]oth Eli Lilly and Novo Nordisk executives, when considering

25              lower list prices, were sensitive to the fact that PBMs largely

26              make their money on rebates and fees that are based on a

DEPARTMENT OF JUSTICE
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1    percentage of a drug's list price . . . In other words, the drug

2    makers were aware that higher list prices meant higher revenue

3    for PBMs.

4                                  380.

5        The documents released by the Senate contemporaneously with the January

6    2021 Senate Insulin Report further corroborate the degree to which the

7    Manufacturers' pricing strategy is focused on the PBMs' profitability. In an internal

8    August 6, 2015 email, Novo Nordisk executives debated delaying increasing the price

9    of an at-issue drug in order to make the increase more profitable for CVS Caremark,

10   stating:

11           Should we take 8/18 [for a price increase], as agreed to by our

12           [pricing committee], or do we recommend pushing back due to

13           the recent CVS concerns on how we take price? . . . We know

14           CVS has stated their disappointment with our price increase

15           strategy (i.e. taking just after the 45th day) and how it

16           essentially results in a lower price protection, admin fee and

17           rebate payment for that quarter/time after our increase . . . it has

18           been costing CVS a good amount of money.

19                                  381.

20       Because the Manufacturer Defendants know that—contrary to their public

21   representations—PBM Defendants make more money from *higher* prices, over the

22   course of the last fifteen years and working in coordination with the PBMs, the

23   Manufacturers have artificially inflated their list prices for the at-issue drugs

24   exponentially, while maintaining their net prices, by paying larger and larger

25   amounts of Manufacturer Payments back to the PBMs.

26

Page 94 – COMPLAINT
1010077716

382.

Starting in 2011, the PBMs began constructing and implementing exclusionary formularies which accelerated the insulin price increases.

383.

As a result, during the last fifteen years the amount of Manufacturer Payments paid to the PBMs has increased substantially. For example, the January 2021 Senate Insulin Report found that:

> In July 2013, Sanofi offered rebates between 2% and 4% for preferred placement on CVS Caremark's commercial formulary. Five years later, in 2018, Sanofi rebates were as high as 56% for preferred formulary placement. Similarly, rebates to Express Scripts and OptumRx increased dramatically between 2013 and 2019 for long-acting insulins. For example, in 2019, Sanofi offered OptumRx rebates up to 79.75% for Lantus for preferred formulary placement on their client's commercial formulary, compared to just 42% in 2015. Similarly, Novo Nordisk offered Express Scripts rebates up to 47% for Levemir for preferred formulary placement on their client's commercial formulary, compared to 25% in 2014.

384.

Beyond increased rebate demands, the PBMs have also requested and received larger and larger administrative fee payments from the Manufacturers during the relevant time period. A recent study by the Pew Charitable Trust estimated that, between 2012 and 2016, the amount of administrative and other fees that the PBMs requested and received from the Manufacturers tripled, reaching more than $16 billion.

Page 95 – COMPLAINT
1010077716

1                    385.

2      The value of these rebates and administrative fees to the PBMs was

3 highlighted during a May 10, 2023 Congressional Hearing before the Senate Health,

4 Education, Labor, and Pensions (HELP) Committee where Defendants testified

5 entitled "The Need to Make Insulin Affordable for All Americans" ("2023 Senate

6 Hearing").

7                    386.

8      During the 2023 Senate Hearing the executives from the Manufacturer

9 Defendants testified that $0.75 to $0.84 of every dollar spent on the list price of

10 insulin goes directly to PBMs and their affiliated rebate aggregators—despite the

11 rising out-of-pocket costs to diabetics.

12                   387.

13      In exchange for the Manufacturer Defendants inflating these prices and

14 paying the PBMs substantial amounts in Manufacturer Payments, PBM Defendants

15 grant Manufacturer Defendants' diabetes medications with the most elevated price

16 and that are the most profitable to the PBMs preferred status on their standard

17 formularies.

18                   388.

19      At all times relevant hereto the PBM Defendants have known that the list

20 prices for the at-issue drugs are grossly inflated. Indeed, the Manufacturers' list

21 prices have become so untethered from the Manufacturers' net prices[8] as to

22 constitute unlawful prices.

23                   389.

24      Despite this knowledge, PBMs include the artificially-inflated list price—often

---

[8] "Net Price" refers to the Manufacturers' list price minus all Manufacturer Payments paid to the PBMs.

DEPARTMENT OF JUSTICE
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1   the AWP price—in their contracts as a basis to set the rate that payors and patients

2   pay for the at-issue drugs and pharmacies are reimbursed for the at-issue drugs.

3                          390.

4        Moreover, the PBMs also use the artificially-inflated list price to misrepresent

5   the amount of "savings" they generate for diabetics, payors and the healthcare

6   system. For example, in January 2016, Express Scripts' president Tim Wentworth

7   stated at the 34th annual JP Morgan Healthcare Conference that Express Scripts

8   "saved our clients more than $3 billion through the Express Scripts National

9   Preferred Formulary." Likewise, in April 2019, CVS Caremark President and

10   Executive Vice President of CVS Health Corp. Derica Rice stated, "Over the last

11   three years . . . CVS Caremark has helped our clients save more than $141 billion by

12   blunting drug price inflation, prioritizing the use of effective, lower-cost drugs and

13   reducing the member's out-of-pocket spend."

14                          391.

15        The PBM Defendants also misrepresent the amount of "savings" they

16   generate to their payor clients and prospective clients.

17                          392.

18        In making these representations, the PBMs fail to disclose that the amount of

19   "savings" they have generated is calculated based on the artificially-inflated list

20   prices, which are not paid by any entity in the pharmaceutical pricing chain and

21   which the PBMs are directly responsible for inflating.

22                         393.

23        The PBM Defendants are not only favoring higher list price/higher

24   Manufacturer Payment drugs on their formularies, but they also are excluding (or

25   disadvantaging) lower priced diabetes drugs from their formularies. And because the

26   PBM Defendants control 80% of the market, that means the PBM Defendants are

Page 97 – COMPLAINT

**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1    cutting off or restricting access to affordable diabetic treatments for 80% of the

2    diabetics and payors in Oregon.

3                                    394.

4            One example of this was discussed at the 2023 Senate Hearing, involving the

5    insulin drug Semglee. In July 2021, the FDA designated Semglee as interchangeable

6    with Lantus, meaning that Semglee could be substituted for Lantus at the pharmacy

7    without the doctor writing a new prescription. In the 2023 Senate Hearings, Senator

8    Susan Collins detailed how the drug manufacturer Viatris released Semglee at a

9    65% lower list price to Lantus but was nonetheless excluded from the PBM

10   Defendants' formularies. Several years later, Viatris rereleased the exact same

11   product, this time at a much higher list price (only 5% lower than Lantus); this time,

12   the PBM Defendants allowed Semglee onto many of their formularies.

13                                    395.

14           In addition, the global strategic consulting company, Xcenda, put out a report

15   in May 2022 titled "Skyrocketing growth in PBM formulary exclusions continues to

16   raise concerns about patient access" that found:

17                   Exclusions, potentially driven in part by misaligned [PBM

18                   Defendant] incentives, have had an extensive impact on patients'

19                   access to insulin over the study period. Lower list-priced insulins

20                   have been available since 2016—including follow-on insulins,

21                   "authorized generic" insulins, and, more recently, biosimilar

22                   insulins. However, [the PBM Defendants] often exclude these

23                   insulins from their formularies in favor of products with higher

24                   list prices and larger rebates. For example, 2 of the 3 [PBM

25                   Defendants] have excluded the 2 insulin authorized generics

26                   from their formulary exclusion lists since 2020, instead favoring

**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1    the higher list-priced equivalents. Remarkably, this was true

2    even though the list prices for these authorized generic insulins

3    can be half the list price of the brand. In addition to the

4    exclusions of authorized generic insulins, lower list-priced

5    biosimilar insulins have also faced formulary exclusions. The

6    first biosimilar insulin was launched in 2021. Due to prevailing

7    market dynamics, 2 identical versions of the product were

8    simultaneously introduced—one with a higher list price and

9    large rebates and one with a lower list price and limited

10    rebates—giving payers the option of which to cover. All 3 PBMs

11    excluded the lower-list priced version in 2022, instead choosing

12    to include the identical product with a higher list price.

13                                      396.

14        Further, in July 2024 the Federal Trade Commission released its Interim

15    Staff Report related to its investigation of the PBM Defendants titled, "Pharmacy

16    Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing

17    Main Street Pharmacies" ("FTC Interim PBM Report"). In the Report, the FTC

18    shared "evidence that [the PBM Defendants] and brand pharmaceutical

19    manufacturers sometimes enter agreements to exclude generic drugs and biosimilars

20    from certain formularies in exchange for higher rebates from the manufacturers."

21                                      397.

22        Two months later, on September 20, 2024, the FTC brought an action against

23    PBM Defendants and their affiliated rebate aggregators (Ascent, Emisar, Zinc) for

24    engaging in "unconscionable rebating practices that have artificially inflated the list

25    price of insulin drugs, impaired patients' access to lower list price products, and

26

Page 99 – COMPLAINT

**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1    shifted the cost of high insulin list prices to vulnerable patients (referred to herein as

2    the Insulin Pricing Scheme)."

3                                    398.

4           Importantly, the Insulin Pricing Scheme is a coordinated effort between the

5    Manufacturer and PBM Defendants, that each agreed to and participated in and

6    that created enormous profits for all Defendants. For example:

7    (a)    Manufacturers and PBMs are in constant communication and regularly

8           meet and exchange information to construct and refine the PBM

9           formularies that fuel the Scheme. As part of these communications, the

10          Manufacturers are directly involved in determining not only where

11          their own diabetes medications are placed on the PBMs' formularies

12          and with what restrictions, but also determining the same for

13          competing products;

14   (b)    Manufacturers and PBMs share confidential and proprietary

15          information with each other in furtherance of the Insulin Pricing

16          Scheme, such as market data gleaned from the PBMs' drug utilization

17          tracking efforts and pharmacy claims (retail and mail-order), internal

18          medical efficacy studies and financial data. Defendants then use this

19          information in coordination to set the misleading and deceptive prices

20          for the at-issue medications and construct their formularies in the

21          manner that is most profitable for both sets of Defendants. The data

22          that is used to further this coordinated scheme is compiled, analyzed

23          and shared either by departments directly housed within the PBM or

24          by subsidiaries of the PBM, as is the case with OptumRx which utilizes

25          OptumInsight; and

26

Page 100 – COMPLAINT
1010077716

1     (c)     Manufacturers and PBMs engage in coordinated outreach programs

2          directly to patients, pharmacies and prescribing physicians to convince

3          them to switch to the at-issue diabetes medications that are more

4          profitable for the PBMs and Manufacturers, even drafting and editing

5          letters in tandem to send out to diabetes patients on behalf of the

6          PBMs' clients. For example, the January 2021 Senate Insulin Report

7          released an email where Eli Lilly discussed paying Defendant

8          UnitedHealth Group and OptumRx additional rebates for every client

9          that was converted to formularies that exclusively preferred Eli Lilly's

10         at-issue drugs, including Humalog. The email continued: "United's

11         leadership committee made one ask of Lilly – that we are highly

12         engaged in the communication/pull through plan.[9] I of course indicated

13         we fully expect to support this massive patient transition [to Eli Lilly's

14         at-issue drugs favored by United] and provider education with the full

15         breadth of Lilly resources. UHC also proactively thanked Lilly for our

16         responsiveness, solution generation and DBU execution."

17                                 399.

18     Far from using their prodigious bargaining power to lower drug prices as they

19 claim, Defendants use their dominant positions to work together to generate billions

20 of dollars at the expense of Oregon diabetics.

21     **H.**     **Defendants' Congressional Testimony**

22                                 400.

23     On April 10, 2019, the United States House of Representatives Committee on

24 ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

[9] "Pull through" is an industry term that refers to an integrated process between

25 PBMs and Manufacturers aimed at moving market share and increasing sales for a
certain product following the PBM granting that product preferred placement on its

26 formulary.

Page 101 – COMPLAINT

1010077716

1  Energy and Commerce held a hearing on Defendants' Insulin Pricing Scheme titled,

2  "Priced Out of a Lifesaving Drug: Getting Answers on the Rising Cost of Insulin."

3                                    401.

4        Representatives from all Defendants testified at the hearing and each

5  acknowledged before Congress that the price for insulin has increased exponentially

6  in the past fifteen (15) years.

7                                    402.

8        Representatives from each Defendant explicitly admitted that the price that

9  diabetics have to pay out-of-pocket for insulin is too high. For example:

10       (a)    Dr. Sumit Dutta, Chief Medical Officer of OptumRx stated, "A lack of

11              meaningful competition allows the [M]anufacturers to set high [list]

12              prices and continually increase them which is odd for a drug that is

13              nearly 100 years old and which has seen no significant innovation in

14              decades. These price increases have a real impact on consumers in the

15              form of higher out-of-pocket costs."

16       (b)    Thomas Moriarty, Chief Policy and External Affairs Officer and

17              General Counsel for CVS Health testified, "A real barrier in our country

18              to achieving good health is cost, including the price of insulin products

19              which are too expensive for too many Americans. Over the last several

20              years, [list] prices for insulin have increased nearly 50 percent. And

21              over the last ten years, [list] price of one product, Lantus, rose by 184

22              percent."

23       (c)    Mike Mason, Senior Vice President of Eli Lilly when discussing how

24              much diabetics pay out-of-pocket for insulin stated "it's difficult for me

25              to hear anyone in the diabetes community worry about the cost of

26

Page 102 – COMPLAINT
1010077716

1   insulin. Too many people today don't have affordable access to chronic

2   medications . . ."

3   (d)   Kathleen Tregoning, Executive Vice President External Affairs at

4   Sanofi, testified, "Patients are rightfully angry about rising out-of-

5   pocket costs and we all have a responsibility to address a system that is

6   clearly failing too many people. . . we recognize the need to address the

7   very real challenges of affordability . . . Since 2012, average out-of-

8   pocket costs for Lantus have risen approximately 60 percent for

9   patients . . ."

10   (e)   Doug Langa, Executive Vice President of Novo Nordisk, stated, "On the

11   issue of affordability . . . I will tell you that at Novo Nordisk we are

12   accountable for the [list] prices of our medicines. We also know that

13   [list] price matters to many, particularly those in high-deductible

14   health plans and those that are uninsured."

15   403.

16   Notably, none of the testifying Defendants claimed that the significant

17   increase in the price of insulin was related to competitive factors such as increased

18   costs or improved clinical benefit.

19   404.

20   None of the Defendants pointed to any other participant in the

21   pharmaceutical pricing chain as responsible for the exorbitant price increases for

22   these diabetes medications—nor could they—for these Defendants collectively are

23   solely responsible for the price of almost every single vial of insulin sold in the

24   United States.

25   405.

26   At the April 2019 Congressional hearing, Novo Nordisk's President, Doug

Page 103 – COMPLAINT
1010077716

1  Langa , explained Novo Nordisk's and PBM Defendants' role in perpetuating the
2  "perverse incentives" of the Insulin Pricing Scheme:

3          [T]here is this perverse incentive and misaligned incentives (in
4          the insulin pricing system) and this encouragement to keep [list]
5          prices high. And *we've been participating in that system* because
6          the higher the [list] price, the higher the rebate . . . There is a
7          significant demand for rebates. We spend almost $18 billion in
8          rebates in 2018 . . . [I]f we eliminate all the rebates . . . we would
9          be in jeopardy of losing [our formulary] positions. (Emphasis
10         added).

11                                    406.

12     Eli Lilly, too, has admitted that it raises list prices as a *quid pro quo* for
13  formulary positions. At the April 2019 Congressional hearing, Mike Mason, Senior
14  Vice President of Eli Lilly testified:

15         Seventy-five percent of our [list] price is paid for rebates and
16         discounts to secure [formulary position] . . . $210 of a vial of
17         Humalog is paid for discounts and rebates. . . We have to provide
18         rebates [to PBMs] in order to provide and compete for [formulary
19         position].

20                                    407.

21     Sanofi has also conceded its participation in the Insulin Pricing Scheme.
22  When testifying at the April 2019 Congressional hearing, Kathleen Tregoning,
23  Executive Vice President for External Affairs of Sanofi, testified:

24         The rebates are how the system has evolved. . . I think the
25         system became complex and rebates generated through

26

Page 104 – COMPLAINT
1010077716

1    negotiations with PBMs are being used to finance other parts of

2    the healthcare system and not to lower prices to the patient.

3                                    408.

4    PBM Defendants also admitted at the April 2019 Congressional hearing that

5    they grant preferred, or even exclusive, formulary position because of higher

6    Manufacturer Payments paid by Manufacturer Defendants.

7                                    409.

8    Amy Bricker, then President of Express Scripts, when asked to explain why

9    Express Scripts did not grant an insulin with a lower list price preferred formulary

10   status, answered, "Manufacturers do give higher [payments] for exclusive

11   [formulary] position . . .."

12                                   410.

13   While all Defendants acknowledged their participation in the Insulin Pricing

14   Scheme before Congress, in an effort to avoid culpability each Defendant group

15   pointed the finger at the other as the responsible party.

16                                   411.

17   PBM Defendants specifically testified to Congress that Manufacturer

18   Defendants are solely responsible for their price increases and that the

19   Manufacturer Payments that the PBMs receive are not correlated to rising insulin

20   prices.

21                                   412.

22   This statement is objectively false. The Manufacturers' price increases are a

23   direct reflection of the PBMs' coordinated requests for larger Manufacturer

24   Payments. A February 2020 study by the Leonard D. Schaeffer Center for Health

25   Policy & Economics at the University of South California titled "The Association

26   Between Drug Rebates and List Prices," found that an increase in the amount that

DEPARTMENT OF JUSTICE
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1  the Manufacturers pay back to the PBMs is directly correlated to an increase in

2  prices—on average, a $1 increase in Manufacturer Payments is associated with a

3  $1.17 increase in price—and that reducing or eliminating Manufacturer Payments

4  could result in lower prices and reduced out-of-pocket expenditures.

5                                         413.

6         In addition, in a report the National Community Pharmacists Association

7  estimated that Manufacturer Payments add nearly 30 cents per dollar to the price

8  consumers pay for prescriptions.

9                                         414.

10         Further, in large part because of the increased list prices, and related

11  Manufacturer Payments, PBMs profit per prescription has grown exponentially over

12  the same time period that prices for the at-issue drugs have been increasing. By way

13  of example, since 2003 Defendant Express Scripts has seen its profit per prescription

14  increase over 500 percent per adjusted prescription.

15                                         415.

16         The Manufacturers, on the other hand, argued before Congress that the PBMs

17  were to blame for high drug prices because of their demands for higher

18  Manufacturer Payments in exchange for formulary placement.

19                                         416.

20         However, that also is not true. For example, a 2020 study from the Institute of

21  New Economic Thinking titled, "Profits, Innovation and Financialization in the

22  Insulin Industry," demonstrates that Manufacturer Defendants are still making

23  substantial profits from the sale of diabetes products regardless of any Manufacturer

24  Payments they are sending back to the PBMs. During the same time period when

25  diabetes medication price increases were at their steepest, distributions to

26  Manufacturers' shareholders in the form of cash dividends and share repurchases

Page 106 – COMPLAINT
1010077716

1  totaled *$122 billion*. In fact, during this time period the Manufacturers spent a

2  significantly lower proportion of profits on research and development compared to

3  shareholder payouts.

4                                            417.

5      Indeed, over the past 3 years, each Manufacturer has conducted billions of

6  dollars in stock buybacks, for example, in 2021 Eli Lilly was authorized to conduct

7  $5 billion in stock buybacks over the course of 2 years.

8                                            418.

9      The January 2021 Senate Insulin Report concluded, *inter alia*:

10  (a)    Manufacturer Defendants are retaining more revenue from insulin

11         than in the 2000s—for example, Eli Lilly has reported a steady increase

12         in Humalog revenue for more than a decade—from $1.5 billion in 2007

13         to $3 billion in 2018;

14  (b)    Manufacturer Defendants have aggressively raised the list price of

15         their insulin products absent significant advances in the efficacy of the

16         drugs; and

17  (c)    Manufacturer Defendants only spend a fraction of their revenue related

18         to the at-issue drugs on research and development—Eli Lilly spent

19         $395 million on R&D costs for Humalog, Humulin and Basaglar

20         between 2014-2018 during which time the company generated $22.4

21         billion in revenue on these drugs. From 2016 to 2020, Novo Nordisk

22         spent approximately $29 billion on stock buybacks and shareholder

23         dividend payouts while only spending approximately $12 billion on

24         R&D costs.

25                                            419.

26      As discussed above, on May 10, 2023 at the 2023 Senate Hearing, Defendants

DEPARTMENT OF JUSTICE
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1   again testified before Congress and each Defendant group once again blamed the

2   other.

3                             420.

4       For example, Paul Hudson**,** CEO of Sanofi, said during the hearing: "Today,

5   there are just three payors in the system that cover 80% of American lives... These

6   consolidated entities encompass PBMs, health insurance, specialty pharmacies and

7   group purchasing organizations. This vertical integration gives these corporations

8   near total control over the products patients can access and the price they have to

9   pay."

10                             421.

11       Adam Kautzner, president of Express Scripts, had this to say during the

12   hearing: "Drug manufacturers seek the highest price point possible and exploit the

13   patent system and marketing practices to maintain monopoly status for their

14   brands," "For employers sponsoring high-deductible health plans, restrictions

15   prevent lowering costs for patients before meeting their deductible."

16                             422.

17       The PBM Defendants also continued to misrepresent that their conduct

18   lowers diabetic drug prices. For example, Adam Kautzner testified, "Without the

19   ability to use [rebates] to achieve lower drug costs, health care spending would be

20   much higher."

21                             423.

22       The truth is—despite their finger pointing in front of Congress—

23   Manufacturers and PBMs are both responsible for their concerted efforts in creating

24   the Insulin Pricing Scheme. This reality was echoed in the statement from the

25   Senate Insulin Report, summarizing Congress's findings of their two-year probe into

26   the Insulin Pricing Scheme:

Page 108 – COMPLAINT

**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1    [M]anufacturers and [PBMs] have created a vicious cycle of price

2    increases that have sent costs for patients and taxpayers through

3    the roof . . . This industry is anything but a free market when

4    PBMs spur drug makers to hike list prices in order to secure

5    prime formulary placement and greater rebates and fees.

6    **I.    Defendants Profit Off the Insulin Pricing Scheme**

7    (1)    Manufacturers Profit Off Insulin Pricing Scheme

8    424.

9    For Manufacturer Defendants, the Insulin Pricing Scheme affords them the

10    ability to increase their revenues while paying the PBM Defendants significant, yet

11    undisclosed, Manufacturer Payments in exchange for formulary placement. During

12    the relevant time period, PBM Defendants granted preferred formulary position to

13    each at-issue drug in exchange for large Manufacturer Payments and inflated prices.

14    425.

15    In addition, coordinating with the PBM Defendants to exclude lower priced

16    diabetes medications from the PBMs' formularies increases sales and utilization of

17    higher priced diabetes medications which are more profitable for the Manufacturers.

18    426.

19    Manufacturer Defendants also use the inflated price to earn hundreds of

20    millions of dollars in additional tax breaks by basing their deductions for donated

21    insulins on the inflated list price.

22    (2)    PBMs Profit Off Insulin Pricing Scheme

23    427.

24    Because of the Insulin Pricing Scheme, PBMs' profit per prescription has

25    grown exponentially during the relevant time period. A recent study published in the

26    Journal of the American Medical Association titled, "Estimation of the Share of Net

Page 109 – COMPLAINT
1010077716

1  Expenditures on Insulin Captured by US Manufacturers, Wholesalers, Pharmacy

2  Benefit Managers, Pharmacies and Health Plans from 2014 to 2018" concluded that

3  the amount of money that goes to the PBM Defendants for each insulin prescription

4  increased over 150% from 2014 to 2018. In fact, for transactions where the PBM

5  Defendants control the insurer, the PBM, and the pharmacy (i.e. Aetna-CVS

6  Health/Caremark-CVS Pharmacy) these Defendants now capture an astonishing

7  50% of the money spent on each insulin prescription (up from only 25% in 2014),

8  despite the fact that they do not contribute to the development, manufacture,

9  innovation or production of the product.

10                                    428.

11      PBM Defendants profit off the Insulin Pricing Scheme in myriad ways,

12  including: (1) retaining a significant—yet undisclosed—percentage of the

13  Manufacturers Payments; (2) using the inflated price to generate profits from

14  pharmacies in their networks; and (3) utilizing their captive mail order and retail

15  pharmacies in furtherance of the Insulin Pricing Scheme.

16              a)      *PBMs profit off Manufacturer Payments*

17                                    429.

18      The first way in which the PBMs profit off the Insulin Pricing Scheme is by

19  keeping a significant portion of the Manufacturer Payments.

20                                    430.

21      The amount that the Manufacturers pay back to the PBMs has accelerated to

22  represent a large percentage of the list price of diabetes medications.

23                                    431.

24      Historically, when PBMs contracted with payors, the contract allowed the

25  PBM to keep all or at least some of the Manufacturer Payments they received,

26  rather than pass them along to the payor and/or patient.

Page 110 – COMPLAINT
1010077716

1       432.

2       Over time, payors have secured contract provisions guaranteeing them all or

3  some portion of the "rebates" paid by the Manufacturers to the PBMs. But critically,

4  "rebates" are only a portion of the total secret Manufacturer Payments.

5       433.

6       In this regard, PBM and Manufacturer Defendants have created a "hide-the-

7  ball" system where the consideration exchanged between them (and not shared with

8  payors and diabetics) is labeled and relabeled. As more payors moved to contracts

9  that require PBMs to pass a majority of the manufacturer "rebates" through to the

10  payor, PBMs have begun renaming the Manufacturer Payments in order to keep a

11  larger portion of this money. Payments once known as "rebates" are now called

12  administrative fees, volume discounts, service fees, data fees, inflation fees or other

13  industry jargon terms designed to obfuscate and distract from the substantial sums

14  being secretly exchanged and retained.

15       434.

16       And these renamed Manufacturer Payments are indeed substantial. A heavily

17  redacted Complaint filed by Defendant Express Scripts revealed that *Express Scripts*

18  *now retains up to 13 times more in "administrative fees" than it passes through to*

19  *payors and/or patients in formulary rebates.*

20       435.

21       In addition, the PBMs have come up with numerous ingenious methods to

22  hide these renamed Manufacturer Payments in order keep them for themselves.

23       436.

24       For example, with regard to the Manufacturer Payments now known as

25  "inflation fees," the PBMs often create a hidden gap between how much the

26

Page 111 – COMPLAINT
1010077716

**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1  Manufacturers pay them to increase their prices and the amount in "price protection

2  guarantees" that the PBMs agree to pay back to their client payors and/or patients.

3                                    437.

4         In particular, the Manufacturer Defendants often pay the PBM Defendants

5  "inflation fees" in order to increase the price of their diabetes medications. The

6  thresholds for these payments are typically set around 6% to 8%—if the

7  Manufacturer Defendants raise their prices by more than 6% (or 8%) during a

8  specified time period they pay the PBM Defendants an additional "inflation fee"

9  (based on a percentage of the artificially-inflated prices).

10                                   438.

11         For many of their clients, the PBMs have separate "price protection

12  guarantees" that state that if the overall drug prices for that payor increase by more

13  than a set amount, then the PBMs will revert a portion of that amount back to these

14  clients.

15                                   439.

16         The PBMs set these "price protection guarantees" at a higher rate than the

17  thresholds that trigger the Manufacturers' "inflation fees," usually around 12%-15%.

18                                   440.

19         If the Manufacturers increase their list prices more than the 6%-8% inflation

20  fee rate but less than the 10%-15% client price protection guarantee rate, then the

21  PBMs keep 100% of the "inflation fee" payments. This is a win-win for the

22  Manufacturers and PBMs—both retain and share all of the benefit of the price

23  increases while costs for diabetics continue to rise.

24                                   441.

25         Another method that the PBMs have devised to conceal and retain

26  Manufacturer Payments is through the use of "rebate aggregators." Rebate

Page 112 – COMPLAINT

1010077716

1  aggregators, sometimes referred to as rebate group purchasing organizations

2  ("GPOs"), are entities that negotiate for and collect Manufacturer Payments from

3  drug manufacturers, including the Manufacturers, on behalf of a large group of

4  pharmacy benefit managers (including the PBM Defendants) and different entities

5  that contract for pharmaceutical drugs.

6                                   442.

7         These rebate aggregators are often owned and controlled by the PBM

8  Defendants, such as Ascent Health Services (Express Scripts), Coalition for

9  Advanced Pharmacy Services and Emisar Pharma Services (OptumRx), and Zinc

10  Health Services (CVS Caremark).

11                                  443.

12         With respect to Ascent Health, the PBM Prime Therapeutics is a minority

13  owner along with Express Scripts. Ascent negotiates Manufacturer Payments for the

14  majority (if not all) of Prime Therapeutics' covered lives.

15                                  444.

16         The PBMs carefully guard the revenue streams from their rebate aggregator

17  activities, hiding them in complex contractual relationships and not reporting them

18  separately in their quarterly SEC filings.

19                                  445.

20         Certain rebate aggregator companies are located offshore, for example, in

21  Switzerland (Express Scripts' Ascent Health) and in Ireland (OptumRx's Emisar

22  Pharma Services), making oversight even more difficult.

23                                  446.

24         These rebate aggregator entities generate additional and new Manufacturer

25  Payments for the PBM Defendants from new administrative fees, prescription data

26  services, data portals, enterprise fees, and other sources—all based on a percentage

Page 113 – COMPLAINT
1010077716

1    of drug list prices. These are revenues earned in addition to the PBM Defendants'

2    typical administrative service fees. The PBM Defendants use Zinc Health, Emisar

3    Pharma, and Ascent Health to retain these new Manufacturer Payments which have

4    become a substantial source of enterprise-wide profits and are yet another driver of

5    higher drug prices.

6                                    447.

7            The *New York Times* recently published an investigation titled, "The Opaque

8    Industry Secretly Inflating Prices for Prescription Drugs: Pharmacy benefit

9    managers are driving up drug costs for millions of people, employers and the

10   government" ("NYT PBM Investigation"). The NYT PBM Investigation found that

11   "in 2022, PBMs and their [rebate aggregator affiliates] pocketed $7.6 billion in fees,

12   double what they were bringing in four years earlier."

13                                   448.

14           The NYT PBM Investigation included a quote from an OptumRx executive

15   who admitted the true purpose behind the creation of these rebate aggregator

16   entities:

17               "The intention of the [rebate aggregator entities] is to create a fee

18               structure that can be retained and not passed on to a client," said

19               Kent Rodgers, a former OptumRx executive who helped set up

20               Emisar, "A PBM has to keep some level of income for them to

21               grow and satisfy stockholders."

22                                   449.

23           Moreover, during the relevant time period the PBM Defendants have used

24   their controlled rebate aggregator entities in furtherance of their conspiracy. For

25   example, a 2017 audit conducted by a local governmental entity on Defendant

26   OptumRx related to its PBM activities from January 1, 2013 until December 31,

Page 114 – COMPLAINT
1010077716

1  2015 concluded that the auditor was unable to verify the percentage of rebates

2  OptumRx passed through to its client payor because OptumRx would not allow the

3  auditor access to its rebate contracts. The audit report explained:

4          Optum[Rx] has stated that it engaged the services of an

5          aggregator to manage its rebate activity. Optum[Rx] shared that

6          under this model, they are paid by their aggregator a certain

7          amount per prescription referred. Then, the aggregator, through

8          another entity, seeks rebates from the drug manufacturers,

9          based upon the referred [Payor Client] prescription utilization,

10         and retains any rebate amounts that may be received.

11         Optum[Rx] states that they have paid [Payor Client] all amounts

12         it has received from its aggregator, and that they do not have

13         access to the contracts between the aggregator (and its

14         contractors) and the manufacturer. However, our understanding

15         is that Optum[Rx] has an affiliate relationship with its

16         aggregator.

17                                    450.

18      A footnote in the audit report clarifies that "Optum[Rx] contracted with

19  Coalition for Advanced Pharmacy Services (CAPS), and CAPS in turn contracted

20  with Express Scripts, Inc."

21                                    451.

22      In other words, according to this audit report, OptumRx contracts with its

23  own affiliate rebate aggregator, Coalition for Advanced Pharmacy Services, who then

24  contracts with OptumRx's co-conspirator, Express Scripts, who then contracts with

25  the Manufacturers for rebates related to OptumRx's client's drug utilization.

26  OptumRx then uses this complex relationship between itself, its affiliate, and its co-

Page 115 – COMPLAINT

1010077716

1   conspirator to obscure the amount of Manufacturer Payments that are being

2   generated from its client's utilization.

3                                              452.

4        The January 2021 Senate Insulin Report contained the following observation

5   on these rebate aggregators:

6              [I]t is noteworthy that industry observers have suggested that

7              the recent partnership between Express Scripts and Prime

8              Therapeutics may serve as a vehicle to avoid increasing

9              legislative and regulatory scrutiny related to administrative fees

10             by channeling such fees through a Swiss-based group purchasing

11             organization (GPO), Ascent Health. While there are several

12             regulatory and legislative efforts underway to prohibit

13             manufacturers from paying administrative fees to PBMs, there is

14             no such effort to change the GPO safe harbor rules. New

15             arrangements used by PBMs to collect fees should be an area of

16             continued investigative interest for Congress.

17                                             453.

18       On April 19, 2024, the Inspector General of the US Office of Personnel

19  Management (OPM) published its final audit report of Express Scripts' management

20  of the pharmacy benefit of the America Postal Workers Union Health Plan (the

21  "Carrier") from 2016 to 2021. The audit found that Express Scripts overcharged the

22  Carrier nearly $44.9 million by not passing through all Manufacturer Payments

23  required under the contract, which included Ascent Health withholding

24  approximately $15.8 million in Manufacturer Payments that should have been

25  passed through to the Carrier.

26

Page 116 – COMPLAINT
1010077716

1                                      454.

2        Further, in July 2024, CVS Caremark agreed to pay the State of Illinois $45

3 million for Manufacturer Payments collected by Zinc Health that should have been

4 passed through to the State of Illinois's health plan.

5                                        455.

6        The NYT PBM Investigation also discussed the role of the PBM Defendants'

7 rebate aggregator entities in the Insulin Pricing Scheme:

8                A former executive of a major drug company, whose

9                responsibilities included negotiating with [PBM Defendants'

10                rebate aggregators], said that he had a set pool of money to cover

11                fees to [PBM Defendants' rebate aggregators] and rebates to

12                employers. When he paid more in fees, he offered less in rebates.

13                Employers are none the wiser. They receive rebates. But they

14                can't see the billions of dollars in fees that the [PBM Defendants'

15                rebate aggregators] take for themselves.

16                                        456.

17        Because the PBMs are able to hide (and retain) a majority of the secret

18 Manufacturer Payments that they receive, they continue to make significant profits

19 on the Insulin Pricing Scheme.

20                                      457.

21        Even in the rare cases where certain payor clients receive a portion of the

22 Manufacturer Payments from their particular pharmacy benefit manager (whether

23 it is a PBM Defendant or not), patients in those plans are still significantly

24 overcharged as a direct result of the Insulin Pricing Scheme given the extent to

25 which Defendants have inflated the prices of the at-issue drugs.

26

Page 117 – COMPLAINT
1010077716

1        *b)    PBMs profit off pharmacies*

2                              458.

3        A second way that PBM Defendants profit off the Insulin Pricing Scheme is by

4   using the artificially-inflated price generated by the scheme to profit off the

5   pharmacies with which they contract, including those in Oregon.

6                              459.

7        PBM Defendants decide which pharmacies are included in the PBM's network

8   and how much they will reimburse these pharmacies for each drug dispensed.

9                              460.

10       PBMs pocket the spread between the amount that the PBMs get paid by their

11  clients for the at-issue drugs (which is based on the artificially-inflated prices

12  generated by the Insulin Pricing Scheme) and the amount the PBM reimburses the

13  pharmacy (which is often less).

14                             461.

15       PBMs do not disclose to their clients or network pharmacies how much the

16  PBM is receiving from or paying to the other.

17                             462.

18       This spread pricing, like the secret Manufacturer Payment negotiation,

19  happens behind closed doors. There is no transparency, no commitment from PBM

20  Defendants to take into account the cost effectiveness of a drug, and no

21  communication to either the payor or the pharmacy to let them know if they are

22  getting a fair deal. The higher the Manufacturers inflate their prices, the more

23  money the PBMs make off this spread.

24                             463.

25       PBMs also use the Insulin Pricing Scheme to generate additional profits from

26

**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1   pharmacies by charging the pharmacies post-purchase fees, including DIR fees[10],

2   based on the artificially-inflated prices generated by the Scheme—and again, the

3   higher the list price for each diabetes medication sold, the more the PBMs generate

4   in these pharmacy fees.

5               c)    *PBM Defendants' captive mail order and retail*

6                     *pharmacies are integral to the Insulin Pricing Scheme*

7                                    464.

8        A third way PBMs profit off the Insulin Pricing Scheme is through the PBM

9   Defendants' own mail order and retail pharmacies.

10                                   465.

11       As explained above, the PBM Defendants are vertically integrated corporate

12  families that include both PBM entities and mail order/specialty/retail pharmacies

13  (among other entities). Express Scripts (PBM) is affiliated with Accredo (specialty

14  pharmacy) and mail order pharmacies (including Defendant Express Scripts

15  Pharmacy); CVS Caremark (PBM) is affiliated with CVS Specialty Pharmacy

16  (specialty pharmacy), mail order pharmacies, and Defendant CVS Pharmacy (retail),

17  and OptumRx is affiliated with mail order and specialty pharmacies.

18                                   466.

19       By owning pharmacies, the PBM Defendants are able to steer their clients'

20  prescription-drug plans to those pharmacies, including by requiring and/or

21  incentivizing their covered lives to utilize their own mail order and retail

22  pharmacies, including CVS Pharmacy, Express Scripts Pharmacy, and Optum's mail

23  order pharmacies. As stated in the NYT PBM Investigation: the PBM Defendants

24

25  _____

26  [10] "DIR" fees are post-purchase concessions pharmacies pay back to the PBMs.

Page 119 – COMPLAINT
1010077716

1    "push, and sometimes force, patients to use their pharmacies, whether mail-order or,

2    in [CVS Pharmacy's] case, the physical drugstores."

3                                          467.

4        In June 2024, the House Committee on Oversight and Accountability released

5    a report titled "The Role of Pharmacy Benefit Managers in Prescription Drug

6    Markets" ("2024 House Committee PBM Report") found that the PBM Defendants

7    steer patients to their own pharmacies, including CVS Pharmacy and Express

8    Scripts Pharmacy:

9            The three largest PBMs [including the PBM Defendants] each

10           own retail, mail-order, and specialty pharmacies that are

11           "preferred" in-network under the pharmacy benefit. PBMs steer

12           patients to pharmacies they own by various means, including: (1)

13           preventing patients from receiving 90-day prescriptions at

14           competing pharmacies; (2) abusing data received by the PBM to

15           target patients with highly profitable medications; (3) only

16           covering specialty medications if they are dispensed from a

17           particular pharmacy; and (4) charging patients higher copays at

18           competing pharmacies to incentivize patients to use the PBM

19           owned pharmacy. [Such practices] harms patients and

20           independent community pharmacies, increasing drug prices for

21           patients, employers, and government payers.

22                                         468.

23       In addition, the State of Minnesota recently levied a large fine against CVS

24   Caremark for steering patients to its captured pharmacies, including by "[f]orcing a

25   family to drive more than 100 miles or use a mail-order service to refill an insulin

26   prescription."

Page 120 – COMPLAINT
1010077716

1       469.

2       Once the PBM Defendants steer patients to their affiliated pharmacies, they

3   are overcharging them for the at-issue drugs.

4       470.

5       The higher the price that PBM Defendants are able to get their customers,

6   such as Oregon diabetics and payors, to pay for diabetes medications, the higher the

7   profits PBM Defendants realize through their mail order and retail pharmacies.

8       471.

9       Because the PBMs base the price they charge for the at-issue diabetes

10  medications on the list price, the more the Manufacturers inflate these prices, the

11  more money the PBMs make at their captive pharmacies, including CVS Pharmacy,

12  Express Scripts Pharmacy and Optum mail order pharmacies.

13      472.

14      A June 2024 study by Three Axis Advisors, a PBM research and investigation

15  firm, found that the PBM Defendants are charging significantly higher prices at

16  their captive pharmacies (which would include CVS Pharmacy, Express Scripts

17  Pharmacy and the Optum mail order pharmacies) for branded drugs, such as the at-

18  issue diabetes medications, than for those prescriptions filled by independent

19  pharmacies. For example, the PBM Defendants are charging their clients a

20  significantly higher markups on brand drugs through their captive mail order

21  pharmacies as demonstrated by the Figure 12:

22

23

24

25

26

Page 121 – COMPLAINT
1010077716

1  **Figure 12: Average Markups for Medicines Dispensed through Mail Order**
2  **versus other channels**



473.

PBMs also collect and retain Manufacturer Payments tied directly to drugs dispensed by their captive pharmacies, including CVS Pharmacy and the PBMs' mail order pharmacies, such as pharmacy supplemental discount fees, indirect purchase and fees and rebates. The PBM Defendants do not pass these pharmacy Manufacturer Payments through to their clients. And again, these pharmacy Manufacturer Payments are based on the list price, thus the higher the price, the more profits the PBM Defendants make.

DEPARTMENT OF JUSTICE
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1         474.

2   Another way the PBMs generate pharmacy profits from the inflated prices

3 generated by the Insulin Pricing Scheme is by way of an arbitrage purchase scheme.

4 Because of their coordinated efforts with the Manufacturers in furtherance of the

5 Insulin Pricing Scheme, the PBMs often know when the Manufacturers are going to

6 raise their prices. The PBMs use this knowledge to purchase large quantities of the

7 at-issue drugs prior to the price increases at a lower price. The PBMs then charge

8 diabetics and payors the higher price after the increase and conceal and retain the

9 difference.

10        475.

11   In sum, the PBM Defendants captive pharmacies, including CVS Pharmacy

12 and the PBMs' mail order pharmacies, are directly involved in and create

13 substantial profits from the Insulin Pricing Scheme.

14        476.

15   Every way that the PBMs make money on diabetes medications is directly

16 tied to the artificially-inflated list prices generated by the Insulin Pricing Scheme.

17 PBMs are not lowering the price of diabetes medications as they publicly represent—

18 rather they are making billions of dollars by fueling these skyrocketing prices.

19  **J.**  **Defendants Deceived Oregon Diabetics and Payors**

20    (1)  <u>Manufacturer Defendants deceived Oregon diabetics and payors</u>

21        477.

22   At all times during the relevant time period, Manufacturer and PBM

23 Defendants knew that diabetics and payors relied on the artificially-inflated list

24 prices generated by the Insulin Pricing Scheme to pay for the at-issue drugs. That is,

25 Oregon diabetics relied on the artificially-inflated list prices by purchasing diabetic

26 medications at such prices.

**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1    478.

2    Manufacturer and PBM Defendants further knew that Oregon' diabetics and

3    payors expected and desired to pay the lowest fair-market price possible for the at-

4    issue drugs. In fact, as discussed in greater detail below, the PBM Defendants

5    repeatedly represented that they were using their market power to ensure that

6    Oregon' diabetics paid the lowest price possible.

7    479.

8    Manufacturer and PBM Defendants knew that the artificially-inflated list

9    prices generated by the Insulin Pricing Scheme were deceptive and completely

10    untethered from the net prices that the Manufacturer Defendants actually received

11    for the drugs.

12    480.

13    As the list prices for the at-issue drugs detached completely from the

14    Manufacturers' net prices, the list prices became misrepresentative and unlawful.

15    481.

16    Despite this knowledge, Manufacturer Defendants caused the artificially-

17    inflated list prices generated by the Insulin Pricing Scheme to be published

18    throughout Oregon through publishing compendia and in various promotional and

19    marketing materials distributed by entities downstream in the drug supply chain.

20    482.

21    Manufacturer Defendants also published these prices to the PBMs and

22    pharmacies in their networks, including their own captive pharmacies such as CVS

23    Pharmacy and the PBMs' mail order pharmacies, who then use the misleading and

24    deceptive prices to set the amount diabetics pay for the at-issue drugs.

25    483.

26    By publishing their artificially-inflated prices throughout Oregon, the

Page 124 – COMPLAINT
1010077716

1    Manufacturers held these prices out as a reasonable price by which to base the

2    prices diabetics pay for the at-issue drugs.

3                                    484.

4          These representations are misleading and deceptive. Manufacturer

5    Defendants knew that their artificially-inflated list prices are not remotely related to

6    the net prices they receive for the at-issue drugs and are not based on transparent or

7    market-based factors such as competition, cost of production, or research and

8    development.

9                                    485.

10         The Manufacturer Defendants could have reported and published prices that

11   accurately reflected the actual, net prices of the at-issue diabetes medications.

12   However, in furtherance of and in order to conceal the Insulin Pricing Scheme the

13   Manufacturer Defendants deliberately published only the artificially-inflated prices.

14                                   486.

15         Notably, during the relevant time period, the Manufacturers published prices

16   in Oregon of $300-$400 for the same at-issue drugs that were sold in other countries

17   for less than $5.

18                                   487.

19         Manufacturer Defendants have also publicly represented that they price the

20   at-issue drugs according to each drug's value to the health care system and the need

21   to fund innovation and research. For example, briefing materials prepared for Chief

22   Executive Officer (CEO) Dave Ricks as a panelist at the 2017 Forbes Healthcare

23   Summit included "Reactive Key Messages" on pricing that emphasized the

24   significant research and development costs for insulin. During the relevant time

25   period, executives from Sanofi and Novo Nordisk also represented that research and

26   development costs were key factors driving the at-issue price increases.

Page 125 – COMPLAINT
1010077716

1     488.

2     These statements are also false. Between 2005 and 2018, Eli Lilly only spent

3     $680 million on R&D costs related to Humalog while earning $31.35 billion in *net*

4     sales during that same time period. In other words, Eli Lilly made more than 46

5     times its reported R&D costs on Humalog during this portion of the relevant time

6     period. Additionally, data reported in the 2021 Senate Report demonstrates that Eli

7     Lilly's R&D spending for its entire "diabetes franchise", including both insulins and

8     GLP-1s, was "just one-third of its sales, goods and administrative expenses" for

9     2017-2018.

10     489.

11     Novo Nordisk has spent triple the amount it spends on R&D on stock buyouts

12     and shareholder dividend payouts in recent years.

13     490.

14     As for Sanofi, the 2021 Senate Report concluded that its R&D spending on

15     Lantus, Soliqua, Toujeo, Apidra, and one other diabetes medication accounted for a

16     "fraction of the company's reported revenue from its diabetes franchise" between

17     2014-2018.

18     491.

19     The Manufacturers' list prices were artificially inflated in furtherance of the

20     Insulin Pricing Scheme to generate profits for the Manufacturer and PBM

21     Defendants.

22     492.

23     Manufacturer Defendants affirmatively withheld the truth from Oregon

24     diabetics and payors and specifically made these misrepresentations in furtherance

25     of the Insulin Pricing Scheme and to induce reliance in diabetics and payors to

26     purchase their at-issue drugs.

Page 126 – COMPLAINT
1010077716

1          493.

2          PBM Defendants ensured that the Manufacturers' artificially-inflated list

3    prices harmed diabetics by requiring that their contracts with both pharmacies and

4    with payors included them as the basis for payment.

5          494.

6          PBMs perpetuate the use of the artificially inflated insulin prices because it

7    allows them to obscure the actual price any entity in the drug pricing chain is paying

8    for the at-issue drugs. This concealment and lack of transparency

9    affords Defendants the opportunity to construct and perpetuate the Insulin Pricing

10   Scheme, and to profit therefrom.

11          (2)    <u>PBM Defendants deceived Oregon diabetics and payors</u>

12          495.

13   PBM Defendants have deceived diabetics and payors in Oregon.

14          496.

15          Throughout the relevant time period, PBM Defendants have consistently and

16   repeatedly represented that: (a) their interests are aligned with diabetics and

17   payors; (b) they work to lower the price of the at-issue drugs and, in doing so, they

18   achieve substantial savings for diabetics and payors; and (c) that the PBMs

19   construct formularies designed to improve the health of diabetics.

20          497.

21          PBMs understand that diabetics rely on the PBMs to achieve the lowest prices

22   for the at-issue drugs and to construct formularies designed to improve their health

23   and lower costs.

24          498.

25          At no time have the PBM Defendants disclosed their knowledge and

26   perpetuation of the artificially-inflated list prices for the at-issue drugs; to the

**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1　contrary, the PBMs ensured that diabetics and payors pay based on those

2　artificially-inflated list prices.

3　　　　　　　　　　　　　　　　499.

4　　　　　In addition to the general PBM misrepresentations discussed above in the

5　Parties section, throughout the relevant time period and continuing to this day,

6　PBM Defendants have purposefully, consistently, and routinely made

7　misrepresentations specifically about the at-issue Manufacturer Payments,

8　formulary construction, and the PBMs' role in the diabetic pricing system. Examples

9　include:

10　　　(a)　　In a public statement issued on May 11, 2010, CVS Caremark

11　　　　　　　　represented that it was focused on diabetes to "help us add value for

12　　　　　　　　our PBM clients and improve the health of plan members . . . a PBM

13　　　　　　　　client with 50,000 employees whose population has an average

14　　　　　　　　prevalence of diabetes could save approximately $3.3 million a year in

15　　　　　　　　medical expenditures."

16　　　(b)　　On June 22, 2010, Andrew Sussman, Chief Medical Officer of CVS

17　　　　　　　　Caremark stated on national television that "CVS is working to develop

18　　　　　　　　programs to hold down [diabetes] costs."

19　　　(c)　　In a public statement issued in November 2012, CVS Caremark

20　　　　　　　　represented that formulary decisions related to insulin products "is one

21　　　　　　　　way the company helps manage costs for clients."

22　　　(d)　　On August 31, 2016, Glen Stettin, Senior Vice President and Chief

23　　　　　　　　Innovation Officer at Express Scripts released a statement that stated

24　　　　　　　　"[d]iabetes is wreaking havoc on patients, and it is also a runaway

25　　　　　　　　driver of costs for payors . . . [Express Scripts] helps our clients and

26

Page 128 – COMPLAINT

1010077716

1      diabetes patients prevail over cost and care challenges created by this

2      terrible disease."

3      (i)      Mr. Stettin continued on to represent that Express Scripts

4                "broaden[s] insulin options for patients and bend[s] down the

5                cost curve of what is currently the costliest class of traditional

6                prescription drugs."

7    (e)    In January 2017, Tim Wentworth, CEO of Express Scripts represented

8      that "without PBMs, and specifically without Express Scripts, our

9      clients would pay [many times] more for [insulin]."

10     (i)      Mr. Wentworth continued on to state Express Scripts is

11               dedicated to controlling insulin prices because "we stand up for

12               payers and patients."

13   (f)    On June 1, 2018, Mark Merritt, President of the PCMA, in response to

14      a question about PBMs' role in the insulin pricing system stated,

15      "[Through their formulary construction], PBMs are putting pressure on

16      drug companies to reduce insulin prices."

17   (g)   On April 4, 2019, Steve Miller, Express Scripts' chief medical officer,

18      stated that Express Scripts "give[s] people who rely on insulin greater

19      affordability and cost predictability so they can focus on what matters

20      most: their well-being." Dr. Miller continued on to describe Express

21      Scripts' work on behalf of diabetics as, "[b]etter care and better

22      outcomes are rooted in greater choice, affordability, and access, and we

23      can bring all of these to people with the greatest needs."

24   (h)   CVS Health's Chief Policy and External Affairs Officer testified during

25      the April 2019 hearings that CVS Caremark "has taken a number of

26      steps to address the impact of insulin price increases. We negotiate the

Page 129 – COMPLAINT
1010077716

1      best possible discounts off the manufacturers' price on behalf of

2      employers, unions, government programs, and beneficiaries that we

3      serve."

4      (i)      Chief Medical Officer of OptumRx, testified before the U.S. Congress in

5      the April 2019 hearing that for "insulin products . . . we negotiate with

6      brand manufacturers to obtain significant discounts off list prices on

7      behalf of our customers."

8      (j)      The PCMA website contains the following misrepresentations,

9      "the insulin market is consolidated, hindering competition and limiting

10      alternatives, leading to higher list prices on new and existing brand

11      insulins. PBMs work hard to drive down costs using formulary

12      management and rebates."

13      (k)      In August 2022, Heather Cianfrocco, CEO of OptumRx, stated that

14      "[t]he need for affordable insulin is urgent, especially for uninsured

15      populations" and represented that OptumRx can improve access and

16      lower costs for those who need an affordable insulin solution. OptumRx

17      also reiterated that it leverages its core clinical and pharmacy benefit

18      capabilities to negotiate lower prices and discounts.

19                                          500.

20      PBM Defendants also misrepresent that they negotiate with Manufacturer

21 Defendants to lower the price of the at-issue diabetes medications for diabetic

22 patients. Examples include:

23      (a)      Express Scripts' publicly available code of conduct states, "[a]t Express

24      Scripts we're dedicated to keeping our promises to *patients and clients* .

25      . . This commitment defines our culture, and all our collective efforts

26

DEPARTMENT OF JUSTICE
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1    are focused on our mission to make the use of prescription drugs safer

2    and more affordable." (Emphasis added).

3    (b)    Amy Bricker, then President at Express Scripts testified before

4    Congress in April 2019, "At Express Scripts we negotiate lower drug

5    prices with drug companies on behalf of our clients, *generating savings*

6    *that are returned to patients* in the form of lower premiums and reduced

7    out-of-pocket costs." (Emphasis added).

8    (c)    Amy Bricker of Express Scripts also testified at the Congressional

9    hearing that "Express Scripts remains committed to . . . *patients* with

10    diabetes and creating affordable access to their medications."

11    (Emphasis added).

12    (d)    OptumRx's website has stated "[t]he services we provide help *improve*

13    *health outcomes for patients* while making prescription drugs more

14    affordable for plan sponsors and *individuals*, and more sustainable for

15    the country . . . the reason is simple: drug manufacturers are

16    responsible for the high cost of prescription drugs . . . OptumRx

17    negotiates better prices with drug manufacturers for our customers *and*

18    *consumers* . . . At OptumRx, *our mission is helping people live healthier*

19    *lives* and *to help make the health system work better for everyone*."

20    (Emphasis added).

21    (e)    In its 2017 Drug Report, CVS Caremark stated that the goal of its

22    pharmacy benefit plans is to ensure "that the cost of a drug is aligned

23    with the value it delivers in terms of *patient* outcomes . . . in 2018, we

24    are doing even more to help keep drugs affordable with our new

25    Savings *Patients* Money initiative." (Emphasis added).

26

Page 131 – COMPLAINT
1010077716

1    (f)    The PCMA website states, "PBMs have kept average out-of-pocket

2          (OOP) payments flat for beneficiaries with commercial insurance."

3    (g)    On March 12, 2019, OptumRx represented, "OptumRx is uniquely able

4          to deploy the broadest range of tools to rein in high drug prices, [which]

5          demonstrates our commitment to delivering better prices for

6          consumers."

7                                501.

8    In 2024, Travis Tate, VP of Formulary and Trend Solutions for CVS

9 Caremark represented on CVS Health's website that CVS Caremark's "formulary

10 design continues to deliver savings while optimizing plan member experience." Mr.

11 Tate further represented that CVS Caremark's managed formularies deliver $4.8

12 billion in client savings and $138 in savings per patient. Mr. Tate also represented

13 that "[CVS Caremark is] dedicated to keeping member costs low so they can afford

14 their medications while limiting member disruption."

15                                502.

16    In April 2024, David Joyner, the Executive Vice President of CVS Caremark,

17 made the following representations in a Fortune article:

18    (a)    "[CVS Caremark] exist[s] to make prescription drugs more affordable."

19    (b)    "As we work to bring down costs, you'll hear from others who want to

20          raise [drug prices], specifically pharmaceutical companies who are

21          directly responsible for how drugs are priced in our country."

22    (c)    "At CVS Caremark, we are creating a more transparent environment

23          for drug pricing in this country . . . for every drug from every

24          manufacturer for every condition and every patient."

25    (d)    "[CVS Caremark's] size and scale allow us to go toe-to-toe with drug

26          companies, driving competition and negotiating discounts that make

Page 132 – COMPLAINT
1010077716

1    the difference between someone affording their medication or going

2    without."

3    (e)    "[CVS Caremark] take[s] on every challenge, manage every drug, and

4    deliver savings and safety."

5    503.

6    CVS Caremark's website represents it is "[w]orking to keep prescription drug

7    costs down for members and clients." CVS Caremark further claims it is

8    "[i]mproving health through affordability" because "people are more likely to take

9    their prescribed medications when they know they can afford them – and that can

10   lead to better health outcomes."

11   504.

12   CVS Caremark also represents to diabetics on the CVS Health website:

13   (a)    "Pharmaceutical manufacturers insist that increasing drug prices are a

14   result of them having to pay rebates. This is simply not true."

15   (b)    "Pharmaceutical manufacturers also argue that PBMs retain the

16   rebates they negotiate, and that higher prices mean more rebates and

17   greater profits for PBMs. This is entirely false. Rebate retention also

18   has no correlation to higher drug prices."

19   (c)    "At CVS Health, we are committed to using every tool possible and

20   continuing to drive innovation to bring down the cost of drugs. We

21   remain focused on providing the right drug to the right patient at the

22   right time at the lowest possible cost."

23   505.

24   Express Scripts claimed in a 2019 article titled "What's a Pharmacy Benefit

25   Manager" that Express Scripts "work[s] with plan sponsors to provide a benefit that

26

Page 133 – COMPLAINT
1010077716

1    delivers the best clinical outcome and the lowest possible cost." Express Scripts also

2    publicly represented in this article:

3        (a)    "By delivering smarter solutions to patients and clients, PBMs provide

4                 better care and lower cost with every prescription, every time."

5        (b)    "Rebates do not raise drug prices, drug makers raise drug prices, and

6                 they alone can lower them. Consider the cost of Humalog® (insulin

7                 lispro): over the past seven years, the list price for this medication has

8                 increased dramatically, yet the net cost has remained relatively

9                 constant. Without PBMs, and specifically without Express Scripts, plan

10                sponsors would have paid exponentially more for their prescription

11                drugs."

12       (c)    "We . . . negotiate with drug manufacturers so no one pays more than

13                they need to."

14       (d)    "FACT: Public disclosure of negotiated rebates will not lower

15                prescription drug costs. #PBMs Express Scripts negotiates with drug

16                manufacturers to increase competition and lower costs for patients."

17                                506.

18       Not only have PBM Defendants intentionally misrepresented that they use

19   their market power to save diabetics money, they also falsely disavowed that their

20   conduct drives the artificially-inflated list prices higher. Examples include:

21       (a)    On an Express Scripts' earnings call in February 2017, CEO Tim

22                Wentworth stated, "Drugmakers set prices, and we exist to bring those

23                prices down."

24       (b)    Larry Merlo, head of CVS Caremark sounded a similar refrain in

25                February 2017, "Any suggestion that PBMs are causing prices to rise is

26                simply erroneous."

Page 134 – COMPLAINT
1010077716

1    (c)    In 2017, Express Scripts' Wentworth went on CBS News to again argue

2        that PBMs play no role in rising drug prices, stating that PBMs work to

3        "negotiate with drug companies to get the prices down."

4    (d)    During the April 2019 Congressional hearings, when asked if PBM-

5        negotiated rebates and discounts were causing the insulin price to

6        increase, OptumRx's Chief Medical Officer answered, "we can't see a

7        correlation when rebates raise list prices."

8    (e)    In 2019, when testifying under oath before Congress on the rising price

9        of insulins, then Senior Vice President Amy Bricker of Express Scripts

10        testified, "I have no idea why the prices [for insulin] are so high, none of

11        it is the fault of rebates."

12    (f)    In 2023 when testifying before Congress about insulin prices, Heather

13        Cianfrocco stated, "[OptumRx] has been at the forefront of efforts to

14        make insulin more affordable." Ms. Cianfrocco continued, "we support

15        and encourage lower list prices across the board."

16                507.

17    Throughout the relevant time period, PBM Defendants have also

18 misrepresented that they are transparent about the Manufacturer Payments that

19 they receive and that they pass along (or do not pass along) to payors. As stated

20 above, PBM Defendants retain many times more in total Manufacturer Payments

21 than the traditional formulary "rebates" they may pass through—in whole or part—

22 to payors.

23                508.

24    Despite this, in 2011, OptumRx's President stated: "We want our clients to

25 fully understand our pricing structure . . . [e]veryday we strive to show our

26

Page 135 – COMPLAINT

1010077716

1    commitment to our clients, and one element of that commitment is to be open and

2    honest about our pricing structure."

3                                                   509.

4            In a 2017 CBS News interview, Express Scripts' CEO, represented, among

5    other things, that Express Scripts was "absolutely transparent" about the

6    Manufacturer Payments it receives and that payors, "know exactly how the dollars

7    flow" with respect to these Manufacturer Payments.

8                                                   510.

9            When testifying before Congress in April 2019, Amy Bricker, then President of

10   Express Scripts, had the following exchange with Representative John Sarbanes of

11   Maryland regarding the transparency (and lack thereof) of the Manufacturer

12   Payments:

13                  Ms. Bricker. The rebate system is 100 percent transparent to the

14                  plan sponsors and the customers that we service. To the people

15                  that hire us, employers of America, the government, health

16                  plans, what we negotiate for them is transparent to them. . .

17                  [However] the reason I'm able to get the discounts that I can

18                  from the manufacturer is because it's confidential [to the public].

19

20                  Mr. Sarbanes. What about if we made it completely transparent?

21                  Who would be for that?

22

23                  Ms. Bricker. Absolutely not . . . it will hurt the consumer.

24

25                  Mr. Sarbanes. I don't buy it.

26

Page 136 – COMPLAINT
1010077716

1      Ms. Bricker – prices will be held high.

2

3      Mr. Sarbanes. I am not buying it. I think a system has been built

4      that allows for gaming to go on and you have all got your talking

5      points. Ms. Tregoning [of Sanofi], you have said you want to

6      guarantee patient access and affordability at least ten times,

7      which is great, but there is a collaboration going on here . . . the

8      system is working for both of you at the expense of the patient.

9      Now I reserve most of my frustration for the moment in this

10     setting for the PBMs, because I think the lack of transparency is

11     allowing for a lot of manipulation. I think the rebate system is

12     totally screwed up, that without transparency there is

13     opportunity for a lot of hocus-pocus to go on with the rebates.

14     Because the list price ends up being unreal in certain ways

15     except to the extent that it leaves certain patients holding the

16     bag, then the rebate is negotiated, but we don't know exactly

17     what happens when the rebate is exchanged in terms of who

18     ultimately benefits from that. And I think we need more

19     transparency, and I do not buy the argument that the patient is

20     going to be worse off, the consumer is going to be worse off if we

21     have absolute transparency . . . *I know when you started out, I*

22     *understand what the mission was originally with the PBMs . . .*

23     *But now things have gotten out of control. You are too big and the*

24     *lack of transparency allows you to manipulate the system at the*

25     *expense of the patients.* So I don't buy the argument that the

26

Page 137 – COMPLAINT
1010077716

1    patient and consumer is going to get hurt if we have absolute

2    transparency. (Emphasis added).

3                                    511.

4         Throughout the relevant time period, the PBMs have made the foregoing

5    misrepresentations consistently and directly to Oregon diabetics through member

6    communications, formulary change notifications, and through extensive direct-to-

7    consumer pull through efforts engaged in with the Manufacturers.

8                                    512.

9         PBM Defendants also make these same representations directly to their

10   Oregon payor clients—that their interests are aligned with their payor clients, that

11   they lower the price of the at-issue drugs, and that their formulary construction is

12   for the benefit of diabetics.

13                                   513.

14        The above stated PBM Defendants' representations are misleading and

15   deceptive, and the Defendants knew they were deceptive when they made these

16   representations.

17                                   514.

18        Contrary to their representations that they lower the price of the at-issue

19   drugs for diabetics, PBMs' formulary construction and the Manufacturer Payments

20   they receive in exchange for formulary placement have caused the price paid by

21   diabetics and payors to significantly increase.

22                                   515.

23        For example, diabetics in Europe and Canada pay significantly less for their

24   diabetes medications than diabetics in the United States who are affected by the

25   Insulin Pricing Scheme.

26

DEPARTMENT OF JUSTICE
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1        516.

2        In addition, diabetics that receive their medications from federal programs

3    that do not utilize PBMs also pay significantly less. For example, in December 2020,

4    the United States House of Representatives Committee on Oversight and Reform

5    issued a Drug Pricing Investigation Report that found that federal health care

6    programs that negotiate directly with the Manufacturers (such as the Department of

7    Veterans Affairs), and thus are outside the PBM Defendants' scheme, paid $16.7

8    billion less from 2011 through 2017 for the at-issue drugs than the Medicare Part D

9    program which relies on the PBM Defendants to set their at-issue drug prices (and

10   thus are victims of the PBMs' concerted efforts to drive up the list prices).

11       517.

12       Another example is the price paid by the Veterans Affairs ("VA") for the at-

13   issue drugs through their national contracts with the Manufacturers. Notably, the

14   VA prices involve the same Manufacturers, the same drugs, the same packaging, the

15   same distributors, the same time period, the same cost of goods sold, the same

16   distribution fees, the same consequential volumes, the same therapeutic category,

17   the same therapeutic interchangeability within the therapeutic category, and the

18   same exclusivity as the commercial market. Indeed, the only difference between the

19   VA and commercial worlds relevant to the price disparity is that the VA prices

20   resulted from actual price competition between the Manufacturers, whereas the

21   artificially-inflated list prices resulted from the Insulin Pricing Scheme. Figures 13

22   and 14 show the price of Novolog and Novolin paid by the VA through its national

23   contract versus the WAC prices of those drugs.

24

25

26

Page 139 – COMPLAINT
1010077716

1   **Figure 13: Novolog VA Prices (Pink Dotted Line) vs. Novolog WAC Prices**

2                              **(Blue Line)**

3



14

15

16

17

18

19

20

21

22

23

24

25

26

**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1   **Figure 14: Novolin VA Prices (Pink Dotted Line) vs. Novolin WAC Prices**

2   **(Blue Line)**



14                                    518.

15   The NYT PBM Investigation concluded:

16           The job of the P.B.M.s is to reduce drug costs. Instead, they

17           frequently do the opposite. They steer patients toward pricier

18           drugs, charge steep markups on what would otherwise be

19           inexpensive medicines and extract billions of dollars in hidden

20           fees, a New York Times investigation found.

21                                    519.

22   The NYT PBM Investigation further "found that the largest PBMs often act in

23   their own financial interest, at the expense of their clients and patients." Among the

24   findings of the NYT PBM Investigation:

25

26

DEPARTMENT OF JUSTICE
100 SW Market Steer
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1    (a)    PBMs sometimes push patients toward drugs with higher out-of-pocket
2            costs, shunning cheaper alternatives.

3    (b)    They often charge employers . . . multiple times the wholesale price of a
4            drug, keeping most of the difference for themselves. That overcharging
5            goes far beyond the markups that pharmacies, like other retailers,
6            typically tack on when they sell products.

7    (c)    The largest PBMs recently established subsidiaries that harvest
8            billions of dollars in fees from drug companies, money that flows
9            straight to their bottom line and does nothing to reduce health care
10           costs.

11                                          520.

12          Contrary to their representations that they work to promote the health of

13   diabetics, as a result of the Insulin Pricing Scheme many diabetics have been priced

14   out of these life-sustaining medications. As a result, many of these diabetics are

15   forced to either ration their insulin or to skip doses. This behavior is dangerous to a

16   diabetic's health and can lead to a variety of complications and even death.

17                                          521.

18          Both PBM and Manufacturer Defendants knew that these representations

19   were misleading and deceptive when they made them, and affirmatively withheld

20   the truth regarding the artificially-inflated list prices, formulary construction, and

21   Manufacturer Payments from the Oregon diabetics and the State. Both PBM

22   Defendants and Manufacturer Defendants intended for Oregon residents with

23   diabetes and payors to rely on their misrepresentations.

24                                          522.

25          Defendants concealed the falsity of these representations by closely guarding

26   their pricing structures, agreements, and sales figures.

Page 142 – COMPLAINT
1010077716

1        523.

2        Manufacturer Defendants do not disclose to diabetics the actual prices they

3   receive for the at-issue drugs or the amount in Manufacturer Payments they pay to

4   the PBM Defendants.

5        524.

6        PBM Defendants do not disclose to diabetics, payors, or the public the details

7   of their agreements with Manufacturer Defendants or the Manufacturer Payments

8   they receive from them—nor do they disclose the details related to their agreements

9   with payors and pharmacies.

10        525.

11        Each Defendant conceals this information and its unconscionable and

12   deceptive conduct by signing confidentiality agreements with any entity in the

13   supply chain with which it contracts.

14        526.

15        PBM Defendants have gone as far as suing governmental entities to block the

16   release of details on their pricing agreements with Manufacturers and pharmacies.

17   Defendants and their trade organizations, including PCMA and PhRMA, expend

18   considerable resources fighting and blocking any legislative efforts aimed at drug

19   pricing transparency.

20        527.

21        Even when audited, PBM Defendants often still refuse to disclose their

22   agreements with Manufacturers and pharmacies, relying on overly broad

23   confidential agreements, claims of trade secrets and other unnecessary restrictions.

24        528.

25        Each Defendant's effort to conceal its pricing structures for the at-issue drugs

26   is evidence that each Defendant knows its conduct is unconscionable and deceptive.

Page 143 – COMPLAINT
1010077716

1      529.

2      To make matters worse, Oregon diabetics have no choice but to pay based on

3  Defendants' artificially-inflated list prices because they need these medications to

4  survive, the Manufacturer Defendants make virtually all of the diabetes medications

5  available in Oregon, and the PBM Defendants completely dominate the pharmacy

6  benefit services market and control nearly every Manufacturer Payment paid in the

7  market.

8      530.

9      In sum, the entire diabetes drug pricing structure created by the

10  Defendants—from the deceptive prices, to the Manufacturers' misrepresentations

11  related to the reason behind the price, to the inclusion of the deceptive prices in

12  payor contracts, to the non-transparent Manufacturer Payments, to the misuse of

13  formularies, to the PBMs' representations that they work to lower prices and

14  promote the health of diabetics—is unconscionable and deceptive.

15      531.

16      Oregon diabetics and payors pay for the at-issue diabetes medications at the

17  artificially-inflated prices generated by the Insulin Pricing Scheme, because they

18  relied on these prices as reasonable bases for their life-sustaining medications.

19      532.

20      Oregon diabetics and payors utilize the PBM Defendants' pharmacy benefit

21  services, mail order and retail pharmacy services, and formularies because the PBM

22  Defendants represent that they lower prices and promote health.

23      533.

24      Oregon diabetics and payors did not know, because the Defendants

25  affirmatively concealed, that contrary to their representations: (i) the Defendants'

26  conduct was driving up prices; (ii) the list prices were manipulated to satisfy

Page 144 – COMPLAINT
1010077716

1   Defendants' profit demands; (iii) the list prices bore no relationship to the net prices

2   received by the Manufacturers for the at-issue drugs; and (iv) that the entire diabetic

3   drug pricing structure was created and perpetuated by Defendants' deceptive and

4   unconscionable conduct.

5   **K.     The Insulin Pricing Scheme Has Damaged Diabetics and**

6   **Payors**

7          (1)     Defendants' misconduct has caused increased healthcare costs

8                                  534.

9          As discussed below, the PBM Defendants formulary exclusions and the rising

10  prices for the at-issue drugs has had a devastating effect on the health of diabetics.

11  It has also caused a staggering increase in healthcare costs.

12                                 535.

13         As a direct result of the Insulin Pricing Scheme, 1 in 4 diabetics can no longer

14  afford their diabetes medication and are forced to ration and skip doses. This forced

15  lack of adherence to their diabetes medications leads to substantial additional

16  healthcare costs.

17                                 536.

18         One national model projected that improved adherence to diabetes medication

19  would avert 699,000 emergency department visits and 341,000 hospitalizations

20  annually, for a savings of $4.7 billion. The model further found that eliminating the

21  loss of adherence would lead to another $3.6 billion in savings, for a combined

22  potential savings of $8.3 billion.

23                                 537.

24         Lack of adherence to diabetes medications also has a significant adverse effect

25  on labor productivity in terms of absenteeism (missing work due to health-related

26

**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1   reasons), presenteeism (being present at work but not productive), and disability

2   (inability to perform necessary physical tasks at work).

3          (2)     The Insulin Pricing Scheme has damaged Oregon diabetics and

4                  payors

5                                    538.

6          Oregon payors pay for the at-issue drugs based on the inflated prices

7   generated by the Insulin Pricing Scheme and have been overcharged by millions of

8   dollars a year for the relevant time period.

9                                    539.

10         Oregon diabetics, whether insured or not, pay a substantial part of their

11  diabetic drug costs based on Defendants' artificially-inflated list prices generated by

12  the Insulin Pricing Scheme and thus have been directly damaged as well.

13                                   540.

14         The Manufacturer Defendants' list price increases have resulted in high costs

15  for both insured patients and uninsured. In 2019, the Department of Health and

16  Human Services found that for patients using diabetes medications with commercial

17  insurance, 19% of insulin prescriptions required out-of-pocket costs exceeding $70.

18  For uninsured patients, 27% of insulin prescriptions involved costs greater than $70.

19                                   541.

20         The Insulin Pricing Scheme has caused the prices that Oregon diabetics must

21  pay for insulin and other diabetic drugs to skyrocket over the last fifteen years.

22                                   542.

23         In addition to financial losses, for many diabetics in Oregon, the Insulin

24  Pricing Scheme has cost them their health and emotional well-being. As a result of

25  increased prices and the fact that the PBM Defendants have been excluding more

26

Page 146 – COMPLAINT
1010077716

1  affordable diabetes medications from their formularies, many Oregon diabetics have

2  been priced out of these life sustaining medications.

3                                      543.

4          Unable to afford Defendants' price increases, many diabetics in Oregon have

5  begun to engage in highly risky behaviors with respect to their disease, such as

6  rationing their medications, skipping their refills, injecting expired insulin, reusing

7  needles, and avoiding doctors' visits. To compensate for their lack of treatment, some

8  patients starve themselves, foregoing one or even two meals a day. These practices—

9  which ineffectively control blood sugar levels—can lead to serious complications such

10  as kidney disease and failure, heart disease and heart attacks, infection,

11  amputation, and blindness, which harm not only the individual persons affected, but

12  also harm the Oregon healthcare system as a whole by burdening its resources and

13  the Oregon economy by requiring additional millions of dollars of additional

14  revenues to be spent.

15                                     544.

16          A recent study by Yale researchers found that 14% of diabetics face

17  "catastrophic" spending on insulin (defined as 40% of their income beyond what they

18  spend on food and housing) and nearly half of diabetics reported rationing their

19  insulin supply because of its cost.

20                                     545.

21          In addition to insulin, recent articles have also described GLP-1s as an

22  absolute gamechanger for people living with diabetes, however they have been

23  priced out of the reach of tens of millions of people because of the Insulin Pricing

24  Scheme.

25

26

Page 147 – COMPLAINT
1010077716

1          546.

2          A recent article by the Kaiser Family Foundation explained how the inflated

3    prices for GLP-1 drugs caused by the Insulin Pricing Scheme is harming diabetics:

4                    [O]ver half of adults who had taken a GLP-1 drug, including

5                    those with insurance, said the cost was "difficult" to afford. But it

6                    is patients with the lowest disposable incomes who are being hit

7                    the hardest. These are people with few resources who struggle to

8                    see doctors and buy healthy foods. In the United States, Novo

9                    Nordisk charges about $1,000 for a month's supply of Ozempic,

10                   and Eli Lilly charges a similar amount for Mounjaro. The high

11                   prices also mean that not everyone who needs the drugs can get

12                   them. "They're kind of disadvantaged in multiple ways already

13                   and this is just one more way," said Wedad Rahman, an

14                   endocrinologist with Piedmont Healthcare in Conyers, Georgia . .

15                   . By the time many of Rahman's patients see her, their diabetes

16                   has gone unmanaged for years [because they cannot afford their

17                   medicines] and they're suffering from severe complications like

18                   foot wounds or blindness. "And that's the end of the road,"

19                   Rahman said. "I have to pick something else that's more

20                   affordable and isn't as good for them."

21         547.

22         In 2024, CBS News reported in an article titled "High Price of Ozempic, other

23   diabetes drugs deprive low-income people more effective treatment":

24                   The "outrageously high" price has "the potential to bankrupt

25                   Medicare, Medicaid, and our entire health care system," Sen.

26                   Bernie Sanders, an independent from Vermont, who chairs the

Page 148 – COMPLAINT
1010077716

1   U.S. Senate Committee on Health, Education, Labor and

2   Pensions, wrote in a letter to Novo Nordisk in April.

3                           548.

4   Even when diabetics can still afford their diabetic medications, as a direct

5   result of PBM Defendants shifting which diabetes medications are favored on their

6   formularies ("non-medical switching"), diabetics are often forced to switch

7   medications every few years or go through a lengthy appeal process (or try the

8   favored drug first) before receiving the patient's preferred medication.

9                           549.

10  Non-medical switching for biologic drugs, such as the at-issue drugs, causes

11  increased health problems for diabetics and increased healthcare costs.

12                          550.

13  The Insulin Pricing Scheme has pushed, and will continue to push, access to

14  these lifesaving drugs out of reach for many diabetes patients in Oregon.

15                          551.

16  Because Oregon diabetics and payors continue to pay for the at-issue drugs

17  based on the artificially-inflated prices generated by the Insulin Pricing Scheme, the

18  harm is ongoing.

19  **L.    Defendants' Recent Efforts in Response to Rising Insulin**

20  **Prices**

21                          552.

22  In reaction to the mounting political and public pressure, Defendants recently

23  have taken action, both on Capitol Hill and in the insulin marketplace.

24                          553.

25  In recent years, Novo Nordisk's political action committee ("PAC") has

26  doubled its spending on federal campaign donations and on lobbying efforts. In 2017

Page 149 – COMPLAINT

**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1  alone, Novo Nordisk spent $3.2 million lobbying Congress and federal agencies, its

2  biggest ever investment in directly influencing U.S. policymakers.

3                                          554.

4          Eli Lilly and Sanofi have directed millions of dollars through their PACs as

5  well in recent years.

6                                          555.

7          Likewise, the PBM Defendants have steadily increased their political

8  spending for the past five years as public outcry has grown against them.

9                                          556.

10         Defendants have also recently begun introducing programs ostensibly aimed

11  at lowering the cost of insulins.

12                                         557.

13         These affordability measures fail to address the structural issues that have

14  given rise to the price hikes. Rather, these steps are merely public relations stunts

15  that do not solve the problem.

16                                         558.

17         For example, in March 2019, Defendant Eli Lilly announced that it would

18  produce an authorized generic version of Humalog, "Insulin Lispro," and promised

19  that it would "work quickly with supply chain partners to make [the authorized

20  generic] available in pharmacies as quickly as possible."

21                                         559.

22         However, in the months after Eli Lilly's announcement, reports raised

23  questions about the availability of "Insulin Lispro" in local pharmacies.

24                                         560.

25         Following this, a Congressional staff report was issued examining the

26  availability of this drug. The investigative report, *Inaccessible Insulin: The Broken*

Page 150 – COMPLAINT
1010077716

1   *Promise of Eli Lilly's Authorized Generic*, concluded that Eli Lilly's lower-priced,

2   authorized generic insulin was widely unavailable in pharmacies across the country,

3   and that the company has not taken meaningful steps to increase insulin

4   accessibility and affordability.

5                 561.

6       The conclusion of the report was that: "Eli Lilly has failed to deliver on its

7   promise to put a more-affordable insulin product on the shelves. Instead of giving

8   patients access to its generic alternative, this pharmaceutical behemoth is still

9   charging astronomical prices for a drug people require daily and cannot live

10   without."

11               562.

12       In addition, in 2023 the Manufacturer Defendants significantly lowered the

13   list prices of certain insulins (in some cases by as much as 70%). While the

14   Manufacturer Defendants each made public statements that the price reductions

15   were designed to help diabetics by making insulin affordable, those statements

16   obscure the true motivations behind these price cuts.

17               563.

18       First, the Manufacturer Defendants could have taken these steps years ago.

19   Taking this action now only confirms how grossly and artificially inflated their

20   prices have been for years.

21               564.

22       Second, even with the price cuts, the Manufacturer Defendants are still

23   making sizeable profits, and the price is still significantly inflated compared to other

24   countries. As reported in a 2023 Los Angeles Times article:

25       Moreover, the price rollback still doesn't bring Lilly insulin back

26       to where it should be on an inflation-adjusted basis compared

Page 151 – COMPLAINT

**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1    with the price of its key product, Humalog, upon its launch in

2    1996. Back then, Humalog cost $21 per vial, which would be

3    about $40 in today's money; the rollback will reduce the price of a

4    vial from $274.70 to $66.40, according to calculations by the

5    Washington consulting firm Veda Partners. So it's still higher by

6    two-thirds than it should be, accounting for inflation . . .

7

8    "Lilly is going to bank a lot of goodwill for this, without taking

9    necessarily a big hit to their bottom line," says Andrew Mulcahy,

10    senior researcher at Rand Corp. and lead author of a 2020 Rand

11    comparison of insulin prices in the U.S. and other countries.

12    That analysis showed that U.S. insulin prices were way out of

13    line with the rest of the world: For example, a benchmark unit

14    cost (in U.S. dollars) $6.94 in Australia, $12 in Canada and $7.52

15    in Britain — but nearly $100 in the U.S. Even if Lilly's price cuts

16    are followed by its competitors, "U.S. prices are still higher than

17    prices in the other countries," Mulcahy told me, though by two to

18    three times rather than by 10 times.

19                                    565.

20    Third, despite years of growing recognition of harm to patients from high

21    diabetic drug pricing, the Manufacturer Defendants did not actually lower their

22    prices of certain insulins until regulatory change forced the price cuts. As explained

23    in the FTC Complaint:

24    The American Rescue Plan of 2021 repealed the Average

25    Manufacturer Price (AMP) Cap. Under Medicaid regulations,

26    manufacturers must pay Medicaid rebates equal to the difference

Page 152 – COMPLAINT

1010077716

1       between the current average price of the drug paid by retail
2       pharmacies and wholesalers and the inflation-adjusted list price
3       of the drug (sometimes referred to as the Medicaid inflation
4       penalty). If a drug's list price has increased faster than inflation,
5       the manufacturer has to rebate the difference to Medicaid. The
6       AMP Cap, in place since 2010, had capped the Medicaid rebate at
7       100% of the drug's average price, even if manufacturers
8       continued to raise list prices. The repeal of the AMP Cap,
9       however, took away this 100% rebate maximum. Thus, beginning
10      in 2024, insulin manufacturers who had dramatically increased
11      list prices (exceeding the inflation rate) would be required to pay
12      a Medicaid rebate in excess of 100% of the drug's price on every
13      unit dispensed in Medicaid.

14

15      Humalog, Novolog, and Lantus, which had experienced up to
16      sevenfold list price increases, were among [the drugs affected by
17      the change in the law]. The insulin manufacturers projected
18      incurring hundreds of millions of dollars in Medicaid liability due
19      to the AMP Cap repeal. Because of the relationship between the
20      AMP Cap and list price, however, manufacturers could mitigate
21      the effect of the AMP Cap repeal by lowering list price.

22                    566.

23     Indeed, as a result of the new Medicaid regulations, each of the Manufacturer

24 Defendants faced huge penalties due to their steep insulin price increases if they did

25 not significantly lower their prices by the end of 2023. For example, one study

26

Page 153 – COMPLAINT
1010077716

1  estimated that Eli Lilly's insulin price cuts would produce approximately $517

2  million in gains for the company by avoiding the new Medicaid charges.

3  567.

4  Finally, the price cuts only affect certain analog insulins, such as Lilly's

5  Humalog and Novo's Novolog, not all diabetes medications. More importantly, the

6  price cuts do not address the fundamental unconscionable and deceptive conduct

7  driving the Insulin Pricing Scheme.

8  **CLAIMS FOR RELIEF**

9  **FIRST CLAIM FOR RELIEF**

10  **(Oregon Unlawful Trade Practices Act)**

11  **Count One**

12

13  **(ORS 646.608(1)(e) – Against Each Defendant)**

14  568.

15  The State re-alleges and incorporates herein by reference each of the

16  allegations contained in this Complaint.

17  569.

18  Defendants are, and at all relevant times were, "persons" engaged in "trade or

19  commerce" in Oregon as defined and used in ORS 646.605, including in their

20  advertising, offering, distributing, and dispensing of the at-issue drugs; advertising

21  and offering of pharmacy benefit services; and advertising and offering pharmacy

22  services.

23  570.

24  By engaging in the Insulin Pricing Scheme, as described herein, in the course

25  of their business Defendants have represented that the at-issue diabetes

26  medications and PBM services, including the Manufacturer Payments, and

Page 154 – COMPLAINT
1010077716

1  formularies, had characteristics, uses, benefits, and qualities that they do not have,

2  in violation of ORS 646.608(1)(e), as alleged below. Pursuant to ORS 646.608(2),

3  Defendants' representations include "any manifestation of any assertion by words or

4  conduct, including but not limited to, a failure to disclose a fact," and therefore also

5  include the failures to disclose the facts alleged below.

6                                          571.

7         In furtherance of the Insulin Pricing Scheme, at least once a year for each

8  year during the relevant time period, the Manufacturer Defendants reported and

9  published artificially-inflated list prices to compendia, pharmacies, PBMs, and

10 distributors. In doing so the Manufacturers held these prices out to have the

11 characteristic and quality of being reasonably related to the actual net prices

12 realized by the Defendants and to be prices that arose from competitive and

13 transparent market factors, in violation of ORS 646.608(1)(e).

14                                         572.

15        The Manufacturer Defendants' list prices are so untethered from the actual,

16 net price realized by Defendants, as well as from the cost to manufacture, market,

17 and sell the at-issue drugs, as to constitute a deceptive price.

18                                         573.

19        In reality, the Manufacturer Defendants raised their list prices (and

20 corresponding Manufacturer Payments) solely for the purposes of increasing their

21 and the PBMs' profits at the expense of diabetics and payors.

22                                         574.

23        PBM Defendants then granted preferred formulary positions to the at-issue

24 drugs with the highest list price and highest Manufacturer Payments and excluded

25 (or disadvantaged) drugs with lower list price drugs. In doing so, the PBM

26 Defendants ensured that diabetics only had access to higher priced diabetes

Page 155 – COMPLAINT

DEPARTMENT OF JUSTICE
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1    medications (which were more profitable for each of the Defendants) and foreclosed

2    access to lower priced diabetic treatments.

3                                              575.

4          PBM Defendants further ensured that Defendants' misleading and deceptive

5    list prices harmed diabetics and payors by mandating these prices were included in

6    their contracts with payors and pharmacies, thereby ensuring that the

7    Manufacturers' artificially-inflated list prices would be used to set the price paid by

8    diabetics and payors.

9                                              576.

10         The Manufacturer Defendants could have reported and published prices that

11   reflected their net prices, and the PBMs could have used these prices to determine

12   formulary inclusion and to set the price paid by diabetics and. Defendants, however,

13   failed to do so and concealed this information in furtherance of the Insulin Pricing

14   Scheme.

15                                             577.

16         In addition, by engaging in the Insulin Pricing Scheme, as described herein,

17   PBM Defendants have also violated the UTPA by representing that their services,

18   formularies, Manufacturer Payments, and relationships with their affiliates have

19   characteristics, uses, benefits, and qualities that they do not have, in violation of

20   ORS 646.608(1)(e). Defendants have done so by:

21         (a)    Misrepresenting that their formulary construction lowers the cost of

22                prescription drugs and promotes patient health;

23         (b)    Misrepresenting that the Manufacturer Payments they pay and receive

24                lower the cost of prescription drugs;

25         (c)    Misrepresenting that their formulary decisions are evidence- and/or

26                value-based decisions;

Page 156 – COMPLAINT
1010077716

1    (d)    Misrepresenting that their relationships with their affiliated

2            pharmacies, including CVS Pharmacy and their captive mail order

3            pharmacies, lowers the cost of prescription drugs and promotes patient

4            health;

5    (e)    Misrepresenting and concealing the reasons behind the price increases

6            for prescription drugs;

7    (f)    Misrepresenting that their formulary preferences and exclusions are

8            lowering prices and promoting patient health;

9    (g)    Misrepresenting the amount of "savings" that they generate for their

10          clients, patients, and the healthcare system;

11   (h)    Failing to disclose and concealing that the Manufacturer Payments

12          that they pay and receive are intended to and do exclude lower priced

13          drugs from formularies and drive up their profits;

14   (i)    Failing to disclose that they are utilizing rebate aggregators, including

15          Ascent Health, Emisar Health, and Zinc Health, to rename, obfuscate,

16          and retain Manufacturer Payments;

17   (j)    Failing to disclose and concealing that they financially benefit from

18          preferring and/or excluding certain prescription drugs on their

19          formularies; and

20   (k)    Failing to disclose and concealing that formulary preferences and

21          exclusions are not based on the best interests of their clients and/or

22          diabetics.

23                                        578.

24          By engaging in the above described misconduct, Defendants have

25   misrepresented, omitted or obscured, and are misrepresenting, omitting and

26   obscuring material facts about the at-issue drugs, published prices, PBM services,

Page 157 – COMPLAINT

DEPARTMENT OF JUSTICE
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1    their formularies, the Manufacturer Payments, and their relationships with the

2    affiliated entities, the disclosure of which would influence the decisions of diabetics

3    and payors to purchase the at-issue drugs, the decisions of diabetics and payors to

4    purchase PBM and pharmacy services, and the prices that diabetics and payors paid

5    for the at-issue drugs.

6                                              579.

7         In addition, engaging in the above-described misconduct, Defendants have

8    created a false impression of the value of the at-issue drugs, their formularies, their

9    relationships with their affiliated entities, and the Manufacturer Payments they pay

10   and receive.

11                                             580.

12        Defendants knew or had reason to know that their misrepresentations and

13   omissions were inaccurate, and those misrepresentations and omissions are and

14   were willful.

15                                             581.

16        By their misrepresentations and omissions, Defendants have violated and are

17   violating the UTPA.

18                                             582.

19        As a direct and proximate result of Defendants' violations of the ORS

20   646.608(1)(e), Oregon diabetics and payors sustained substantial health and

21   economic damages. Plaintiff seeks all relief available under ORS 646.636, in an

22   amount to be determined at trial, but not less than $900 million dollars in economic

23   relief.

24                                             583.

25        Each Defendant is liable under the Oregon Unlawful Trade Practices Act for

26   the independent, additional reason that the defendant engaged in a civil conspiracy

Page 158 – COMPLAINT
1010077716

1   with other Defendants to engage in the violations of the Oregon Unlawful Trade

2   Practices Act described above. Each Defendant is therefore jointly liable for the

3   tortious conduct of his or her coconspirators.

4                      584.

5       There was a meeting of the minds on this course of action to engage in the

6   Insulin Pricing Scheme, and Defendants aided and abetted each other in the

7   violations alleged above. Unlawful overt acts in this conspiracy included the direct

8   agreements between the Manufacturers and PBMs for formulary placement and

9   Manufacturer Payments, as well as the agreements between the PBMs and their

10   affiliated rebate aggregator and pharmacy entities.

11                    585.

12       The State alleges both direct agreements and circumstantial evidence

13   demonstrating Defendants' conspiracy. The following circumstantial evidence

14   demonstrates the Defendants' concerted activity:

15       (a)   Defendants coordinated at least twice a year PCMA conferences, which

16             included private exchanges and meetings that appear to be focused on

17             developing and maintaining the Insulin Pricing Scheme, which all

18             Manufacturers and PBM Defendants attended;

19       (b)   Defendants' refused to disclose the details of their pricing structures,

20             agreements and sales figures in order to maintain the secrecy of their

21             Insulin Pricing Scheme;

22       (c)   Numerous ongoing government investigations, hearings and inquiries

23             have targeted the collusion between Defendants related to the at-issue

24             drugs, including:

25

26

Page 159 – COMPLAINT

1010077716

1      (i)      In 2016, the U.S. Attorney's Office for the Southern District of

2             New York issued a CID for information related to the

3             Defendants' conduct involving insulin prices;

4      (ii)      In 2016, Defendants received civil investigative demands from

5             the State of Washington, in conjunction with the Attorney

6             Generals for California, Florida and Minnesota, related to their

7             role in increasing insulin prices;

8      (iii)      In 2017, Manufacturers received civil investigation demands

9             from the States of Minnesota, California and Florida related to

10             the pricing of their insulin products and their relationships with

11             the PBMs;

12      (iv)      In April 2019, U.S. Congress held a hearing on the Insulin

13             Pricing Scheme before the Senate Financing Committee in which

14             each Defendant testified;

15      (v)      The Senate Finance Committee's two-year probe into the Insulin

16             Pricing Scheme that resulted in the January 2021 Senate Insulin

17             Report;

18      (vi)      A December 10, 2021 Congressional Report prepared by the

19             House Committee on Oversight and Reform Minority Staff titled

20             "A View from Congress: Role of Pharmacy Benefit Managers in

21             Pharmaceutical Markets" that concluded:

22             •      Manufacturers raise their prices due to PBMs;

23             •      PBMs' retail and mail order pharmacies create conflicts of

24                   interest, hurt competition and distort the market;

25             •      PBMs' practices impact patient health; and

26

Page 160 – COMPLAINT

1010077716

1             •     PBMs use their market leverage to increase their profits,

2                  not reduce costs for consumers;

3      (vii)    In June 2022, the FTC announced it would investigate the PBM

4               Defendants (and later, their affiliated rebate aggregators)

5               including related to the impact of rebates and fees from drug

6               manufacturers on formulary design and the costs of prescription

7               drugs to payers and patients;

8      (viii)    The 2023 Senate Hearing;

9      (ix)     The 2024 House Committee PBM Report;

10     (x)      The NYT PBM Investigation;

11     (xi)     The FTC Interim PBM Report; and

12     (xii)    The FTC Complaint.

13                         586.

14      As a direct result of the overt acts taken in furtherance of Defendants'

15 conspiracy, Oregon diabetics and payors have suffered damages, as alleged above.

16 Defendants are all jointly and severally liable for the actions taken in furtherance of

17 their joint conduct.

18                         587.

19      For relief on count one, as authorized by ORS 646.632, ORS 646.636, ORS

20 646.642, and ORS 82.010, the State seeks such injunctive relief as may be

21 determined to be appropriate in order to cease Defendants' unlawful conduct, an

22 order requiring Defendants to pay all restitution and other relief that may be owed

23 to Oregon diabetics and payors affected by Defendants' unlawful acts and practices,

24 an order requiring Defendants to disgorge all ill-gotten profits, together with

25 prejudgment and post-judgment interest at nine percent on all such monetary relief,

26

Page 161 – COMPLAINT
1010077716

1  imposition of civil penalties, and the reasonable costs of the State's investigation and

2  litigation, including reasonable attorneys' fees.

3                                    **Count Two**

4                    **(ORS 646.608(1)(s) - Against Each Defendant)**

5

6                                         588.

7        The State re-alleges and incorporates herein by reference each of the

8  allegations contained in this Complaint.

9                                         589.

10       Defendants are, and at all relevant times were, "persons" engaged in "trade or

11  commerce" in Oregon as defined and used in ORS 646.605, including in their

12  advertising, offering, distributing, and dispensing of the at-issue drugs; advertising

13  and offering of pharmacy benefit services; and advertising and offering pharmacy

14  services.

15                                        590.

16       By engaging in the Insulin Pricing Scheme, as described herein, Defendants

17  have made false and misleading statements in the course of their business

18  concerning the offering price of the at-issue diabetes medications (including the

19  effect that, Manufacturer Payments and formulary construction has on that price) in

20  violation of ORS 646.608(1)(s), as alleged below.

21                                        591.

22       In furtherance of the Insulin Pricing Scheme, at least once a year for each

23  year during the relevant time period, the Manufacturer Defendants reported and

24  published artificially-inflated list prices to compendia, pharmacies, PBMs, and

25  distributors. In doing so the Manufacturers held these prices out to have the

26  characteristic and quality of being reasonably related to the actual net prices

Page 162 – COMPLAINT
1010077716

1    realized by the Defendants and to be prices that arose from competitive and

2    transparent market factors in violation of ORS 646.608(1)(s).

3                                    592.

4        The Manufacturer Defendants' list prices are so untethered from the actual,

5    net price realized by Defendants, as well as from the cost to manufacture, market,

6    and sell the at-issue drugs, as to constitute a deceptive price.

7                                    593.

8        Further, the Manufacturer Defendants misrepresented that their price

9    increases for the at-issue drugs were driven by research and development and

10   benefited diabetics and concealed the true reasons for the increases in violation of

11   ORS 646.608(1)(s).

12                                   594.

13       In reality, the Manufacturer Defendants raised their list prices (and

14   corresponding Manufacturer Payments) solely for the purposes of increasing their

15   and the PBMs' profits at the expense of diabetics and payors.

16                                   595.

17       PBM Defendants then granted preferred formulary positions to the at-issue

18   drugs with the highest list price and highest Manufacturer Payments and excluded

19   (or disadvantaged) drugs with lower list price drugs. In doing so, the PBM

20   Defendants ensured that diabetics only had access to higher priced diabetes

21   medications (which were more profitable for each of the Defendants) and foreclosed

22   access to lower priced diabetic treatments.

23                                   596.

24       PBM Defendants further ensured that Defendants misleading and deceptive

25   list prices harmed diabetics and payors by mandating these prices were included in

26   their contracts with payors and pharmacies, thereby ensuring that the

Page 163 – COMPLAINT

**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1  Manufacturers' artificially-inflated list prices would be used to set the price paid by

2  diabetics and payors.

3                                                    597.

4           The Manufacturer Defendants could have reported and published prices that

5  reflected their net prices, and the PBMs could have used these prices to determine

6  formulary inclusion and to set the price paid by diabetics and. Defendants however

7  failed to do so and concealed this information in furtherance of the Insulin Pricing

8  Scheme.

9                                                    598.

10          In addition, by engaging in the Insulin Pricing Scheme, as described herein,

11  PBM Defendants have also violated the UTPA by making false or misleading

12  representations of fact concerning the offering price or a person's cost for goods or

13  services, in violation of ORS 646.608(1)(s). Defendants have done so by:

14          (a)     Misrepresenting that their formulary construction lowers the cost of

15                  prescription drugs and promotes patient health;

16          (b)     Misrepresenting that the Manufacturer Payments they pay and receive

17                  lower the cost of prescription drugs;

18          (c)     Misrepresenting that their formulary decisions are evidence- and/or

19                  value-based decisions;

20          (d)     Misrepresenting that their relationships with their affiliated

21                  pharmacies, including CVS Pharmacy and their captive mail order

22                  pharmacies, lowers the cost of prescription drugs and promotes patient

23                  health;

24          (e)     Misrepresenting and concealing the reasons behind the price increases

25                  for prescription drugs;

26

Page 164 – COMPLAINT
1010077716

1    (f)    Misrepresenting that their formulary preferences and exclusions are

2            lowering prices and promoting patient health;

3    (g)    Misrepresenting the amount of "savings" that they generate for their

4            clients, patients, and the healthcare system;

5    (h)    Failing to disclose and concealing that the Manufacturer Payments

6            that they pay and receive are intended to and do exclude lower priced

7            drugs from formularies and drive up their profits;

8    (i)    Failing to disclose that they are utilizing rebate aggregators, including

9            Ascent Health, Emisar Health, and Zinc Health, to rename, obfuscate,

10           and retain Manufacturer Payments;

11    (j)    Failing to disclose and concealing that they financially benefit from

12           preferring and/or excluding certain prescription drugs on their

13           formularies; and

14    (k)    Failing to disclose and concealing that formulary preferences and

15           exclusions are not based on the best interests of their clients and/or

16           diabetics.

17                       599.

18    By engaging in the above described misconduct, Defendants have

19  misrepresented, omitted or obscured, and are misrepresenting, omitting and

20  obscuring material facts about the at-issue drugs, published prices, their

21  formularies, the Manufacturer Payments, and their relationships with the affiliated

22  entities, the disclosure of which would influence the decisions of diabetics and payors

23  to purchase the at-issue drugs, the decisions of diabetics and payors to purchase

24  PBM and pharmacy services, and the prices that diabetics and payors paid for the

25  at-issue drugs.

26

Page 165 – COMPLAINT

1010077716

1    600.

2    In addition, engaging in the above-described misconduct, Defendants have

3    created a false impression of the value of the at-issue drugs, their formularies, their

4    relationships with their affiliated entities, and the Manufacturer Payments they pay

5    and receive.

6    601.

7    Defendants knew or had reason to know that their misrepresentations and

8    omissions were and are false or misleading, and those misrepresentations and

9    omissions are and were willful.

10    602.

11    By their misrepresentations and omissions, Defendants have violated and are

12    violating the UTPA.

13    603.

14    As a direct and proximate result of Defendants' violations of ORS

15    646.608(1)(s), Oregon diabetics and payors sustained substantial damages, in an

16    amount to be determined at trial but not less than $900 million.

17    604.

18    Each Defendant is liable under the Oregon Unlawful Trade Practices Act for

19    the independent, additional reason that the defendant engaged in a civil conspiracy

20    with other Defendants to engage in the violations of the Oregon Unlawful Trade

21    Practices Act described above. Each Defendant is therefore jointly liable for the

22    tortious conduct of his or her coconspirators.

23    605.

24    For relief on count two, pursuant to ORS 646.632, ORS 646.636, ORS 646.642,

25    and ORS 82.010, the State seeks such injunctive relief as may be determined to be

26    appropriate in order to cease Defendants' unlawful conduct, an order requiring

Page 166 – COMPLAINT

1010077716

1  Defendants to pay all restitution and other relief that may be owed to Oregon

2  diabetics and payors affected by Defendants' unlawful acts and practices, an order

3  requiring Defendants to disgorge all ill-gotten profits, together with prejudgment

4  and post-judgment interest at nine percent on all such monetary relief, an

5  imposition of civil penalties, and the reasonable costs of the State's investigation and

6  litigation, including reasonable attorneys' fees.

**Count Three**

**(ORS 646.607(1) – Against Each Defendant)**

606.

10  The State re-alleges and incorporates herein by reference each of the

11  allegations contained in the preceding paragraphs. The UTPA makes unlawful any

12  person employing any unconscionable tactic in connection with selling or disposing of

13  goods or services. ORS 646.607(1).

607.

15  "Unconscionable tactics" include, but are not limited to, actions by which a

16  person knowingly takes advantage of a customer's physical infirmity. ORS

17  646.605(9)(a).

608.

19  Defendants' conduct and practices are unconscionable because Defendants

20  knowingly took advantage of diabetics who need the at-issue drugs to sustain a

21  healthy life and who have no choice other than to purchase the at-issue drugs at the

22  inflated prices generated by the Insulin Pricing Scheme. In particular:

23  (a)  The PBM and Manufacturer Defendants have created a non-

24  transparent system—the Insulin Pricing Scheme—that is intentionally

25  driving up prices—while simultaneously foreclosing diabetic and payor

26  access to lower priced, life-saving drugs.

Page 167 – COMPLAINT
1010077716

1        (b)     Oregon diabetics are unable to avoid the Insulin Pricing Scheme

2                because (1) the PBM and Manufacturer Defendants have complete

3                control of the diabetic drug pricing chain in Oregon and (2) Oregon

4                diabetics need the drugs at-issue to sustain a healthy life.

5        (c)     There are no conceivable benefits to diabetics in Oregon to being forced

6                to pay egregiously inflated prices for medicines they need to stay alive

7                or being cut off from access to lower priced, clinically equivalent

8                alternatives. In fact, the opposite is true—as a direct result of

9                Defendants' egregious price increases Oregon diabetics' health and

10              wellbeing have been severely and detrimentally impacted and they

11              have overpaid millions of dollars for the at-issue drugs.

12                                    609.

13      Defendants knew or had reason to know that their tactics, methods or

14   practices were unconscionable, and their use of those tactics, methods, and practices

15   are and were willful.

16                                    610.

17      As a direct and proximate result of Defendants' unconscionable practices and

18   violations of ORS 646.607(1), Oregon diabetics sustained substantial health and

19   economic damages, in an amount to be determined at trial but not less than $900

20   million.

21                                    611.

22      Each Defendant is liable under the Oregon Unlawful Trade Practices Act for

23   the independent, additional reason that the defendant engaged in a civil conspiracy

24   with other Defendants to engage in the violations of the Oregon Unlawful Trade

25   Practices Act described above. Each Defendant is therefore jointly liable for the

26   tortious conduct of his or her coconspirators.

Page 168 – COMPLAINT

**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-1880 / Fax: (971) 673-1884

1      612.

2          For relief on count three, pursuant to ORS 646.632, ORS 646.636, ORS

3  646.642, and ORS 82.010, the State seeks such injunctive relief as may be

4  determined to be appropriate in order to cease Defendants' unlawful conduct, an

5  order requiring Defendants to pay all restitution and other relief that may be owed

6  to Oregon diabetics and payors affected by Defendants' unlawful acts and practices,

7  an order requiring Defendants to disgorge all ill-gotten profits, disgorgement,

8  together with prejudgment and post-judgment interest at nine percent on all such

9  monetary relief, and an imposition of civil penalties, and the reasonable costs of the

10  State's investigation and litigation, including reasonable attorneys' fees.

11                      **SECOND CLAIM FOR RELIEF**

12              **(Unjust Enrichment – Against Each Defendant)**

13                              613.

14          The State re-alleges and incorporates herein by reference each of the

15  allegations contained in the preceding paragraphs.

16                              614.

17          Defendants deceived Oregon diabetics and payors, and have received a

18  financial windfall from the Insulin Pricing Scheme at the expense of Oregon

19  diabetics.

20                              615.

21          Defendants wrongfully secured and retained unjust benefits from Oregon

22  diabetics and payors, in the form of amounts paid for diabetes medications and

23  Manufacturer Payments collected based on the artificially-inflated prices generated

24  by the Insulin Pricing Scheme.

25                              616.

26          It is inequitable and unconscionable for Defendants to retain these benefits.

Page 169 – COMPLAINT
1010077716

1      617.

2          Defendants knowingly accepted the unjust benefits of their unconscionable

3  and deceptive conduct.

4      618.

5          Defendants have been enriched by revenue resulting from the Insulin Pricing

6  Scheme while Oregon diabetics have been impoverished by Defendants' misconduct.

7  Defendants' enrichment and Oregon diabetics' impoverishment are connected.

8  Payors have also paid additional amounts that should not have been required.

9      619.

10         Accordingly, Defendants should not be permitted to retain the proceeds from

11  the benefits conferred upon them by the Insulin Pricing Scheme. The State seeks

12  disgorgement of Defendants' unjustly acquired profits and other monetary benefits

13  resulting from their unlawful conduct and seeks restitution and/or recission, in an

14  equitable and efficient fashion to be determined by the Court.

15      620.

16         The State's claims do not arise out of a contract, but rather are based on the

17  larger unconscionable and deceptive Insulin Pricing Scheme that drove up the at-

18  issue artificially-inflated list prices for all Oregon diabetics.

19      621.

20         As a direct and proximate cause of Defendants' unjust enrichment, as

21  referenced above, Oregon diabetics and payors suffered, and continue to suffer,

22  ascertainable losses and damages as specified herein.

23      622.

24         Defendants should not be unjustly enriched at the expense of Oregon diabetics

25  and payors. The State seeks an order of restitution that includes the requirement

26  that Defendants disgorge all ill-gotten profits, in an amount to be determined at

Page 170 – COMPLAINT
1010077716

1  trial, but not less than $900 million, together with prejudgment and post-judgment

2  interest on all monetary relief as provided by law.

3  **JURY DEMAND**

4  The State respectfully requests a trial by jury on all issues so triable.

5  **PRAYER FOR RELIEF**

6  Plaintiff State of Oregon, through its Attorney General Dan Rayfield, requests

7  judgment in its favor and against each Defendant, together with the following

8  relief.

9  A.  On plaintiff's first claim, for violating the Unlawful Trade Practices Act:

10      1.  Penalties of up to $25,000 for each willful violation of the

11         Unlawful Trade Practices Act as alleged above;

12      2.  Restitution, damages, disgorgement and any other monetary

13         relief available under ORS 646.636 for any person in Oregon

14         affected by defendants' violations of the Unlawful Trade

15         Practices Act, in an amount totaling not less than $900 million;

16      3.  Prejudgment interest and post-judgment interest on such

17         amounts as provided by law;

18      4.  A permanent injunction under ORS 646.632 and ORS 646.636

19         enjoining Defendants from engaging in the unlawful practices

20         alleged herein;

21      5.  An award of reasonable attorneys' fees and costs including

22         investigative costs, pursuant to ORS 646.632(8) and as provided

23         by law; and

24      6.  Such further relief as the Court deems appropriate under ORS

25         646.636.

26  B.  On plaintiff's second claim, for unjust enrichment:

Page 171 – COMPLAINT
1010077716

1        1.     An award of restitution including disgorgement of all sums by

2              which defendants were unjustly enriched as a result of insulin

3              sales in Oregon and pharmacy benefit management activities

4              impacting Oregon, in an amount totaling not less than $900

5              million, together with prejudgment and post-judgment interest

6              on such sums as provided by law;

7        2.     An award of costs as provided by law; and

8        3.     Such further relief as the Court deems just.

9    DATED this 7th day of January 2026.

10                      Respectfully submitted,

11

12                      DAN RAYFIELD
                        Attorney General

13

14                      JOHN J. DUNBAR, OSB No. 842100

15                      Assistant Attorney General
                      Oregon Department of Justice

16                      Economic Justice Section
                      100 SW Market Street

17                      Portland, Oregon 97201
                      Phone: (971) 398-5877

18                      Fax: (971) 673-1884

19                      Email: john.dunbar@doj.oregon.gov

20                      Joanne Cicala (*pro hac vice* forthcoming)

21                      Josh Wackerly (*pro hac vice* forthcoming)
                      R. Johan Conrod (*pro hac vice* forthcoming)

22                      CICALA WACKERLY CONROD PLLC
                      101 College Street

23                      Dripping Springs, Texas 78620

24                      Phone: (512) 275-6550
                      Email: joanne.cicala@cwc.law

25                              josh.wackerly@cwc.law
                              johan.conrod@cwc.law

26

Page 172 – COMPLAINT
1010077716

W. Lawrence Deas (*pro hac vice* forthcoming)
William Liston III (*pro hac vice* forthcoming)
LISTON DEAS PLLC
Post Office Box 14127
Jackson, Mississippi 39236
Phone: (601) 981-1636
Email: lawrence@listondeas.com
      william@listondeas.com

Trey Watkins (*pro hac vice* forthcoming)
Tanya D. Ellis (*pro hac vice* forthcoming)
FORMAN WATKINS & KRUTZ LLP
210 East Capitol Street, Suite 2200
Jackson, Mississippi 39201-2375
Phone: (601) 960-8600
Fax: (601) 960-8613
Email: tanya.ellis@formanwatkins.com
      trey.watkins@formanwatkins.com

Matthew C. McDonald (*pro hac vice* forthcoming)
DAVID NUTT & ASSOCIATES PC
605 Crescent Blvd., Suite 200
Ridgeland, Mississippi 39157
Phone: (601) 898-7302
Email: mattm@davidnutt.com

*Attorneys for Plaintiff, State of Oregon, ex rel. Dan Rayfield, Attorney General*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Page 173 – COMPLAINT
1010077716